JUDGE ROBINSON

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**08 CV 3702**

--------------------------------------------------

WELLS FARGO BANK NORTHWEST,
NATIONAL ASSOCIATION, acting not in its
individual capacity but solely as trustee,

                    **Plaintiff,**

          -against-

AIR COMET SOCIEDAD ANONIMA,

                    **Defendant.**

--------------------------------------------------

**COMPLAINT**

**Civil Action No.**

 

Plaintiff WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, acting

not in its individual capacity but solely as trustee, by its attorneys Vedder Price P.C., as and for

its complaint herein, alleges as follows:

**SUMMARY OF THE CASE**

1.      This is an action for breach of a lease agreement, declaratory judgment and

specific performance brought by the lessor of an aircraft against a lessee in default. The lease

has been terminated and the lessor seeks a judgment providing that (a) lessee has no further right

and interest in and to the aircraft, and no further right to possess and operate the aircraft, (b)

lessor has the immediate right to retake possession of the aircraft and obtain the deregistration

and export of the aircraft, and (c) lessee is obligated to and shall comply with all its obligations

under the lease regarding the return of the aircraft, including but not limited to (i) deliver the

aircraft to lessor, (ii) deliver to lessor all aircraft documentation concerning the aircraft,

including but not limited to, all technical and maintenance documentation relating thereto, and

(iii) take all actions necessary to deregister the aircraft from the Spanish Aircraft Matriculation Registry where it is presently registered under the lessee's name.

## THE PARTIES

2.      Plaintiff Wells Fargo Bank Northwest, National Association, acting not in its individual capacity but solely as trustee (the "Lessor"), is a national banking association organized under the laws of the United States which is located and has its principal place of business in Salt Lake City, Utah.

3.      Upon information and belief, defendant Air Comet Sociedad Anonima ("Air Comet" or "Lessee") is a corporation organized under the laws of Spain with its principal place of business in Madrid, Spain.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 as plaintiff is a citizen of a State, defendant is a citizen of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over defendant pursuant to its contractual submission to the jurisdiction of any New York state or federal court sitting in the City and County of New York with respect to any action brought in connection with the aircraft lease that is at issue in this case.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391 (c) and (d).

## FACTS

7.      This action concerns an Airbus A320-200 passenger aircraft with Airframe Manufacturer's Serial No. 342, together with related engines, parts equipment and documents (collectively, the "Aircraft") which was leased by Lessor (acting not in its individual capacity but

solely as trustee) to Air Comet pursuant to Aircraft Lease Agreement (342) dated June 15, 2007 (the "Lease"). A copy of the Lease is annexed hereto as Exhibit A.

8.      The Lease specifies certain events as "constitut[ing] an Event of Default and material breach of [the] Lease by Lessee." See Exhibit A, § 25.2. Pursuant to Article 25.2(b) of the Lease, an Event of Default exists if the "Lessee fails to make a payment of Rent[1] or other payment due [under the Lease] . . . and fails to make such payment within five (5) Business Days after the date on which such payment is due." See Exhibit A, § 25.2(b). Article 25.2(r) of the Lease further provides that an Event of Default will occur where "[a]ny relevant air traffic control authority . . . has notified Lessor that there are unpaid charges due from Lessee . . . and such charges remain outstanding for a period of thirty (30) days from the date of such authority's notice to Lessor provided that such thirty (30) day grace period will not apply if there is a danger of detention, interference with the use or operation, sale, forfeiture or loss of the Aircraft." See Exhibit A, § 25.2(r).

9.      Pursuant to Article 25.3.1 of the Lease, "[a]t any time after the occurrence and during the continuance of an Event of Default, Lessor may, by notice to Lessee and subject to applicable Law, immediately terminate [the] Lease". Upon such a termination, "Lessee's right and interest in and to the Aircraft, and to possess and operate the Aircraft, shall terminate." Id. Upon such termination, the Lessor also has the right to "retake possession of the Aircraft, and Lessee agrees that Lessor may for [such] purpose enter upon any premises where the Aircraft is located." Id.

---

[1]      Under the Lease, "Rent" includes both "Basic Rent" and "Supplemental Rent"; "Supplemental Rent" includes, among other things, "Default Interest", "Maintenance Supplemental Rent" and all other amounts, liabilities and obligations payable by Lessee to Lessor under the Lease and the other Operative Documents (all such capitalized terms as defined in the Lease).

10.    The existence of an Event of Default also permits the Lessor to enforce other rights and remedies against the Lessee, to take possession of the Aircraft, to require the deregistration and export of the Aircraft, and to require the Lessee to pay all amounts due under the Lease and other operative documents and to seek damages against Lessee. See Exhibit A, §§ 25.3.1- 25.5.

11.    The Lessee failed to make the following payments within five (5) business days of the date when such payments were due under the Lease:  (i) a payment of Basic Rent (as defined in the Lease) due to be paid under the Lease for the month of March 2008 in the amount of $225,000.00, (ii) a payment of Maintenance Supplemental Rent (as defined in the Lease) due to be made under the Lease during the month of March 2008 in the amount of $75,160.00, and (iii) a payment of Default Interest (as defined in the Lease) due to be made under the Lease in the amount of $208,000.00 as of April 9, 2008, which amount increases by $1,000.00 per day thereafter until all of the amounts specified in clauses (i) and (ii) above and this clause (iii) have been paid in full; collectively, the foregoing payment obligations owed to Lessor by Lessee aggregate to $508,160.00, which failures continued for more than five (5) business days following their respective due dates. The Lessee also failed to pay charges due to the European Organisation for the Safety of Air Navigation (a/k/a EUROCONTROL) ("EUROCONTROL"), Central Route Charges Office, and such charges have remained outstanding for a period in excess of thirty (30) days from the date EUROCONTROL invoiced Lessee which charges amounted to almost Euro (€) 2 million on or about April 10, 2008.

12.    The Lessee's failure to make the payments referred to in paragraph 11 above constitute Events of Default under the Lease. These Events of Default confer upon Lessor the right to immediately terminate the Lease of the Aircraft to the Lessee. Upon termination of the

-4-

Lease, the Lease expressly grants Lessor the right to immediately repossess the Aircraft and deregister the Aircraft. See Exhibit A, §§ 25.3.1 and 25.4. The termination of the lease of the Aircraft terminates Lessee's right to the continued use and possession of the Aircraft. See Exhibit A, § 25.3.1.

13.    Based upon the Events of Default described in paragraph 11 above, and other Events of Default, the Lessor delivered a written Notice of Default, Demand for Payment and Notice of Termination of the Lease to Lessee ("Lease Termination Notice"). A copy of the Lease Termination Notice is annexed hereto as Exhibit B.

14.    On April 10, 2008, immediately following Lessor's termination of the Lease, Lessor executed an arrest order issued by the Tribunal de Grande Instance de Bobigny in Bobigny, France (the "French Court") prohibiting the Aircraft from being moved from Roissy Charles de Gaulle Airport in Paris, France ("Roissy Airport"), until the French Court or another French court of competent jurisdiction declares enforceable in France a decision of this Court or another court of competent jurisdiction ordering Lessee to return the Aircraft to Lessor. The Aircraft is presently located at Roissy Airport.

15.    Following the termination of the Lease and the issuance of the French Court's arrest order, Lessee requested that Lessor waive its defaults pursuant to Article 25.6 of the Lease which states, in relevant part, that "Lessor may at its election waive any Default or Event of Default and its consequences and rescind and annul any prior notice of termination of this Lease." To induce Lessor to grant such a waiver, Lessee paid the liquidated amounts owed to Lessor as of the time that the Lease was terminated.

16.    Lessor declined to waive Lessee's Defaults or Events of Defaults and has not rescinded its Lease Termination Notice, which remains in full force and effect.

NEWYORK/#194373.3

17.    Although the Aircraft is under arrest in Paris, the Aircraft is not in Lessor's possession and Lessee has failed to consent to the turnover of the Aircraft to the Lessor.  Under the terms of the Lease, Lessee remains obligated to pay all amounts arising under the Lease until the earlier of the Lessor's recovery of possession of the Aircraft or Lessee making an effective tender of the Aircraft to Lessor.  See Exhibit A, § 25.5(a).  In addition, the Lessee is obligated for damages, claims and expenses  arising due to the occurrence of Events of Default and the termination of the Lease.  See Exhibit A, §§ 25.3.1 & 25.5.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

18.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-17 of the Complaint as if fully set forth herein.

19.    A number of Events of Default as described above in paragraph 11 occurred under the Lease.

20.    After the occurrence and during the continuance of the Events of Default, Lessor by proper notice to the Lessee terminated the Lease.

21.    Upon termination of the Lease, the Lessor has the right to retake possession of the Aircraft.

22.    Lessee has failed and refused to allow Lessor to retake possession of the Aircraft.

23.    There exists an actual controversy between the parties and Lessor is entitled to a declaration of the rights and other legal relations of the parties pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure.

24.    Lessor requests that the Court declare that (a) Lessee has no further right and interest in and to the Aircraft, and no further right to possess and operate the Aircraft, (b) Lessor has the immediate right to retake possession of the Aircraft and obtain the deregistration and

NEWYORK/#194373.3

export of the Aircraft, (c) Lessee is obligated to and shall comply with all its obligations under the Lease regarding the return of the Aircraft, including but not limited to (i) deliver the Aircraft to Lessor, (ii) deliver to Lessor all Aircraft Documentation (as defined in the Lease) concerning the Aircraft, including but not limited to, all technical and maintenance documentation relating thereto, and (iii) take all actions necessary to deregister the Aircraft from the Spanish Aircraft Matriculation Registry where it is presently registered under the Lessee's name.

## SECOND CLAIM FOR RELIEF
### (Damages For Breach Of Lease Agreement)

25.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-24 of the Complaint as if fully set forth herein.

26.    Under the Lease, Lessee was required to pay to Lessor Basic Rent, Maintenance Supplemental Rent and Default Interest, all as defined in the Lease, until such time as Lessor recovers possession of the Aircraft. In addition, Lessee was required to pay amounts due to EUROCONTROL.

27.    The Lessee's breaches of its obligations under the Lease and the early termination of the Lease have caused the Lessor to suffer substantial costs, expenses and damages.

28.    Under the terms of the Lease, Lessee is liable to Lessor for the following amounts:

(1)    All amounts arising under the Lease pending the Lessor's recovery of the possession of the Aircraft (see Exhibit A, §§ 25.3.1(a) & 25.5(a));

(2)    All losses incurred in connection with the early termination of the Lease, including, without limitation, (i) all costs and expenses for recovering possession of the Aircraft, and (ii) repairing the Aircraft to the extent the Aircraft is not in the return condition required under the Lease (see Exhibit A, §§ 25.3.1(b), 25.5(c) & 25.5(f));

-7-

(3)    Any economic loss suffered by Lessor due to the early termination of the Lease (see Exhibit A, §§ 25.3.1(c) & 25.5(b));

(4)    All costs associated with the Lessor's exercise of remedies, including repossession costs, legal fees, insurance, ferry flight and aircraft storage costs, re-lease and sale costs and the Lessor's internal costs (see Exhibit A, § 25.5(c)); and

(5)    All other losses, damages, expenses, costs or liability that Lessor suffers or incurs as a result of any Events of Default and/or the termination of the Lease (see Exhibit A, §§ 25.3.1(e) & 25.5(g)).

29.    By reason of the foregoing, Lessor has suffered damages to date in excess of $2 million, which damages continue to accrue on a daily basis.

### THIRD CLAIM FOR RELIEF
### (Specific Performance)

30.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-29 of the Complaint as if fully set forth herein.

31.    Pursuant to Article 23 of the Lease, Lessee has a number of affirmative obligations to perform upon the termination of the Lease in connection with the return of the Aircraft, including, but not limited to, to return the Aircraft to Lessor, return all Aircraft Documentation (as defined in the Lease) to Lessor and to take all actions necessary to deregister the Aircraft from the Spanish Aircraft Matriculation Registry where it is presently registered under the Lessee's name.  (See Exhibit A, §§ 23.1, 23.8).

32.    Lessee has failed and refused to fulfill its obligations with respect to the return of the Aircraft under Article 23 of the Lease.

33.    Lessor has no adequate remedy at law.

-8-

34.    By reason of the foregoing, Lessor requests that the Court issue a judgment ordering Lessee to specifically perform all its obligations under Article 23 of the Lease, including, but not limited to, (a) deliver the Aircraft to Lessor, (b) deliver to Lessor all Aircraft Documentation (as defined in the Lease) concerning the Aircraft, including not limited to, all technical and maintenance documentation relating thereto, and (c) take all actions necessary to deregister the Aircraft from the Spanish Aircraft Matriculation Registry where it is presently registered under the Lessee's name.

## CONCLUSION

35.    WHEREFORE, plaintiff Wells Fargo Bank Northwest, National Association demands that the Court grant judgment:

(1)    Declaring that (a) Lessee has no further right and interest in and to the Aircraft, and no further right to possess and operate the Aircraft, (b) Lessor has the immediate right to retake possession of the Aircraft and obtain the deregistration and export of the Aircraft, and (c) Lessee is obligated to and shall comply with all its obligations under the Lease regarding the return of the Aircraft, including but not limited to (i) deliver the Aircraft to Lessor, (ii) deliver to Lessor all Aircraft Documentation (as defined in the Lease) concerning the Aircraft, including but not limited to, all technical and maintenance documentation relating thereto, and (iii) take all actions necessary to deregister the Aircraft from the Spanish Aircraft Matriculation Registry where it is presently registered under the Lessee's name;

(2)    Awarding plaintiff damages in the amount of at least $2 million in an amount to be determined by the Court, plus interest;

NEWYORK/#194373.3

(3)    Ordering Lessee to specifically perform all its obligations under Article 23 of the Lease, including, but not limited to, (a) deliver the Aircraft to Lessor, (b) deliver to Lessor all Aircraft Documentation (as defined in the Lease) concerning the Aircraft, including not limited to, all technical and maintenance documentation relating thereto, and (c) take all actions necessary to deregister the Aircraft from the Spanish Aircraft Matriculation Registry where it is presently registered under the Lessee's name.

(4)    Awarding plaintiff its costs, disbursements and attorneys fees' incurred in this action; and

(5)    Awarding such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        April 17, 2008

                                    VEDDER PRICE P.C.

                                    By:_____
                                        Michael G. Davies (MD-6045)
                                        Michael J. Edelman (ME-6476)
                                        1633 Broadway
                                        47th Floor
                                        New York, New York  10019
                                        (212) 407-7700

                                        Attorneys for Plaintiff
                                        WELLS FARGO BANK
                                        NORTHWEST, NATIONAL
                                        ASSOCIATION, acting not in its
                                        individual capacity but solely as trustee

EXECUTION
VERSION

# AIRCRAFT LEASE AGREEMENT (342)

dated as of June 15, 2007

between

**AIR COMET SOCIEDAD ANONIMA,**
as Lessee

and

**WELLS FARGO BANK NORTHWEST,
NATIONAL ASSOCIATION**
not in its individual capacity but solely
as Trustee
as Lessor

---

Aircraft Make and Model:  Airbus A320-200
Airframe Serial Number:  342
Aircraft Registration Mark EC-KJG
Engine Make and Model:  CFM International, Inc. CFM56-5A1
Engine Serial Numbers:  731681 and 731682

---

*Vedder, Price, Kaufman & Kammholz, P.C.*
*Chicago, Illinois*

# TABLE OF CONTENTS

**Page**

ARTICLE 1    SUMMARY OF TRANSACTION ................................................................. 1

1.1    Description of Aircraft ................................................................. 1
1.2    Scheduled Delivery Date and Location ................................................ 1
1.3    Lease Term ................................................................. 1
1.4    Security Deposit ................................................................. 1
1.5    Rent During Lease Term ................................................................. 1
1.6    Country of Aircraft Registration ................................................... 1
1.7    Agreed Value of Aircraft ................................................................. 1
1.8    Lessor's Bank Account ................................................................. 2

ARTICLE 2    DEFINITIONS ................................................................. 2

2.1    General Definitions ................................................................. 2
2.2    Specific Definitions ................................................................. 9

ARTICLE 3    PLACE AND DATE OF DELIVERY ................................................ 10

3.1    Place of Delivery ................................................................. 10
3.2    Delivery Date ................................................................. 10
3.3    No Lessor Liability ................................................................. 10
3.4    Total Loss of Aircraft Prior to Delivery ........................................ 10

ARTICLE 4    LEASE TERM ................................................................. 11

4.1    Lease Term ................................................................. 11
4.2    Expiration Date ................................................................. 11
4.3    Termination Date ................................................................. 11
4.4    Survival of Certain Lessee Obligations ........................................... 11

ARTICLE 5    SECURITY DEPOSIT, TRANSACTION FEE, RENT, RESERVES
             AND OTHER PAYMENTS ................................................ 11

5.1    Security Deposit ................................................................. 11
5.2    [Reserved] ................................................................. 13
5.3    Rent ................................................................. 13
5.4    The first payment of Basic Rent, made pursuant to Article 5.3.2
       hereof, shall include pro-rated rent for the period beginning on the
       Effective Date (being the date on which Lessee accepted technical
       delivery of the Airframe) and ending on the Delivery Date ................ 13
5.5    [Reserved] ................................................................. 13
5.6    Lessor's Bank Account ................................................................. 13
5.7    Default Interest ................................................................. 13
5.8    No Deductions or Withholdings ................................................... 13
5.9    Value Added Taxes ................................................................. 14
5.10   Triple Net Lease ................................................................. 14
5.11   Currency Indemnity ................................................................. 15

i

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 5.12 | Lessor Performance of Lessee Obligation | 15 |
| 5.13 | Consideration for Rent and other Amounts | 15 |

**ARTICLE 6    CONDITION OF AIRCRAFT** .................................................. 15

| 6.1 | LESSEE SELECTION OF AIRCRAFT | 15 |
|---|---|---|
| 6.2 | Delivery | 16 |
| 6.3 | Delivery of the Aircraft to Lessee | 16 |
| 6.4 | Lessee Acceptance of Aircraft | 16 |

**ARTICLE 7    CONDITIONS PRECEDENT** .................................................. 16

| 7.1 | Lessee Requirements | 16 |
|---|---|---|
| 7.2 | Post-Delivery Requirements | 19 |

**ARTICLE 8    DISCLAIMERS** .................................................. 20

| 8.1 | "As Is, Where Is" | 20 |
|---|---|---|
| 8.2 | Waiver of Warranty of Description | 21 |
| 8.3 | Lessee Waiver | 21 |
| 8.4 | Conclusive Proof | 22 |
| 8.5 | No Liability for Losses | 22 |
| 8.6 | No Liability to Repair or Replace | 22 |

**ARTICLE 9    MANUFACTURERS' AND VENDORS' WARRANTIES** .................................................. 22

| 9.1 | Warranties | 22 |
|---|---|---|
| 9.2 | Reassignment | 22 |
| 9.3 | Warranty Claims | 22 |

**ARTICLE 10    OPERATION OF AIRCRAFT** .................................................. 23

| 10.1 | Costs of Operation | 23 |
|---|---|---|
| 10.2 | Compliance with Laws | 23 |
| 10.3 | Training | 23 |
| 10.4 | No Violation of Insurance Policies | 23 |
| 10.5 | Flight Charges | 24 |
| 10.6 | No Flight Crew | 24 |
| 10.7 | No Grounding | 24 |
| 10.8 | Non-Discrimination | 24 |

**ARTICLE 11    NO SUBLEASE; WET LEASES** .................................................. 24

| 11.1 | No Sublease without Lessor Consent | 24 |
|---|---|---|
| 11.2 | Wet Leasing | 25 |

**ARTICLE 12    MAINTENANCE OF AIRCRAFT** .................................................. 26

CHICAGO/#1626279.11

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| | 12.1 | General Obligation | 26 |
| | 12.2 | Specific Obligations | 26 |
| | 12.3 | Replacement of Parts | 28 |
| | 12.4 | Removal of Engines | 29 |
| | 12.5 | Installation of Engines on other Aircraft | 29 |
| | 12.6 | Modifications | 30 |
| | 12.7 | Pooling of Engines and Parts | 31 |
| | 12.8 | Performance of Work by Third Parties | 31 |
| | 12.9 | [Reserved] | 31 |
| | 12.10 | Information Regarding Maintenance Program | 31 |
| | 12.11 | Lessor Rights to Inspect Aircraft | 31 |
| | 12.12 | Airworthiness Directive Cost Sharing | 32 |
| ARTICLE 13 | | GENERAL UNDERTAKINGS | 32 |
| | 13.1 | Lessee Undertakings | 32 |
| ARTICLE 14 | | TITLE AND REGISTRATION | 35 |
| | 14.1 | Title to the Aircraft During Lease Term | 35 |
| | 14.2 | Registration of Aircraft | 35 |
| | 14.3 | Filing of this Lease | 36 |
| | 14.4 | Evidence of Registration and Filings | 36 |
| ARTICLE 15 | | IDENTIFICATION PLATES | 37 |
| ARTICLE 16 | | TAXES | 37 |
| | 16.1 | General Obligation of Lessee | 37 |
| | 16.2 | Exceptions to Indemnity | 38 |
| | 16.3 | After-Tax Basis | 39 |
| | 16.4 | Timing of Payment | 39 |
| | 16.5 | Contests | 39 |
| | 16.6 | Refunds | 39 |
| | 16.7 | Cooperation in Filing Tax Returns | 40 |
| | 16.8 | Survival of Obligations | 40 |
| ARTICLE 17 | | INDEMNITIES | 40 |
| | 17.1 | General Indemnity | 40 |
| | 17.2 | Exceptions to General Indemnities | 41 |
| | 17.3 | After-Tax Basis | 42 |
| | 17.4 | Timing of Payment | 42 |
| | 17.5 | Subrogation | 43 |
| | 17.6 | Notice | 43 |
| | 17.7 | Refunds | 43 |

iii

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 17.8 | Defense of Claims | 43 |
| 17.9 | Survival of Obligation | 44 |
| **ARTICLE 18** | **INSURANCE** | 44 |
| 18.1 | Categories of Insurance | 44 |
| 18.2 | Insurance for Indemnitees | 44 |
| 18.3 | Renewal | 44 |
| 18.4 | Assignment of Rights by Lessor | 44 |
| 18.5 | Deductibles | 45 |
| 18.6 | Additional Requirements | 45 |
| 18.7 | Information | 45 |
| 18.8 | Currency | 46 |
| 18.9 | Grounding of Aircraft | 46 |
| 18.10 | Failure to Insure | 46 |
| 18.11 | Reinsurance | 46 |
| 18.12 | Limit on Hull in Favor of Lessee | 46 |
| 18.13 | Assignment of Insurances | 47 |
| **ARTICLE 19** | **LOSS, DAMAGE AND REQUISITION** | 47 |
| 19.1 | Definitions | 47 |
| 19.2 | Notice of Total Loss | 48 |
| 19.3 | Total Loss of Aircraft or Airframe | 48 |
| 19.4 | Surviving Engine(s) | 49 |
| 19.5 | Total Loss of Engine and not Airframe | 49 |
| 19.6 | Other Loss or Damage | 50 |
| 19.7 | Government Requisition | 50 |
| **ARTICLE 20** | **REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSEE** | 51 |
| 20.1 | Representations and Warranties | 51 |
| 20.2 | Covenants | 54 |
| **ARTICLE 21** | **REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSOR** | 55 |
| 21.1 | Representations and Warranties | 55 |
| 21.2 | Covenant of Quiet Enjoyment | 56 |
| 21.3 | Sovereign Immunity | 56 |
| **ARTICLE 22** | **[RESERVED]** | 57 |
| **ARTICLE 23** | **RETURN OF AIRCRAFT** | 57 |

CHICAGO/#1626279.11

# TABLE OF CONTENTS
### (continued)

**Page**

23.1    Date and Location of Return ....................................................... 57
23.2    Reports ......................................................................................... 57
23.3    Return Location ........................................................................... 57
23.4    Full Aircraft Documentation Review .......................................... 57
23.5    Condition of Aircraft ................................................................... 57
23.6    Aircraft Inspection ...................................................................... 58
23.7    Certificate of Airworthiness Matters .......................................... 58
23.8    Export and Deregistration of Aircraft ......................................... 59
23.9    Lessee's Continuing Obligations ................................................ 59
23.10   Airport and Navigation Charges ................................................. 60
23.11   Return Acceptance Certificate .................................................... 60
23.12   Indemnities and Insurance .......................................................... 60
23.13   Storage ......................................................................................... 60
23.14   Non-Incident Statement .............................................................. 60

ARTICLE 24     ASSIGNMENT; PROTECTIONS .................................................. 60

24.1    No Assignment by Lessee ............................................................ 60
24.2    Sale or Assignment by Lessor ..................................................... 60
24.3    Subordination ............................................................................... 61
24.4    Lessee Cooperation ...................................................................... 61
24.5    Protections ................................................................................... 61

ARTICLE 25     DEFAULT OF LESSEE ................................................................. 62

25.1    Lessee Notice to Lessor ............................................................... 62
25.2    Events of Default ......................................................................... 62
25.3    Lessor's General Rights Following an Event of Default ............. 65
25.4    Deregistration and Export of Aircraft ......................................... 66
25.5    Lessee Liability for Damages ...................................................... 66
25.6    Waiver of Default ......................................................................... 66
25.7    Present Value of Payments .......................................................... 67
25.8    Use of "Termination Date" .......................................................... 67

ARTICLE 26     NOTICES ...................................................................................... 67

26.1    Manner of Sending Notices .......................................................... 67
26.2    Notice Information ....................................................................... 67

ARTICLE 27     GOVERNING LAW AND JURISDICTION ................................. 69

27.1    New York Law .............................................................................. 69
27.2    Non-Exclusive Jurisdiction .......................................................... 69
27.3    Service of Process ........................................................................ 69
27.4    Prevailing Party in Dispute ......................................................... 69
27.5    Waiver .......................................................................................... 70

v

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE 28    MISCELLANEOUS ...................................................... 70

28.1    Press Releases .................................................................. 70
28.2    Power of Attorney ............................................................ 70
28.3    Lessor Performance for Lessee ........................................ 70
28.4    Lessor's Payment Obligations .......................................... 70
28.5    Application of Payments .................................................. 70
28.6    Usury Laws ...................................................................... 70
28.7    Delegation by Lessor ....................................................... 71
28.8    Confidentiality ................................................................. 71
28.9    Rights of Parties .............................................................. 71
28.10   Further Assurances .......................................................... 71
28.11   Use of Word "including" .................................................. 71
28.12   Headings ......................................................................... 71
28.13   Invalidity of any Provision .............................................. 72
28.14   Time is of the Essence ..................................................... 72
28.15   Amendments in Writing ................................................... 72
28.16   Counterparts ................................................................... 72
28.17   Delivery of Documents by Fax ......................................... 72
28.18   Entire Agreement ............................................................ 72
28.19   Transaction Expenses ...................................................... 72
28.20   No Brokers ...................................................................... 72
28.21   Concerning the Trustee .................................................... 73

ARTICLE 29    MAINTENANCE SUPPLEMENTAL RENT; COST SHARING ................ 73

29.1    Supplemental Rent ........................................................... 73

Exhibit A    -    Aircraft Description
Exhibit B    -    Certificate of Insurance
Exhibit C-1  -    Form of Eurocontrol Letter
Exhibit C-2  -    Form of AENA Letter
Exhibit D    -    Estoppel and Acceptance Certificate
Exhibit E-1  -    Form of Delivery Date Certificate
Exhibit E-2  -    Form of Conditions Precedent Certificate
Exhibit E-3  -    Form of Owner's Consent Certificate
Exhibit F    -    Form of Power of Attorney
Exhibit G    -    Return Acceptance Receipt
Exhibit H    -    Monthly Utilization Report
Exhibit I    -    Assignment of Insurances
Schedule 1   -    Delivery Conditions
Schedule 2   -    Return Conditions

vi

# AIRCRAFT LEASE AGREEMENT

**THIS AIRCRAFT LEASE AGREEMENT** is made, entered into and effective as of the 15th day of June, 2007.

**BETWEEN**:

**AIR COMET SOCIEDAD ANONIMA**, a company organized under the laws of Spain with its principal place of business at Bahia de Pollensa, 21-23, 28042 Madrid, Spain ("**Lessee**"); and

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, a national banking association organized under the laws of the United States of America with its principal place of business at 299 South Main Street, 12th Floor, MAC: U1228-120, Salt Lake City, Utah 84111, United States of America, not in its individual capacity but solely as trustee ("**Lessor**").

The subject matter of this Lease is one (1) Airbus A320-200 aircraft.  In consideration of and subject to the mutual covenants, terms and conditions contained in this Lease, Lessor hereby agrees to lease to Lessee and Lessee hereby agrees to lease from Lessor the Aircraft for the Lease Term and the parties further agree as follows:

## ARTICLE 1

## SUMMARY OF TRANSACTION

The following is a summary of the lease transaction between Lessee and Lessor.  It is set forth for the convenience of the parties only and will not be deemed in any way to amend, detract from or simplify the other provisions of this Lease.

1.1    Description of Aircraft.  One (1) Airbus model A320-200 airframe with Airframe Manufacturer's serial number 342, together with two (2) CFM International, Inc. model CFM56-5A1 engines with Engine Manufacturer's Serial Numbers 731681 and 731682, as further described in Exhibit A hereto

1.2    Scheduled Delivery Date and Location.  August 14, 2007 or such other date as the parties mutually agree, at Montréal, Québec, Canada, as further described in Article 3.2 hereof

1.3    Lease Term.  60 months from the Delivery Date

1.4    Security Deposit.  $450,000, in cash

1.5    Rent During Lease Term.  Payable monthly in advance and equal to the sum of $225,000, net of any taxes

1.6    Country of Aircraft Registration.  Spain

1.7    Agreed Value of Aircraft.  $18,000,000

1.8    Lessor's Bank Account.

JPMorgan Chase Bank
ABA Number: 021-000-021
Account Name: The CIT Group/Equipment Financing, Inc.
Account Number: 116-003855
SWIFT Code: CHASUS33
Re: AAR/Air Comet (342)

## ARTICLE 2

## DEFINITIONS

Except where the context otherwise requires, the following words have the following meanings for all purposes of this Lease. The definitions are equally applicable to the singular and plural forms of the words. Any agreement defined below includes each amendment, modification, supplement and waiver thereto in effect from time to time.

2.1    General Definitions.

"**AENA**" means Aeropuertos Españoles y Navegación Aerea.

"**Aircraft**" means, collectively, the Airframe, the two (2) Engines, the Parts and the Aircraft Documentation. As the context requires, "Aircraft" may also mean the Airframe, any Engine, any Part, the Aircraft Documentation or any part thereof individually. For example, in the context of return to Lessor the term "Aircraft" means the Airframe, Engines, Parts and Aircraft Documentation collectively, yet in the context of Lessee not creating any Security Interests other than Permitted Liens on the Aircraft, the term "Aircraft" means any of the Airframe, any Engine, any Part or the Aircraft Documentation individually.

"**Aircraft Documentation**" means, collectively, all (i) log books, Aircraft records, manuals and other documents provided to Lessee in connection with the Aircraft, and (ii) any other documents generated by Lessee or any of its maintenance providers or that are required to be maintained by either hard copy or electronic copy and with third party vendors during the Lease Term by the Aviation Authority, the Maintenance Program and this Lease.

"**Airframe**" means the Airbus model A320-200 airframe (except only Engines or engines from time to time installed thereon) leased hereunder by Lessor to Lessee described in Exhibit A together with all Parts relating thereto so long as the same shall be incorporated or installed in or attached to such airframe, and any and all Parts removed therefrom so long as title to such removed Parts shall remain vested in CIT in accordance with the terms of Article 12.

"**Airframe Cycle**" shall mean, with respect to the Airframe, one (1) takeoff and landing thereof.

"**Airframe Flight Hour**" shall mean each hour or part thereof elapsing from the moment the wheels of the Airframe leave the ground on takeoff until the wheels of the Airframe touch the ground on landing following such flight. For purposes of all calculations under this Lease

2

measured in Airframe Flight Hours, such Airframe Flight Hours (and parts thereof) shall be rounded to the nearest tenth of an hour.

"**Airframe Manufacturer**" means Airbus S.A.S.

"**Airworthiness Directives**" means all airworthiness directives (or equivalent) and other instruction of EASA, the FAA or the Aviation Authority applicable to the Aircraft.

"**APU**" means the auxiliary power unit located on the Aircraft and any auxiliary power unit substituted for such auxiliary power unit in accordance with this Lease.

"**Assignment of Insurances**" means that certain Assignment of Insurances of even date herewith by Lessee in favor of Lessor, substantially in the form of Exhibit I hereto.

"**Aviation Authority**" means the DGAC, or any government department, committee or agency that under the laws of the State of Registration shall from time to time have control and supervision over civil aviation in that state or have jurisdiction over the registration, airworthiness or operation of, or over matters otherwise relating to, the Aircraft.

"**Aviation Documents**" means any or all of the following which at any time may be obtainable from the Aviation Authority in the State of Registration: (i) if required, a temporary certificate of airworthiness from the Aviation Authority allowing the Aircraft to be flown after Delivery to the State of Registration, (ii) an application for registration of the Aircraft with the appropriate authority in the State of Registration, (iii) the certificate of registration for the Aircraft issued by the State of Registration, (iv) a full certificate of airworthiness for the Aircraft specifying transport category (passenger), (v) an air transport license (if applicable), (vi) an air operator's certificate, (vii) such recordation of CIT's title to and Lessor's interest in the Aircraft and CIT's and Lessor's interest in this Lease as may be available in the State of Registration and (viii) all such other authorizations, approvals, consents and certificates in the State of Registration and Spain as may be required to enable Lessee lawfully to operate the Aircraft in commercial service.

"**Bill of Sale**" means that certain bill of sale with respect to the Aircraft by Participant in favor of CIT, filed for recordation with the Aviation Authority.

"**Business Day**" means a day other than a Saturday or Sunday on which the banks in Chicago, Salt Lake City, New York and Madrid are open for the transaction of business of the type required by this Lease.

"**"C" Check**" means a recommended Airframe Manufacturer's system, zonal and/or structural maintenance event, as such term is defined in the Airframe Manufacturer's MPD and in Lessee's Maintenance Program relating to the Aircraft.

"**Cape Town Convention**" means collectively, the official English language texts of the Convention on International Interests in Mobile Equipment (the "Convention") and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (the "Protocol"), both signed in Cape Town, South Africa on November 16, 2001, together with any protocols, regulations, rules, orders, agreements, instruments, amendments,

3

supplements, revisions or otherwise that have or will be subsequently made in connection with the Convention or the Protocol by the "Supervisory Authority" (as defined in the Consolidated Text), the International Registry or "Registrar" (as defined in the Consolidated Text) or any other international or national, body or authority, all as in effect in the United States or other relevant Contracting State (as used in the Consolidated Text).

"**CIT**" means C.I.T. Leasing Corporation, a Delaware corporation, together with its successors and assigns.

"**Creditor**" means any lessor, owner, bank, lender, mortgagee or other Person which is the owner of or has any interest in an aircraft engine or aircraft operated by Lessee.

"**Creditor Agreement**" means the applicable agreement between a Creditor and Lessee or between Creditors pursuant to which such Creditor owns, leases or has an interest in either an aircraft operated by Lessee on which an Engine may be installed or in an aircraft engine which may be installed on the Airframe.

"**Default**" means any event which, upon the giving of notice, the lapse of time and/or a relevant determination, would constitute an Event of Default.

"**Delivery**" means the acceptance by the Lessee of delivery of the Aircraft in accordance with the terms of this Lease.

"**Delivery Date**" means the date on which Delivery takes place.

"**DGAC**" means the Dirección General de Aviacion Civil of Spain and any successor government department, committee or agency that shall from time to time have control or supervision over civil aviation in that state or have jurisdiction over the registration, airworthiness or operation of, or over matters otherwise relating to, the Aircraft.

"**Dollars**" and "**$**" means the lawful currency of the U.S.

"**EASA**" means the European Aviation Safety Agency, or any successor agency thereto.

"**Effective Date**" means June 15, 2007.

"**Engine**" means (i) each of the engines listed on the Estoppel and Acceptance Certificate; (ii) any replacement engine acquired by Lessor and leased to Lessee pursuant to Article 19.5 following a Total Loss of an Engine; and (iii) all Parts installed in or on any of such engines at Delivery (or substituted, renewed or replacement Parts in accordance with this Lease) so long as title thereto is or remains vested in CIT in accordance with the terms of Article 12.3, but excludes any properly replaced engine, title to which has or should have passed to the Lessee pursuant to the terms of this Lease.

"**Engine Cycle**" shall mean, with respect to any Engine, one (1) takeoff and landing of the airframe (including, without limitation, the Airframe) on which such Engine is from time to time installed.

CHICAGO/#1626279.11

"**Engine Flight Hour**" shall mean each hour or part thereof elapsing from the moment the wheels of the airframe (including, without limitation, the Airframe) on which such Engine is from time to time installed leave the ground on takeoff until the wheels of such airframe on which such Engine is from time to time installed touch the ground on landing. For purposes of all calculations under this Lease measured in Engine Flight Hours, such Engine Flight Hours (and parts thereof) shall be rounded to the nearest tenth of an hour.

"**Engine Heavy Maintenance**" shall mean, with respect to an Engine, engine maintenance performed on such Engine when removed from the Airframe and prior to reinstallation that (a) involves disassembly and separation of pairs of major mating engine gaspath flanges (100% disassembly and 100% piece part inspection may not be required), (b) is performed in accordance with standards and procedures specified by the Engine Manufacturer's engine shop manual, and (c) requires a prescribed package of inspection, maintenance checks and repair or refurbishment of major maintenance assemblies necessary to return the Engine to service with an expected on-wing operating life (disregarding scheduled replacement of LLPs) at least equal to the Engine Manufacturer's then current reported mean time between overhauls for engines of the same model as such Engine.

"**Engine Manufacturer**" means CFM International, Inc.

"**Event of Default**" means any of the events referred to in Article 25.2.

"**Excluded Parts**" means those Parts from time to time installed on the Aircraft which are additional to the Parts installed on the Aircraft at Delivery and which are not installed as a consequence of the fulfillment by the Lessee of its obligations under Article 12, and any Parts installed on the Aircraft by way of substitution or replacement for any of the foregoing.

"**FAA**" shall mean the United States Federal Aviation Administration and any successor agency or agencies thereto.

"**FARs**" means the U.S. Federal Aviation Regulations embodied in Title 14 of the U.S. Code of Federal Regulations, as amended from time to time, or any successor regulations thereto.

"**Geneva Convention**" means the Convention on the International Recognition of Rights in Aircraft signed in Geneva, Switzerland on June 19, 1946.

"**Government Entity**" means any (i) national, state or local government, (ii) board, commission, department, division, instrumentality, court, agency or political subdivision thereof and (iii) association, organization or institution of which any of the entities listed in (i) or (ii) is a member or to whose jurisdiction any such entity is subject.

"**Guarantor**" means Viajes Marsans, S.A., a joint stock company organized and existing under the laws of Spain.

"**Guaranty**" means that certain Guaranty of even date herewith by Guarantor in favor of Lessor and CIT, with respect to payment and performance of Lessor's obligations hereunder.

5

"**Head Lease**" means that certain Aircraft Head Lease Agreement (342) of even date herewith between CIT, as lessor, and Lessor, as lessee, with respect to the Aircraft.

"**Indebtedness**" means any obligation for payment or repayment of money, whether as principal or as surety, and whether present or future, actual or contingent.

"**Initial Qualifying Maintenance Event**" means the first maintenance event following the Delivery Date which would entitle Lessee to reimbursement pursuant to Article 29.1.

"**Insurances**" means any and all contracts or policies of insurance and reinsurance required to be effected and maintained under this Lease.

"**International Registry**" has the meaning ascribed thereto in the Cape Town Convention.

"**Landing Gear**" means the installed main and nose landing gear, components and their associated actuators, side braces and parts.

"**Law**" means any (i) statute, decree, constitution, regulation, order or any directive of any Government Entity, (ii) treaty, pact, compact or other agreement to which any Government Entity is a signatory or party and (iii) judicial or administrative interpretation or application of any of the foregoing.

"**Lease**" means this Aircraft Lease Agreement, together with all Exhibits and Schedules hereto, as supplemented, modified or amended from time to time.

"**Lease Term**" means the sixty (60) month period commencing on the Delivery Date and ending on the Expiration Date, as more fully described in Article 4.1.

"**Lessor's Lien**" means (i) any Security Interest created by or in favor of Lessor; (ii) any Security Interest from time to time created by or through the Lessor and/or CIT in connection with the financing or refinancing of the Aircraft; (iii) liens for Lessor's Taxes which are not overdue for a period of more than 60 days after receipt of notice thereof or for amounts which are either not yet due or are being contested in good faith by appropriate proceedings in a timely manner (and for which adequate reserves have been made or, when required in order to pursue such proceedings, an adequate bond has been provided) so long as such proceedings do not involve any danger of sale, forfeiture or loss of the Aircraft; (iv) any Security Interest (other than a Security Interest created by or through Lessee) relating to or arising from the period prior to the Delivery Date; and (v) any other Security Interest in respect of the Aircraft which results from acts or claims against the Lessor and/or CIT not related to the transactions contemplated herein.

"**Lessor's Taxes**" means (i) any Tax imposed as a direct result of activities by an Indemnitee in the jurisdiction imposing such Tax unrelated to the Indemnitee's dealings with Lessee or to the transactions contemplated by this Lease or the operation of the Aircraft by Lessee; (ii) Taxes imposed on the income, profits or gains of an Indemnitee by any Government Entity in the United States or in any other jurisdiction where an Indemnitee is liable for such Tax but only to the extent that such liability has or would have arisen in the absence of the transactions contemplated by this Lease or the operation of the Aircraft by Lessee; (iii) Taxes

6

imposed with respect to any period commencing or events occurring before the date of this Lease or after the Expiration Date and unrelated to the Indemnitee's dealings with Lessee or the transactions contemplated by this Lease; and (iv) Taxes imposed as a direct result of the sale or other disposition of the Aircraft or any interest therein, unless such sale or disposition occurs as a consequence of an Event of Default or in connection with the registration of the Aircraft with the Aviation Authority.

"**LLP**" means life limited part.

"**Maintenance Program**" means Lessee's maintenance program as approved by the Aviation Authority or such other maintenance program as Lessor may, in its discretion acting reasonably, accept in writing.

"**Major Check**" shall mean any "12 Year" Check, any "6 Year" Check (including all lower checks and all other items, such as LLP, aging aircraft or structural inspection tasks, that are due before the next "C" Check), heavy structural inspection (or equivalent), structural inspection or annual heavy maintenance visit or segment thereof for commercial aircraft of the same model as the Aircraft as set out in the Maintenance Program.

"**MPD**" means, as the context requires, the Maintenance Planning Document published by the Airframe Manufacturer and applicable to the Airframe and/or the Maintenance Planning Document published by the Engine Manufacturer and applicable to the Engines.

"**Other Lease**" means that certain Aircraft Lease Agreement (662) dated as of July 13, 2007 and entered into by and between Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as owner trustee, as lessor, and Lessee, as lessee with respect to one (1) Airbus A320-211 aircraft bearing manufacturer's serial number 662.

"**Overhaul**" means the refurbishment of the Aircraft, an Engine, APU, Landing Gear, module or Part, as the case may be, in which such equipment has been disassembled; cleaned, and thoroughly inspected; repaired, reworked or had a replacement of parts; reassembled; and tested to the tolerances and standards specified by the applicable manufacturer's overhaul procedures manual or equivalent in order to bring such equipment to a condition ready for service in commercial aircraft operation and, in the case of an Engine, such that the Engine is restored to its full performance and expected life standard.

"**Part**" means any part, component, appliance, system module, engine module, the auxiliary power unit (APU), accessory, material, instrument, communications equipment, furnishing, Lessee-furnished or Lessor-purchased equipment or other item of equipment (other than complete Engines or engines) for the time being installed in or attached to the Airframe or any Engine or which, having been removed from the Airframe or any Engine, remains the property of CIT, but excludes such items title to which has or should have passed to the Lessee pursuant to this Lease.

"**Participant**" means AARIFS (342) LLC, a Delaware limited liability company.

"**Permitted Lien**" means (i) Lessor's Liens; (ii) Security Interests arising in the ordinary course of Lessee's business for Taxes either not yet assessed or, if assessed, not yet due and

7

payable or being contested in good faith in accordance with Article 16.5; (iii) material men's, mechanics, hangar keepers, carriers, workmens, repair mens or employees liens or similar Security Interests arising in the ordinary course of the Lessee's business or by operation of Law after the Delivery Date which are not overdue for a period of more than 60 days after receipt of notice thereof or for amounts which are either not yet due or are being contested in good faith by appropriate proceedings in a timely manner (and for which adequate reserves have been made or, when required in order to pursue such proceedings, an adequate bond has been provided) so long as such proceedings do not involve any danger of sale, forfeiture or loss of the Aircraft; or (iv) Security Interests created by Lessee in favor of Lessor pursuant to this Lease.

"**Person**" means any individual, firm, partnership, joint venture, trust, corporation, Government Entity, committee, department, authority or any body, incorporated or unincorporated, whether having distinct legal personality or not.

"**Prime Rate**" means the rate of interest from time to time announced by J.P. Morgan Chase Bank, N.A. as its prime commercial lending rate.

"**Prior Owners**" means, collectively, US Bank Trust National Association, a national banking association, as trustee, AAR Aircraft & Engine Sales & Leasing, Inc., an Illinois corporation, and AAR-GS A320 (342) LLC, a Delaware limited liability company.

"**Prohibited Country**" means any country to which the export and/or use of commercial aircraft is not permitted under (i) the Export of Goods Control Order 1992, (ii) the United States Export Administration Act 1979 (as amended) or any successor legislation and/or the Export Administration Regulations promulgated thereunder, (iii) any similar or corresponding legislation then in effect (unless knowledge of any non-applicability of such legislation or regulations referred to in (i) or (ii) above or this clause (iii) is in the public domain), or (iv) any United Nations Sanctions Orders the effect of which prohibits or restricts the export and/or use of commercial aircraft to such country.

"**Relevant Event**" means any event which with the giving of notice or lapse of time or the satisfaction of any other condition (or any combination thereof) would constitute a Termination Event.

"**Relevant Party**" means any other person who, from time to time, Lessor shall notify Lessee as having or having had, an ownership, security, leasehold or management interest in the Aircraft from time to time (including, without limitation, CIT).

"**Rent**" means, collectively, Basic Rent and Supplemental Rent.

"**Security Interest**" means any encumbrance or security interest, whether recorded or unrecorded, filed or not filed, however and wherever created or arising including (without prejudice to the generality of the foregoing) any right of ownership, security, mortgage, pledge, charge, encumbrance, lease, lien, statutory or other right in rem, hypothecation, title retention, attachment, levy, claim or right of possession or detention.

"**Spain**" means the Kingdom of Spain.

8

"**Spanish VAT Law**" means the Ley 37/1992, de 28 de diciembre, del Impuesto sobre el Valor Añadido.

"**State of Registration**" means Spain or such other country or state of registration of the Aircraft as Lessor may, in its absolute discretion, approve in writing prior to such registration becoming effective.

"**Supplemental Rent**" means all amounts, liabilities and obligations (other than Basic Rent) which Lessee assumes, agrees or otherwise becomes liable to pay to Lessor, any Indemnitee or any other Person hereunder or under any of the other Operative Documents, including, without limitation, payments of or in respect of Agreed Value, Default Interest, Expenses, Taxes, Maintenance Supplemental Rent or other amounts payable under any indemnity provisions hereunder.

"**Termination Event**" means any of the events or circumstances described in Article 4.3.

"**Trust Agreement**" means that certain Trust Agreement (342), dated as of May 25, 2007 between Wells Fargo Bank Northwest, National Association and the Participant.

"**U.S.**" or "**U.S.A.**" means the United States of America.

2.2     Specific Definitions.  The following terms are defined in the Articles referenced below:

| Terms | Article |
| --- | --- |
| Agreed Value | 19.1 |
| Airframe 12 Year Supplemental Rent | 29.1 |
| Airframe 6 Year Supplemental Rent | 29.1 |
| APU Supplemental Rent | 29.1 |
| Bank | 5.6 |
| Basic Rent | 5.3.1 |
| Cape Town Convention | 14.3 |
| Certificate of Airworthiness | 23.7.1 |
| Change Event | 20.2.5 |
| Delivery Location | 3.1 |
| Engine LLP Supplemental Rent | 29.1 |
| Engine Full Performance Restoration Supplemental Rent | 29.1 |
| Estoppel and Acceptance Certificate | 7.1.1 |
| Expenses | 17.1 |
| Expiration Date | 4.2 |
| Export Certificate of Airworthiness | 23.8 |
| Financial Statements | 13.1.1(c) |
| Indemnitees | 17.1 |
| Landing Gear Supplemental Rent | 29.1 |
| Lessor's Assignee | 24.2 |
| Maintenance Supplemental Rent | 29.1 |

9

| Terms | Article |
|-------|---------|
| Modification | 12.6.1 |
| Operative Documents | 20.1.3 |
| Payee | 16.6 |
| Payor | 16.6 |
| Rent Payment Date | 5.3.2 |
| Security Deposit | 5.1.1 |
| Taxes | 16.1 |
| Termination Date | 4.3 |
| Total Loss | 19.1 |
| Total Loss Date | 19.1 |
| Total Loss Proceeds | 19.1 |
| Trust Company | 28.21 |

## ARTICLE 3

## PLACE AND DATE OF DELIVERY

3.1    <u>Place of Delivery</u>.  On the Delivery Date, the Aircraft will be delivered to Lessee at the location noted in Article 1.2 or such other location as may be agreed between Lessor and Lessee (the "**Delivery Location**").  Should consummation of the transaction contemplated hereby at the Delivery Location result in any taxes, excluding Lessor Taxes and any Taxes which may be payable in connection with the operation of the Aircraft prior to the Delivery Date including its import into Spain, such shall be for the account of Lessee.  Notwithstanding the foregoing, Lessor and Lessee shall cooperate to minimize any tax impact to either party.

3.2    <u>Delivery Date</u>.  The Delivery of the Aircraft shall take place on a date as mutually agreed between Lessee and Lessor, subject to Article 3.3 hereof.

3.3    <u>No Lessor Liability</u>.  Lessor will not be liable for any loss or expense, or any loss of profit, arising from any delay or failure in Delivery to Lessee unless such delay or failure arises as a direct consequence of the gross negligence or willful misconduct of Lessor.

The Aircraft shall be delivered by Lessor at Montreal, Quebec, Canada, painted white. If Lessee requests the Aircraft to be delivered painted in Lessee's livery, Lessee shall be liable for the cost of the difference between the cost of painting the Aircraft in Lessee's livery instead of white.  Lessor shall not be responsible for any tasks or sharing any work in connection with the painting of the Aircraft.  Provided that Lessor has tendered the Aircraft to Lessee in the proper delivery condition as set forth in Schedule I hereto, then, notwithstanding anything to the contrary contained herein, Lessee agrees that it shall be required to procure the registration of the Aircraft, and Lessor shall be deemed to have effected valid Delivery of the Aircraft and the Lease Term shall commence, on the Delivery Date.

3.4    <u>Total Loss of Aircraft Prior to Delivery</u>.  If a Total Loss of the Aircraft occurs prior to Delivery, neither party will have any further liability to the other except that Lessor will return to Lessee the Security Deposit in accordance with Article 5.1.

CHICAGO/#1626279.11

# ARTICLE 4

# LEASE TERM

4.1     <u>Lease Term</u>.  The term of this Lease (the "**Lease Term**") shall commence on the Effective Date and, unless this Lease is terminated earlier pursuant to the provisions hereof, shall end on the Expiration Date.

4.2     <u>Expiration Date</u>.  This Lease shall end on the date (the "**Expiration Date**") on which Lessee is required to redeliver the Aircraft to Lessor in the condition required by this Lease, which date shall be the date falling sixty (60) months after the Delivery Date.

4.3     <u>Termination Date</u>.  This Lease may terminate on any of the following dates:

(a)     the Expiration Date; or

(b)     a date earlier than the Expiration Date, if:

(1)     there is a Total Loss of the Aircraft prior to Delivery pursuant to Article 3.4;

(2)     there is a Total Loss of the Aircraft, payment is made to Lessor in accordance with Article 19.3 and all other obligations of Lessee under this Lease have been performed;

(3)     an Event of Default occurs and Lessor exercises its remedies pursuant to Article 25.3.

The "**Termination Date**" is the date on which this Lease terminates because one of the foregoing has occurred.

4.4     <u>Survival of Certain Lessee Obligations</u>.  The obligations of Lessee set forth in Articles 10.5, 16, 17 and 18, and any other obligations of Lessee which were due to have been performed but have not been fully performed prior to the termination of this Lease pursuant to Article 4.3, will survive the Termination Date.  The obligations of Lessee in the event of a termination pursuant to Article 25.3 are set forth in Article 25.

# ARTICLE 5

# SECURITY DEPOSIT, TRANSACTION FEE, RENT, RESERVES AND OTHER PAYMENTS

5.1     <u>Security Deposit</u>.

5.1.1     Upon execution hereof, Lessee shall supply Lessor with sufficient cash such that Lessor then holds Four Hundred Fifty Thousand Dollars ($450,000), the cash equivalent of two (2) months of Rent (the "**Security Deposit**").  The Security Deposit will serve as security for the

11

performance by Lessee of its obligations under this Lease and may be applied by Lessor upon the occurrence of a Default or Event of Default hereunder.

    5.1.2    The Security Deposit shall be held by the Lessor, without any obligation for the payment of interest thereon to the Lessee, and may (if provided in cash) be commingled by the Lessor with its own general or other funds, during the Lease Term as security for the full and punctual performance of all of the Lessee's obligations to the Lessor under the Operative Documents. The Lessor may, but shall not be obliged to, apply the Security Deposit in whole or in part for the payment of any amounts owing from time to time by the Lessee under any Operative Document, or may utilize the Security Deposit in whole or in part to perform any of the Lessee's obligations under any Operative Document which it has failed to comply with or otherwise remedy any Default or Event of Default which has occurred and is continuing (including, without limitation, in respect of the redelivery condition of the Aircraft), without prejudice to any other remedy of the Lessor. In any such event the Lessee shall within two (2) Business Days of demand restore the Security Deposit to the full amount provided for herein by payment to the Lessor of an amount in cash equal to the amount applied or utilized. The Lessee shall not attempt to subject the Security Deposit to any Security Interest (other than as created in favor of the Lessor by this Lease) or assign any interest therein to any other person. The Lessee agrees that the Lessor shall be entitled to the remedy of offset against and application of the Security Deposit in or towards sums due and payable from the Lessee to the Lessor under this Lease, without any notice to or demand against the Lessee, all of which are hereby waived. The Lessee further agrees that the Security Deposit may be assigned as security or transferred to any assignee or transferee of the Lessor. Should any Default or Event of Default occur and be continuing, the Security Deposit may, in Lessor's sole discretion, be applied to any sum due to the Lessor, unless the Lessor thereafter elects otherwise by notice to the Lessee. At the end of the Lease Term, provided that no Event of Default shall have occurred and be continuing, any remaining Security Deposit shall be repaid by the Lessor to the Lessee (without interest thereon) upon such date when all sums due under this Lease, both actually and contingently, have been paid or, as the case may be, when the Lessor has recovered all sums due under this Lease and following redelivery of the Aircraft to the Lessor in accordance with this Lease, subject to the provisions of Article 5.1.3 below. For the avoidance of doubt, the Security Deposit shall be returned to Lessee within five (5) Business Days following redelivery of the Aircraft to Lessor in the condition required by Article 23 hereof subject to all sums due under this Lease having been irrevocably paid in full.

    5.1.3    If the Aircraft has suffered a Total Loss or upon either the Expiration Date or redelivery of the Aircraft, whichever is later, other than if an Event of Default has occurred and is continuing and so long as Lessee has paid all amounts then owing to Lessor under this Lease, Lessor will return that portion of the Security Deposit then held by Lessor, without interest, less an amount determined by Lessor to be a reasonable estimate of the costs, if any, which Lessor will incur to remedy any unperformed obligations of Lessee on return of the Aircraft under this Lease, including the correction of any discrepancies from the required condition of the Aircraft as set forth in Schedule 2.

    5.1.4    Nothing in this Article 5.1 shall create a relationship of trust or any duty of a fiduciary nature between the Lessor and the Lessee.

12

5.2     [Reserved]

5.3     Rent.

5.3.1     During the Lease Term, Lessee will pay Lessor monthly in advance as rent for the Aircraft ("**Basic Rent**") in equal monthly cash payments, each in the amount of Two Hundred Twenty-Five Thousand Dollars ($225,000).  Lessee will also pay Lessor Maintenance Supplemental Rent in the amounts and at the time specified in Article 29.1.

5.3.2     The first payment of Basic Rent will be due on the Delivery Date, and thereafter each installment of Basic Rent shall be due on each monthly anniversary of the Delivery Date (each, a "**Rent Payment Date**") except that, if such day is not a Business Day or there is not any numerically equivalent day in such month, Basic Rent will be due on the immediately preceding Business Day of such month.

5.4     The first payment of Basic Rent, made pursuant to Article 5.3.2 hereof, shall include pro-rated rent for the period beginning on the Effective Date (being the date on which Lessee accepted technical delivery of the Airframe) and ending on the Delivery Date.  All obligations of Lessee to pay Rent shall be suspended for the period commencing on the Effective Date and ending on the Delivery Date, whereupon all Rent accrued during such period and Rent for the period commencing on the Delivery Date and continuing up to, but not including, the next Rent Payment Date, shall immediately become due and payable.

5.5     [Reserved]

5.6     Lessor's Bank Account.  Rent due under this Lease will be paid by Lessee by wire transfer of immediately available U.S. Dollar funds to Lessor's Bank Account or to such other bank account as Lessor may from time to time designate by written notice.

Lessor acknowledges the prior receipt from Lessee of the Security Deposit due under this Lease.  Lessee acknowledges and agrees that the Security Deposit funds may be transferred to CIT or to an account pledged by Lessor to CIT, who, in the event of any such transfer and pledge, shall have a first priority security interest in such Security Deposit funds.

Lessee shall pay Maintenance Supplemental Rent during the Lease Term in the manner specified herein, to such account or accounts as Lessor shall notify Lessee from time to time.  Lessee acknowledges and agrees that such account or accounts may be pledged by Lessor to CIT, who, in the event of any such transfer and pledge, shall have a first priority security interest in such Maintenance Supplemental Rent funds.

5.7     Default Interest.  If Lessee fails to pay Rent or any other amount when due and payable under this Lease, and such Rent or other amount remains unpaid after four (4) days, Lessee will pay Lessor, as additional Supplemental Rent (by way of agreed compensation and not as a penalty), the amount of One Thousand Dollars ($1,000) per day until such Rent or amount is paid in full.

5.8     No Deductions or Withholdings.  All payments by Lessee under this Lease, including the Security Deposit, Rent, Default Interest, fees, indemnities or any other item, will be

13

made in full without any deduction or withholding whether in respect of set-off, counterclaim, duties, or Taxes imposed in the State of Registration or any jurisdiction from which such payments are made unless Lessee is prohibited by Law from doing so, in which event Lessee will gross up the payment amount such that the net payment received by Lessor after any deduction or withholding equals the amounts called for under this Lease (provided, however, that if Lessee pays any such additional amount to compensate for the withholding of any Lessor's Tax, Lessor shall repay to Lessee within thirty (30) days after receipt of Lessee's written request therefor the amount of such additional amount to the extent attributable to any Lessor's Tax). The provisions of Articles 16.5 and 16.6 hereof shall apply where Lessee is required to make an increased payment pursuant to this Article 5.8.

5.9    Value Added Taxes.  The Rent and other amounts payable by Lessee under this Lease are exclusive of any value added tax, turnover tax or similar tax or duty.  If a value added tax or any similar tax or duty is payable in any jurisdiction in respect of any Rent or other amounts as aforesaid, Lessee will pay all such tax or duty and indemnify the Indemnitees against any claims for the same and any related claims, losses or liabilities.

5.10    Triple Net Lease.

5.10.1    This Lease is a triple net lease and all expenses associated with the possession, operation, and control of the Aircraft, including without limitation insurance and maintenance, will be borne by Lessee.  Lessee's obligation to pay Rent and make other payments in accordance with this Lease will be absolute and unconditional under any and all circumstances and regardless of other events, including the following:

(a)    any right of set-off, reduction, delay, counterclaim, recoupment, defense or other right (including any right of reimbursement) which Lessee may have against Lessor, the Airframe Manufacturer, the Engine Manufacturer or any other person for any reason, including any claim Lessee may have for the foregoing; or

(b)    unavailability or interruption in use of the Aircraft for any reason, including a requisition (whether related to title or use) thereof or any prohibition or interference with or other restriction against Lessee's use, operation or possession of the Aircraft (whether by Law or otherwise), any defect in title, airworthiness, merchantability, fitness for any purpose, condition, design, specification or operation of any kind or nature of the Aircraft, the ineligibility of the Aircraft for any particular use or trade or for registration or documentation under the Laws of any jurisdiction or Total Loss of the Aircraft; or

(c)    subject to applicable Law, the insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation, receivership, administration or similar proceedings by or against Lessor, Lessee, Airframe Manufacturer, the Engine Manufacturer or any other Person; or

(d)    invalidity or unenforceability or lack of due authorization of or other defect in this Lease; or

(e)    failure or delay on the part of any party to perform its obligations under this Lease; or

14

(f)     any other circumstance which but for this provision would or might have the effect of terminating or in any other way affecting any obligation of Lessee hereunder.

5.10.2    Nothing contained in this Article 5.10 will be construed to limit Lessee's right to pursue damages in the event of Lessor's breach of its warranty of quiet enjoyment set forth in Article 21.2.

5.11    Currency Indemnity.  If under any applicable Law, whether as a result of judgment against Lessee or the liquidation of Lessee or for any other reason, any payment hereunder is required to be made or recovered in a currency other than Dollars then, to the extent that the payment (when converted into Dollars at the "rate of exchange" on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable Law) falls short of the amount unpaid under this Lease, Lessee will as a separate and independent obligation, fully indemnify Lessor and each other Indemnitee against the amount of the shortfall and promptly remit such shortfall to Lessor.  If the amount received by Lessor upon converting the payment into Dollars exceeds the amount payable under this Lease, Lessor will remit such excess to Lessee and each other Indemnitee.  For the purposes of this paragraph "rate of exchange" means the rate at which Lessor or such Indemnitee, as the case may be, is able on the relevant date to purchase Dollars in Chicago, New York or Madrid (at Lessor's option) with such other currency.

5.12    Lessor Performance of Lessee Obligation.  If Lessee fails to make any payment under this Lease to a third party in connection with the Aircraft or fails to perform any other obligation required under this Lease, Lessor may (but is not required to) at its election and without waiver of its rights perform such obligation and/or pay such amount.  Within five (5) Business Days after written notice to Lessee of the amount paid by Lessor on behalf of Lessee, Lessee will repay such amount to Lessor together with Default Interest.  Such payment to Lessor will constitute additional Rent payable by Lessee to Lessor hereunder.  Any payment, performance or compliance by Lessor of a Lessee obligation hereunder will not affect Lessor's rights or remedies with respect to the occurrence or continuance of a Default or Event of Default, as the case may be.

5.13    Consideration for Rent and other Amounts.  The amount of the Rent and other payments contained herein are in consideration of Lessee's waiver of warranties and indemnities set forth in Articles 8 and 17, respectively, and the other provisions of this Lease.

## ARTICLE 6

## CONDITION OF AIRCRAFT

6.1    LESSEE SELECTION OF AIRCRAFT.  LESSEE COVENANTS TO LESSOR THAT LESSEE HAS USED ITS OWN JUDGMENT IN SELECTING THE AIRCRAFT AND HAS DONE SO BASED ON ITS SIZE, DESIGN AND TYPE.  LESSEE ACKNOWLEDGES THAT LESSOR IS NOT A MANUFACTURER, REPAIRER OR SERVICING AGENT OF THE AIRCRAFT.

15

6.2    Delivery. Prior to the Delivery Date, the Lessee shall have inspected the Aircraft to determine that the Aircraft conforms to the standards set forth on Schedule 1.

6.3    Delivery of the Aircraft to Lessee. Subject to Lessee having performed and satisfied all of the conditions precedent to Delivery set forth herein, Lessor will deliver the Aircraft in accordance with the terms of this Lease to Lessee at the Delivery Location. Upon the tender of the Aircraft by Lessor to Lessee, provided the Aircraft conforms to the standards set forth herein and on Schedule 1 and Lessee's conditions precedent have been met, Lessee will accept the Aircraft, as evidenced by Lessee's execution of an Estoppel and Acceptance Certificate in the form of Exhibit D hereto. In the event that there is any discrepancy between the anticipated condition of the Aircraft as set forth herein and in Schedule 1 hereto and the condition of the Aircraft as described in the Estoppel and Acceptance Certificate, the condition as set forth in the Estoppel and Acceptance Certificate shall control.

6.4    Lessee Acceptance of Aircraft. Lessee will accept the Aircraft when tendered for delivery in accordance with the terms of this Lease by Lessor. If Lessee fails to (i) comply with its obligations set forth in Articles 6.1 and 6.2 so as to allow Delivery to take place following delivery of the Aircraft when properly tendered for delivery by Lessor in the condition required hereunder, Lessee will indemnify Lessor for all costs and expenses incurred by Lessor as a result thereof.

## ARTICLE 7

## CONDITIONS PRECEDENT

7.1    Lessee Requirements. The obligation of Lessor to lease the Aircraft to Lessee hereunder is subject to the satisfaction of the following conditions precedent prior to the Delivery Date:

7.1.1    Lessee shall have delivered the following to Lessor:

(a)    this Lease, the Estoppel and Acceptance Certificate in the form of Exhibit D (the "**Estoppel and Acceptance Certificate**") and the Guaranty, each duly authorized and executed by Lessee or Guarantor (as the case may be);

(b)    authenticated notarial copies ("*copias autorizadas*") of each of Lessee's and Guarantor's articles of incorporation ("*Escritura de Constitución*"), bylaws and any other organizational or charter documents plus any subsequent amendments thereof and a certificate from the Commercial Registry ("*Registro Mercantil*") including all entries ("asientos") as of the Delivery Date;

(c)    copies of resolutions of the board of directors of each of Lessee and Guarantor to or other written evidence of appropriate corporate action, duly authorizing or ratifying the lease of the Aircraft hereunder, and the execution, delivery and performance of this Agreement, the Guaranty and the other Operative Documents, certified by a duly authorized officer of Lessee and Guarantor, as applicable, in the case of any such resolutions, to have been passed at a duly convened and constituted meeting, and in each case to be true, accurate, complete, unamended and in full force and effect;

16

(d)     opinions of (i) Adrian Borrego, counsel to Lessee and Guarantor; (ii) Bufete M. Vega Penichet, special Spanish counsel to Lessor and CIT, and (iii) such other legal opinions as required by Lessor or CIT, each in form and substance satisfactory to Lessor and CIT and covering such customary matters as Lessor may reasonably require;

(e)     a certificate of insurance and a report of Lessee's insurance brokers evidencing insurance of the Aircraft in accordance with this Lease, each in form and substance satisfactory to Lessor including the letter of undertaking under Article 18.7;

(f)     evidence reasonably satisfactory to Lessor of the issuance of each approval, license and consent (if any) which may be required in connection with the remittance to Lessor of any amount payable under this Lease or the performance by Lessee and Guarantor (as the case may be) of any of its obligations hereunder and under the Guaranty (including without limitation any exchange control approval);

(g)     copies of such Aviation Documents as have not been previously delivered which are available; or delivered pursuant to other provisions under this Article 7.1.1;

(h)     a power of attorney empowering Lessee's representative, who may be an officer or employee of Lessee, to accept the Aircraft on behalf of Lessee;

(i)     a deregistration power of attorney in the form of Exhibit F, duly authorized and executed by Lessee before a Spanish notary public, together with any consents required in connection therewith;

(j)     the Assignment of Insurances completed, duly executed and delivered by Lessee, dated and effective as of the Delivery Date, together with an acknowledgment of such assignment by Lessee's insurance broker on behalf of the insurer, substantially in the form of Exhibit I hereto;

(k)     evidence reasonably satisfactory to Lessor confirming that each of the Bill of Sale and this Lease, notarized and apostilled, is in a form suitable for filing with the Aviation Authority and any other appropriate Government Entity and has been presented for filing and recordation with the Aviation Authority thereof, in order to obtain the registration of the Aircraft with the Aviation Authority and the registration of the respective interests of Lessor and Lessee in the Aircraft and this Lease and otherwise all documents reasonably requested by Lessor evidencing that the Aircraft will be certified by and registered with the Aviation Authority in the name of the Lessee as a charterer by demise and will comply with all requirements of the Aviation Authority for commercial operation in the State of Registration;

(l)     a certificate signed by an officer of Lessee stating all of the following:

(1)     the representations and warranties contained in Article 20 are true and accurate on and as of the Delivery Date as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date) and all authorizations and approvals of, giving of notice to, and filings and recordings with, all Governmental Entities which may be conditions to the validity or

17

enforceability of this Lease or Lessee's performance of the terms hereof and each other Operative Document to which Lessee is a party have been duly accomplished; and

(2)    no Default has occurred and is continuing or will result from Lessee's lease of the Aircraft hereunder; and

(3)    no action or proceeding or governmental action has been instituted or threatened before any court or Government Entity, nor has any order, judgment or decree have been issued or proposed to be issued by any court or Government Entity, on or prior to such date which might (i) set aside, restrain, enjoin or prevent the completion, consummation, performance or observance of this Lease or any other Operative Document to which Lessee is a party or any of the transactions contemplated hereby or thereby, (ii) have a material adverse effect in respect of Lessee or (iii) in any other manner question the validity, binding effect or enforceability of this Lease or any of the other Operative Documents to which Lessee is a party; and

(4)    no material adverse change has occurred in the financial condition or prospects of Lessee between the date of the last audited financial statements of Lessee, copies of which have been provided to Lessor, and the Delivery Date, which could reasonably be expected to have a material adverse effect on the ability of Lessee to carry on its business or to perform its obligations under any Operative Document to which it is a party;

(m)    Lessor shall have received payment in full of the Security Deposit and the first payment of Basic Rent and evidence of payment by Lessee of all fees payable in connection with the filing of the Bill of Sale and this Lease and any related filings;

(n)    copies of all necessary consents or approvals from any Government Entity or such other Person as to the transactions contemplated by this Lease, the Guaranty and, if applicable, the other Operative Documents, including but not limited to the authorization, if necessary, issued by the appropriate monetary control agency for the payments required under the terms of this Lease, the Guaranty and the other Operative Documents;

(o)    if required, (i) an import license or certificate with respect to the Aircraft, duly authorized and issued to Lessee by the appropriate Government Entity and (ii) export documentation with respect to the Aircraft, as may be required by applicable Law;

(p)    a copy of the current and valid provisional matriculation certificate for the Aircraft issued by the Aviation Authority;

(q)    evidence of the appointment of, and acceptance by, Law Debenture as agent for service of process for Lessee and Guarantor, as required pursuant to Article 27.3 hereof;

(r)    letters of authority to each of Eurocontrol and AENA substantially in the form of Exhibits C-1 and C-2, respectively, and evidence reasonably satisfactory to Lessor that Lessee is not in default with respect to any Eurocontrol, AENA or similar airport or navigation fees;

(s)    evidence that Lessee has obtained such licenses, operator's certificates or other documents from each appropriate Government Entity as may be required to operate the Aircraft as a commercial air carrier under applicable Law (other than such approvals as are obtained following Delivery pursuant to Article 7.2 hereof), including but not limited to Lessee's permit to provide national air transportation services (transporte aereo nacional) and the authorization issued by the DGAC authorizing Lessee to lease and operate the Aircraft as part of Lessee's fleet of aircraft, a temporary import license for the Aircraft (following receipt by Lessee of a pro forma invoice for the Aircraft for customs purposes) and approval by the DGAC of the Maintenance Program for the Aircraft;

(t)    any necessary and appropriate filings of any documents with the DGAC in connection with Lessor's financing of the Aircraft;

(u)    the most recent audited accounts and financial statements of each of Lessee and Guarantor and such additional financial information concerning Lessee or Guarantor and other documents and matters incident to the foregoing as Lessor or its respective counsel may reasonably request, in form and substance satisfactory to Lessor, in order to establish the consummation of the transactions contemplated by this Lease, the Guaranty and the other Operative Documents in respect of the Aircraft, the taking of all corporate proceedings in connection therewith and compliance with the conditions herein or therein set forth;

(v)    the items described in Article 18.13 hereof; and

(w)    such other documents and matters as Lessor may reasonably request, in form and substance satisfactory to Lessor.

7.1.2    Lessor Requirements.  The obligation of Lessee to lease the Aircraft from Lessor hereunder is subject to the satisfaction of the following conditions precedent prior to the Delivery Date:

(a)    Lessee shall have received this Lease, authorized and executed by Lessor; and

(b)    Lessee shall have received (or satisfactory arrangements shall have been made for delivery of) all Aircraft Documentation in Lessor's possession.

7.2    Post-Delivery Requirements.

(a)    Lessee will, within seven (7) days after Delivery, if not previously provided, furnish Lessor with copies of all Aviation Documents not previously delivered, including the full Certificate of Airworthiness (but if it is not available within seven (7) days, as soon as it is available) and Lessee will comply with any special conditions attached thereto within any time limits imposed for compliance by the Aviation Authority and evidence of any recordation of Lessor's interest in the Aircraft and Lease permitted by the Law of the State of Registration;

(b)    Lessee will, within fifteen (15) days of Lessee's receipt from Lessor of a duly executed, notarized, apostilled Certificate of Acceptance, provide Lessor with evidence

reasonably satisfactory to Lessor confirming that the Certificate of Acceptance is in a form suitable for filing with the DGAC and any other appropriate Government Entity and has been presented for filing and recordation with the DGAC together with a certified Spanish translation thereof;

(c)     Lessee will, within five (5) days of the filing referred to in Article 7.2(b) above, provide Lessor with evidence that Lessee has paid all registration fees and duties in connection with the filing of the Certificate of Acceptance;

(d)     Lessee will, within one hundred twenty (120) days of Delivery, provide Lessor with a certificate of registration satisfactory to Lessor with respect to the Aircraft issued by the Aviation Authority, in the name of Lessor as lessor and Lessee as operator thereof;

(e)     Lessee will, within thirty (30) days of the Delivery Date, provide Lessor with (i) evidence that Lessee has obtained all licenses, air operator's certificates or other documents from each appropriate Government Entity as may be required to operate the Aircraft as a commercial air carrier under applicable Law, including but not limited to the authorization issued by the DGAC authorizing Lessee to lease and operate the Aircraft as part of Lessee's fleet of aircraft, and (ii) any other authorizations, approvals, consents and certificates in the State of Registration as may be required to enable Lessee to lawfully operate the Aircraft;

(f)     Lessor will, within three (3) Business Days of Delivery, execute and deliver (i) a certificate as to the occurrence of the Delivery Date, substantially in the form of Exhibit E-1 hereto, and (ii) a certificate as to the satisfaction of the conditions precedent hereunder, substantially in the form of Exhibit E-2 hereto; and

(g)     CIT will, within three (3) Business Days of Delivery, execute and deliver a certificate confirming its consent to the Lease between Lessor and Lessee, substantially in the form of Exhibit E-3 hereto.

## ARTICLE 8

## DISCLAIMERS

LESSOR HAS COMMITTED TO LESSEE THAT ON THE DELIVERY DATE THE AIRCRAFT WILL BE IN THE CONDITION REQUIRED BY ARTICLE 6.2 AND SCHEDULE 1.  SUCH COMMITMENT OR COVENANT ON THE PART OF LESSOR EXPIRES AND THE DISCLAIMERS SET FORTH IN THIS ARTICLE 8 APPLY UPON LESSEE'S ACCEPTANCE OF THE AIRCRAFT AND EXECUTION OF THE ESTOPPEL AND ACCEPTANCE CERTIFICATE.  AFTER SUCH TIME, THEN AS BETWEEN LESSOR AND LESSEE:

8.1     "As Is, Where Is".  LESSEE AGREES THAT IT IS LEASING THE AIRCRAFT "AS IS, WHERE IS".  LESSEE UNCONDITIONALLY ACKNOWLEDGES AND AGREES THAT NEITHER LESSOR NOR CIT NOR PARTICIPANT NOR ANY OTHER RELEVANT PARTY NOR ANY OF THEIR RESPECTIVE AFFILIATES, SUBSIDIARIES, MEMBERS, MANAGERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES HAVE MADE OR WILL BE DEEMED TO HAVE MADE ANY TERM, CONDITION,

20

REPRESENTATION, WARRANTY OR COVENANT EXPRESS OR IMPLIED (WHETHER STATUTORY OR OTHERWISE) AS TO (I) THE CAPACITY, AGE, AIRWORTHINESS, VALUE, QUALITY, DURABILITY, CONFORMITY TO THE PROVISIONS OF THIS LEASE, DESCRIPTION, CONDITION (WHETHER OF THE AIRCRAFT, ANY ENGINE, ANY PART THEREOF OR THE AIRCRAFT DOCUMENTATION), DESIGN, WORKMANSHIP, MATERIALS, MANUFACTURE, CONSTRUCTION, OPERATION, DESCRIPTION, STATE, MERCHANTABILITY, PERFORMANCE, FITNESS FOR ANY PARTICULAR USE OR PURPOSE (INCLUDING THE ABILITY TO OPERATE OR REGISTER THE AIRCRAFT OR USE THE AIRCRAFT IN ANY OR ALL JURISDICTIONS) OR SUITABILITY OF THE AIRCRAFT OR ANY PART THEREOF, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, KNOWN OR UNKNOWN, APPARENT OR CONCEALED, EXTERIOR OR INTERIOR, (II) THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK, COPYRIGHT OR OTHER INTELLECTUAL PROPERTY RIGHTS, (III) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE OR (IV) ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE AIRCRAFT OR ANY PART THEREOF, ALL OF WHICH ARE HEREBY EXPRESSLY EXCLUDED AND EXTINGUISHED.

8.2    <u>Waiver of Warranty of Description</u>.  IN CONSIDERATION OF (I) LESSEE'S RIGHTS HEREUNDER TO INSPECT THE AIRCRAFT AND (II) LESSOR'S ASSIGNMENT TO LESSEE OF ANY EXISTING AND ASSIGNABLE WARRANTIES OF AIRFRAME MANUFACTURER AND ENGINE MANUFACTURER AVAILABLE TO IT, LESSEE HEREBY AGREES THAT ITS ACCEPTANCE OF THE AIRCRAFT AT DELIVERY AND ITS EXECUTION AND DELIVERY OF THE ESTOPPEL AND ACCEPTANCE CERTIFICATE CONSTITUTE LESSEE'S WAIVER OF THE WARRANTY OF DESCRIPTION AND ANY CLAIMS LESSEE MAY HAVE AGAINST EITHER LESSOR, CIT OR PARTICIPANT OR ANY OTHER RELEVANT PARTY BASED UPON THE FAILURE OF THE AIRCRAFT TO CONFORM WITH SUCH DESCRIPTION.  EVEN IF AT ANY TIME THE FAILURE OF THE AIRCRAFT TO CONFORM TO SUCH DESCRIPTION SUBSTANTIALLY IMPAIRS THE VALUE AND UTILITY AND MARKETABILITY OF THE AIRCRAFT AND EITHER (A) LESSEE ACCEPTED THE AIRCRAFT BASED ON A REASONABLE ASSUMPTION THAT THE NONCONFORMITY WOULD BE CURED AND IT WAS NOT SEASONABLY CURED OR (B) LESSEE ACCEPTED THE AIRCRAFT WITHOUT DISCOVERING THE NONCONFORMITY BUT LESSEE'S ACCEPTANCE OF THE AIRCRAFT WAS REASONABLY INDUCED EITHER BY LESSOR'S OR CIT'S OR PARTICIPANT'S ASSURANCES OR BY THE DIFFICULTY OF DISCOVERING ANY DEFECT PRIOR TO ACCEPTANCE, LESSEE AGREES NOT TO LOOK TO ANY OF LESSOR, CIT OR PARTICIPANT OR ANY OTHER RELEVANT PARTY FOR DAMAGES OR RELIEF ARISING OUT OF THE FAILURE OF THE AIRCRAFT TO CONFORM TO SUCH DESCRIPTION.

8.3    <u>Lessee Waiver</u>.  Lessee hereby waives and agrees not to seek to establish or enforce any rights and remedies, express or implied (whether statutory or otherwise) against any of Lessor, CIT, Participant or any other Relevant Party relating to any of the matters mentioned in Articles 8.1 or 8.2 and the leasing of the Aircraft by Lessor to Lessee.

21

8.4    <u>Conclusive Proof</u>. DELIVERY BY LESSEE TO LESSOR OF THE ESTOPPEL AND ACCEPTANCE CERTIFICATE WILL BE CONCLUSIVE PROOF AS BETWEEN LESSOR AND LESSEE THAT LESSEE'S TECHNICAL EXPERTS HAVE EXAMINED AND INVESTIGATED THE AIRCRAFT AND ENGINES AND (A) EACH IS AIRWORTHY AND IN GOOD WORKING ORDER AND REPAIR AND (B) THE AIRCRAFT AND ENGINES AND THE AIRCRAFT DOCUMENTATION ARE WITHOUT DEFECT (WHETHER OR NOT DISCOVERABLE AT DELIVERY) AND IN EVERY WAY SATISFACTORY TO LESSEE.

Lessor shall provide reasonable cooperation to assist Lessee in obtaining any additional documentation pertaining to the Aircraft or its operation or maintenance as Lessee may reasonably require and request in writing.

8.5    <u>No Liability for Losses</u>. Lessee agrees that none of Lessor, CIT, Participant or any other Relevant Party will be liable to Lessee, or any Person, whether in contract or tort and however arising, for any cost, loss or damage (consequential or otherwise) arising out of the condition of the Aircraft, whether or not due in whole or in part to an act or omission or the active or passive negligence of such party.

8.6    <u>No Liability to Repair or Replace</u>. Lessor will not be liable for any expense in repairing or replacing any item of the Aircraft or be liable to supply another aircraft or any item in lieu of the Aircraft or any part thereof if the same is lost, confiscated, damaged, destroyed or otherwise rendered unfit for use.

## ARTICLE 9

## MANUFACTURERS' AND VENDORS' WARRANTIES

9.1    <u>Warranties</u>. At Delivery Lessor will assign to Lessee for the duration of the Lease Term the benefit of all remaining warranties and indemnities given to Lessor by the Airframe Manufacturer, the Engine Manufacturer and other vendors with respect to the Aircraft. Lessor will not be responsible for incurring any cost in conjunction with Lessee's pursuit of benefits under such warranty coverage.

9.2    <u>Reassignment</u>. On the Termination Date, the benefit of any warranty assigned by Lessor to Lessee hereunder to the extent not expired will be reassigned automatically to Lessor or its designee. Lessee's rights under such warranties (including Lessee's claims and rights to payment thereunder) will revert to Lessor during any period in which an Event of Default is continuing. Lessee at its own cost and expense will do all such things and execute such documents as may be required for this purpose.

9.3    <u>Warranty Claims</u>. Lessee will diligently and promptly pursue any valid claims it may have against any of the parties listed in Article 9.1 under the warranties described therein with respect to the Aircraft, the Airframe, any Engine, the APU, any Landing Gear or any Part and will provide notice of the same to Lessor.

CHICAGO/#1626279.11

## ARTICLE 10

## OPERATION OF AIRCRAFT

10.1    Costs of Operation.  Lessee will pay all costs incurred in the operation of the Aircraft during the Lease Term and redelivery of the Aircraft to Lessor, for profit or otherwise, including the costs of flight crews, cabin personnel, fuel, oil, lubricants, maintenance, insurance, storage, landing and navigation fees, airport charges, passenger service and any and all other expenses of any kind or nature, directly or indirectly, in connection with or related to the use, movement and operation of the Aircraft.  The obligations, covenants and liabilities of Lessee under this paragraph arising prior to return of the Aircraft to Lessor will continue in full force and effect, notwithstanding the termination of this Lease or expiration of the Lease Term.

10.2    Compliance with Laws.  Lessee agrees throughout the Lease Term to maintain operational control of the Aircraft and use the Aircraft in accordance with applicable Laws of the State of Registration and of any country, state, territory or municipality into or over which Lessee may operate and in accordance with the applicable regulations of EASA and the Aviation Authority.  Lessee will not employ, suffer or cause the Aircraft to be used in any business which is forbidden by Law or in any manner which may render it liable to condemnation, destruction, seizure, or confiscation by any authority.  The Aircraft shall not be subleased or wet leased to or operated by or for the benefit of (a) any Prohibited Entity, (b) a national of any country as to which the United States has imposed an embargo, (c) any entities, persons, organizations or nationals on the list of Specially Designated Nationals and Blocked Persons listed on the website of the U.S. Department of the Treasury, Office of Foreign Assets Control (www.ustreas.gov/ofac), or (d) entities or nationals as to which exportation is prohibited by the U.S. Department of Commerce pursuant to the Denied Persons List or the Entity List posted on the website of the U.S. Department of Commerce, Bureau of Export Administration (www.bxa.doc.gov).  The Aircraft shall not be used in, or with respect to travel to and/or from any of the countries as to which the United States has imposed an embargo, as listed on the website of the U.S. Department of the Treasury, Office of Foreign Assets Control (www.ustreas.gov/ofac), provided however, the foregoing shall not prohibit the use of the Aircraft for travel to any such countries if (a) such use would be permitted as a temporary sojourn under Part 740.15 of the Export Administration Regulations of the United States (posted at www.bxa.doc.gov), (b) Lessee retains operational control of the Aircraft at all times, as that term is defined in Part 740.15 of the Export Administration Regulations, and (c) such use is not the predominant route of the Aircraft.

10.3    Training.  Lessee will not use the Aircraft for testing or for training of flight crew members other than Lessee crew members and will not use the Aircraft for training any more than it utilizes for training the other aircraft in its fleet.

10.4    No Violation of Insurance Policies.  Lessee will not use or permit the Aircraft to be used in any manner or for any purpose which is not covered by the insurance policies Lessee is required to carry and maintain as set forth in this Lease.  Lessee will not carry any goods of any description excepted or exempted from such policies or do any other act or permit to be done anything which could reasonably be expected to invalidate or limit any such insurance policy.  Lessee will not operate the Aircraft during any period when the Insurances are not in effect.

10.5    Flight Charges.

10.5.1    Lessee will pay promptly when due all Eurocontrol, AENA, and other navigation charges, landing fees, navigation service charges and all other charges payable by Lessee for the use of or for services provided at any airport on or after the Delivery Date and prior to the Expiration Date or Termination Date, as applicable, whether in respect of the Aircraft or any other aircraft of Lessee, and will indemnify and hold Lessor harmless in respect of the same. This indemnity for such charges will continue in full force and effect notwithstanding the termination or expiration of the Lease Term for any reason or the return of the Aircraft.

10.5.2    If requested by Lessor, Lessee will provide Lessor with a list of the airports to which Lessee regularly operates the Aircraft or its other aircraft. Lessee hereby authorizes Lessor to confirm with Eurocontrol, AENA, the relevant Aviation Authority or airport or creditor claiming rights on the Aircraft to confirm the status of Lessee's payments to such creditor for the Aircraft and its other aircraft, as and when requested by Lessor. Except with the prior written consent of the Lessor, not to be unreasonably withheld, and as otherwise permitted under this Lease, Lessee shall ensure that the Aircraft is based in and operated from Spain and the Lessee will advise the Lessor if it is intended that the Aircraft should be based outside Spain for a period of more than fourteen (14) consecutive days.

10.6    No Flight Crew. Lessor will not provide, directly or indirectly, any flight crew to operate the Aircraft.

10.7    No Grounding. During the Lease Term, other than for scheduled maintenance, Lessee will not take the Aircraft out of operation (ground the Aircraft), unless, and only so long as (i) at the time of such grounding at least thirty percent (30%) of Lessee's narrow-bodied fleet have been taken out of operation (grounded) prior to Lessee's grounding of the Aircraft and (ii) at least thirty percent (30%) of Lessee's narrow-bodied fleet (not including the Aircraft) remain out of operation for the duration of such grounding.

10.8    Non-Discrimination. Lessee shall, at its sole cost and expense, except as otherwise explicitly set forth herein, commencing on the Delivery Date and through the balance of the Lease Term maintain, operate, use, service, repair, and overhaul (or cause to be maintained, operated, used, serviced, repaired, and overhauled) the Aircraft (including, without limitation, the Airframe, Engines, Parts, APU and Landing Gear) (and any engine which is not an Engine but which is installed on the Aircraft) in substantially the same manner as Lessee maintains, operates, uses, services, repairs and overhauls similar aircraft and engines operated by Lessee in similar circumstances and without in any way discriminating against the Aircraft whether by reason of the leased status thereof or otherwise, including, without limitation, in regard to compliance with Airworthiness Directives, modifications and/or improvements.

## ARTICLE 11

## NO SUBLEASE; WET LEASES

11.1    No Sublease without Lessor Consent. LESSEE WILL NOT SUBLEASE OR PART WITH POSSESSION OF THE AIRCRAFT, ANY ENGINE OR ANY PART THEREOF

(EXCEPT FOR MAINTENANCE AND REPAIR) AT ANY TIME WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Lessee may, with Lessor's express written consent, sublease the Aircraft, provided that Lessee shall reimburse Lessor for any legal fees and costs involved with evaluating such sublease (whether or not Lessor's consent to such sublease is ultimately given) and documenting such sublease. Also, Lessee shall pay to Lessor prior to the execution of such sublease a fee of $10,000. In addition to the costs and fees outlined above, (i) the sublessee shall covenant for the benefit of Lessor not to do anything which would prejudice the interest, rights and benefits of CIT and Lessor in all or any part of the Aircraft under this Agreement, such covenant to be given in a written form reasonably satisfactory to Lessor; (ii) no such sublease shall extend beyond the date that is three months before the scheduled expiration of the Lease Term or in any event, involve any transfer of title or interest in or to the Aircraft or the right to acquire all or any part of the Aircraft, or in any way diminish or discharge Lessee's obligations to Lessor hereunder; (iii) the terms of any sublease shall (a) not be contrary to or infringe in any way the terms of this Agreement or any Operative Document or confer on any sublessee any greater rights that the Lessee has under such documents, (b) not result in a breach, either directly or indirectly, by Lessee of any of the terms of this Agreement or any of the Operative Documents and (c) provide appropriate Lessor indemnities regarding the maintenance and repair standards for the Aircraft, the insurances which will be carried by the sublessee and the circumstances which constitute a Total Loss of the Aircraft; (iv) the rights of such sublessee are at all times expressly subject and subordinate to all the terms of this Agreement and the rights of CIT and the Lessor hereunder and under the Head Lease and the other Operative Documents, including Lessor's rights to repossess the Aircraft and terminate the sublease if an Event of Default hereunder or under the sublease exists; (v) Lessee shall furnish Lessor with a copy of such sublease fifteen (15) Business Days prior to its commencement date; (vi) Lessor may require an opinion of counsel in connection with such sublease, including a legal opinion (a) as to Lessor's right to repossess the Aircraft in the event of an Event of Default hereunder or under the sublease, (b) that it is not necessary for CIT or Lessor to register or qualify to do business in such jurisdiction, if not already so registered or qualified, as a result of the proposed sublease, (c) that CIT's and Lessor's interest, rights and benefits in the Aircraft will be recognized and enforceable, (d) that there is no tort liability imposed on CIT or Lessor having no operational interest in the Aircraft, and (e) that neither CIT nor Lessor will be subjected to any adverse tax consequences as a result of such sublease, unless Lessee agrees to indemnify such Person pursuant to a separate indemnity agreement reasonably satisfactory to such Person; (vii) Lessee will not amend any of the terms of any approved sublease without the prior written consent of Lessor. Finally, any approved sublease will be assigned to Lessor as security. In connection therewith, Lessee will deliver the original counterpart of the sublease to Lessor and make any filings necessary to protect Lessor's security interest in the Sublease; and (viii) any such sublease shall include assurances reasonably satisfactory to Lessor and CIT that the Aircraft will, throughout the term of such sublease, be engaged in international air travel.

11.2    <u>Wet Leasing</u>. The wet leasing of the Aircraft during the Lease Term (in which Lessee and its crews retain operational control of the Aircraft) will not be considered a sublease or assignment of the Aircraft provided that:

(a)    the Aircraft remains registered in State of Registration;

25

(b)    the wet lease is for a term of not more than 12 months, and in any event expires prior to the Expiration Date hereof;

(c)    the Aircraft is neither based nor operated in a Prohibited Country;

(d)    Lessee retains at all times operational control of the Aircraft and full responsibility for the Insurances relating to the Aircraft required under this Lease;

(e)    the Aircraft remains under and subject to Lessee's Maintenance Program;

(f)    Lessee furnishes Lessor and CIT with a copy of such wet lease prior to its commencement date.

## ARTICLE 12

## MAINTENANCE OF AIRCRAFT

12.1    <u>General Obligation</u>.  During the Lease Term, Lessee, at its sole expense, shall continuously maintain the Aircraft in good operating order, repair, condition, and appearance, and in at least as good condition (taking into account the relative age of the Aircraft) and repair as other aircraft owned or leased and operated by Lessee.  Lessee shall maintain the Aircraft in accordance with the Maintenance Program approved by the Aviation Authority, in adherence with EASA standards, based on the MPD, and in accordance with EASA requirements, and all other requirements as mandated by the Aviation Authority.  Lessee, at its cost and expense, shall be obligated to comply (on a terminating basis if required to be terminated during the Lease Term or no later than 180 days after the Expiration Date, unless otherwise mutually agreed between Lessee and Lessor) with all Airworthiness Directives which are required by the Aviation Authority, and all mandatory service bulletins issued by EASA, the FAA and/or the Aviation Authority, which have compliance date(s) during the Lease Term or no later than 180 days after the Expiration Date.  Lessor shall have the right to review any changes to the Maintenance Program which relate to lengthening of maintenance intervals or modifying the nomenclature or the content of maintenance checks which Lessee proposes to make during the Lease Term.

12.2    <u>Specific Obligations</u>.  Without limiting Article 12.1, Lessee agrees that such maintenance and repairs will include but will not be limited to each of the following specific items:

(a)    Performance in accordance with the Maintenance Program of all routine and non-routine maintenance work.

(b)    Incorporation in the Aircraft of all applicable Airworthiness Directives, and as specified in 12.1 all mandatory service bulletins of Airframe Manufacturer, Engine Manufacturer and other vendors or manufacturers of Parts incorporated on the Aircraft and any service bulletins which must be performed in order to maintain the warranties on the Aircraft, Engines and Parts.

26

(c)     It is the intent of the parties that the Aircraft will not be discriminated from the rest of Lessee's fleet in service bulletin compliance (including method of compliance and timeliness of completion) or other operational or airworthiness compliance maintenance matters. Lessee will not discriminate against the Engines with respect to overhaul build standards and life limited part replacements.

(d)     Incorporation in the Maintenance Program for the Aircraft of a corrosion prevention and control program as recommended by the Airframe Manufacturer and the Aviation Authority and the correction of any discrepancies in accordance with the recommendations of Airframe Manufacturer and the Structural Repair Manual. In addition, all inspected areas will be properly treated with corrosion inhibitor as recommended by the Airframe Manufacturer, if required.

(e)     Incorporation into the Maintenance Program of an anti-fungus/biological growth and contamination prevention, control and treatment program of all fuel tanks in accordance with the Airframe Manufacturer's approved procedures, if required.

(f)     Providing Lessor with written summaries of all sampling programs involving or affecting the Aircraft.

(g)     At all times Lessee shall ensure, retain, and control complete and accurate maintenance records for the Aircraft (in the English language, except for mechanics' notes of which Lessor, acting reasonably, may request Lessee to submit certified English translations) which at a minimum shall be in compliance with the Maintenance Program and all applicable Aviation Authority requirements, and keep in an up-to-date status the records and historical documents set forth in Attachment 1 of Exhibit G.

(h)     Maintaining historical records, in English, for (x) hard time and life limited Parts (including all back-to-birth documentation for Landing Gear and Engine life limited Parts and such other Parts as required by the Aviation Authority and dirty finger print records and tags, whether produced by Lessee, the manufacturer of such Part or a repair facility which evidence that such Part is new or overhauled and establish authenticity, total time in service and time since Overhaul for such Part), (y) the Airframe Cycles, Engine Cycles, Airframe Flight Hours and the Engine Flight Hours, as applicable, and (z) all maintenance and repairs performed on the Aircraft, including any Major Check or Engine Heavy Maintenance.

(i)     Properly documenting in a timely manner all repairs, Modifications and alterations and the addition, removal or replacement of equipment, systems or components in accordance with the rules and regulations of the Aviation Authority and reflecting such items in the Aircraft Documentation. In addition, all Modifications, repairs and alterations will be accomplished in accordance with Airframe Manufacturer's Structural Repair Manual and service bulletins of the Airframe Manufacturer, supplemental type change certificates, Lessee's engineering orders and other approved data.

(j)     Ensuring that all maintenance to the Aircraft (including Overhauls) is accomplished utilizing maintenance and quality control procedures approved at an EASA-approved (or accepted) facility utilizing maintenance and quality control procedures approved by

27

EASA and the Aviation Authority (with the exception of "A" checks, "B" checks and non-structural "C" checks (each as defined and described in the Maintenance Program), which shall be performed in accordance with manufacturer specifications only) and that the repair agency provides a complete record of all work performed during the course of such maintenance and certifies that such maintenance was accomplished, that the equipment is airworthy and released for return to service and that the maintenance was in conformity with the original type design.

12.3    Replacement of Parts.

12.3.1    Lessee, at its own cost and expense, will promptly replace all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or rendered unfit or beyond economical repair for use for any reason. In the ordinary course of maintenance, service, repair, Overhaul or testing, Lessee may remove any Part provided that Lessee replaces such part as promptly as practicable. All replacement Parts will (i) be free and clear of all Security Interests (except Permitted Liens) of any kind or description, (ii) be in airworthy condition and of at least equivalent model, service bulletin and modification status and have a value and utility and marketability at least equal to the Parts replaced, assuming such replaced Parts were in the condition and repair required to be maintained by the terms hereof, (iii) have complete records evidencing fully traceable "back-to-birth" documentation for Landing Gear and Engine life limited Parts and such other Parts as required by the Aviation Authority, and (iv) have a current "serviceable tag" and other Aviation Authority required documentation including but not limited to FAA Form 8130 or EASA Form 1 of the manufacturer or maintenance facility providing such items to Lessee, indicating that such Parts are new, serviceable or Overhauled. With respect to replacement modules in an Engine, the replacement module will not have been previously operated at a higher thrust rating than the replaced module. So long as a substitution meets the requirements of the Maintenance Program and Aviation Authority, Lessee may substitute for any Part a part that does not meet the requirements of the foregoing sentence if a complying Part cannot be procured or installed within the available ground time of the Aircraft and as soon as practicable the noncomplying part is removed and replaced by a complying Part.

12.3.2    All Parts removed from the Airframe or any Engine will remain the property of CIT subject to the Head Lease and Lessor's interest therein and subject to this Lease no matter where located, until such time as such Parts have been replaced by Parts (which have been incorporated or installed in or attached to the Airframe or such Engine) which meet the requirements for replacement Parts specified above and title to such replacement Parts has passed to CIT subject to the Head Lease and Lessor's interest therein under the Laws of the State of Registration and lex situs. To the extent permitted by the Laws of the State of Registration and the lex situs it is the intent of Lessor and Lessee that without further act and immediately upon any replacement Part becoming incorporated, installed or attached to the Airframe or an Engine as above provided, (i) title to the removed Part will thereupon vest in Lessee, free and clear of all rights of Lessor, (ii) title to the replacement Part will thereupon vest in CIT subject to the Head Lease and Lessor's interest therein free and clear of all rights of Lessee and (iii) such replacement Part will become subject to this Lease and be deemed to be a Part hereunder to the same extent as the Parts originally incorporated or installed in or attached to the Airframe or such Engine.

28

12.4    Removal of Engines.

12.4.1    If an Engine is removed for testing, service, repair, maintenance, Overhaul work, alterations, or modifications, title to such Engine will at all times remain vested in CIT.

12.4.2    Lessee will be entitled to remove any of the Engines from the Aircraft and install another engine or engines on the Aircraft, provided that Lessee complies with each the following obligations:

(a)    The insurance requirements set forth in Article 18 and Exhibit B are in place.

(b)    Lessee ensures that the identification plates referred to in Article 15 are not removed from any Engine upon such Engine being detached from the Aircraft.

(c)    Title to the Engine remains with CIT subject to the Head Lease and Lessor's interest therein free from all Security Interests (except Permitted Liens) regardless of the location of the Engine or its attachment to or detachment from the Aircraft.

(d)    If Lessee removes an Engine from the Aircraft, it will promptly install a replacement engine.  Any replacement engine installed on the Aircraft at any time must be in serviceable condition and of a similar model as the Engine removed.

12.5    Installation of Engines on other Aircraft.  So long as no Default or Event of Default shall have occurred and be continuing, any Engine removed from the Aircraft may be installed on another aircraft in Lessee's fleet which utilizes engines of the same type as the Engine only if one of the situations described in this Article 12.5 exists throughout the period of time that the Engine is installed:

12.5.1    Lessee, Lessor or CIT has title to such other aircraft free and clear of all Security Interests (except Permitted Liens).

12.5.2    Lessee, Lessor and all the Creditors of Lessee holding an interest in such aircraft enter into a cooperation agreement in form and substance acceptable to Lessor in which each party agrees to recognize one another's rights in the Engine. Lessee will reimburse each of Lessor and CIT for their respective reasonable attorneys' fees and costs in negotiating and finalizing engine cooperation agreement arrangements with Lessee and its Creditors.

12.5.3    Such other aircraft is subject to a Creditor Agreement (but no other Security Interests except Permitted Liens) which by its terms expressly or effectively states that such Creditor and its successors and assigns will not acquire any right, title or interest in any Engine by reason of such Engine being installed on such aircraft. To evidence the foregoing, at or before Delivery, Lessee will provide Lessor with an opinion of counsel and officer's certificate as to this matter (and such an opinion of counsel and officer's certificate will be provided during the Lease Term with respect to other Creditor Agreements regarding aircraft entering Lessee's operating fleet subsequent to Delivery). Lessee hereby agrees that if CIT's title to, or Lessor's interest in, an Engine is in fact impaired under any such Creditor Agreement, such impairment will be a Total Loss of such Engine and the provisions of Article 19.5 will apply. To the extent

29

another Creditor Agreement contains such provisions, then Lessor hereby agrees for the benefit of the Creditor of such Creditor Agreement that neither Lessor nor its successors or assigns will acquire or claim any right, title or interest in any engine in which Lessee or another Creditor has an interest as a result of such engine being installed on the Airframe.

12.6    Modifications.

12.6.1    No modification, alteration, addition or removal to the Aircraft ("**Modification**") expected to cost over Two Hundred Fifty Thousand U.S. Dollars ($250,000) or deviation from the Aircraft's original type design certificate or configuration will be made without the prior written consent of Lessor, which consent will not be unreasonably withheld. "Modifications" do not include Airworthiness Directives of the Aviation Authority, EASA, the FAA or Airframe Manufacturer's mandatory service bulletins, for which Lessor consent is not required.

12.6.2    Lessor may review Lessee's proposed designs, plans, engineering drawings and diagrams, and flight and maintenance manual revisions for any proposed Modification prior to such work commencing. If requested by Lessor, Lessee will furnish Lessor (at Lessee's expense) with such documents in final form and any other documents required by Law, as a result of such Modification. All Modifications incorporated on the Aircraft will be properly documented in the Aircraft Documentation and be fully approved by the Aviation Authority. Upon completion of each Modification, or while in process, at the discretion of Lessor, Lessor or its designee will be entitled to inspect the Aircraft independent of any other inspection rights provided in this Lease.

12.6.3    During the Lease Term, Lessee may elect to modify the interior of the Aircraft. In the event that Lessee elects to do so, Lessee shall notify Lessor of all proposed modifications to the interior of the Aircraft and request approval from Lessor for such modifications. Lessee shall be responsible for all costs associated with such interior modifications. All modifications accomplished by Lessee shall immediately become the property of CIT subject to the Head Lease and Lessor's interest therein. All removed Parts will remain the property of CIT, and Lessor and CIT will notify Lessee whether to scrap such Parts. If the Parts are not scrapped, Lessor shall have the responsibility for storage and for transportation of such Parts.

12.6.4    Notwithstanding any other provision of this Lease, no Modification will be made which has the effect of decreasing the utility or value or marketability of the Aircraft or invalidating any warranty applicable to the Aircraft. No Modification will be made to the Aircraft which is inconsistent with the Maintenance Program.

12.6.5    No Modification will be made by Lessee if a Default or Event of Default exists and is continuing hereunder. No Modification will be permitted during a sublease of the Aircraft.

12.6.6    Unless otherwise agreed by Lessor in writing, all permanent or structural Modifications will forthwith become a part of the Aircraft and Lessee relinquishes to CIT subject to the Head Lease and Lessor's interest therein all rights and title thereto. All Parts associated with such Modifications will be owned by CIT subject to the Head Lease and Lessor's interest

CHICAGO/#1626279.11

therein free of any and all liens. However, all temporary and non-structural Modifications which can be removed without impairing the airworthiness of the Aircraft or diminishing the value or utility or marketability, or altering the specification or structure of the Aircraft will remain the property of Lessee and may be removed by Lessee and, at Lessor's request and Lessee's cost, will be removed from the Aircraft prior to return of the Aircraft, with Lessee restoring the Aircraft to the condition it was in prior to the Modification in a manner cosmetically acceptable to Lessor and in compliance with the redelivery requirements set forth in Article 23 of this Lease. Notwithstanding the foregoing, no such removal will be permitted without Lessor's permission after the occurrence of a Default or Event of Default and termination of any cure period under any such Default or Event of Default hereunder and immediately upon the occurrence of a Default or Event of Default hereunder, without the requirement of any further act or notice, all right, title and interest in such Modifications will immediately vest in CIT subject to the Head Lease and Lessor's interest therein.

12.6.7    Lessor will bear no liability for the cost of Modifications of the Aircraft whether in the event of grounding or suspensions of certification, or for any other cause.

12.7    Pooling of Engines and Parts.  With Lessor's prior written consent, not to be unreasonably withheld, Lessee may subject the Engines and Parts to normal interchange or pooling agreements with responsible, solvent international commercial air carriers customary in the airline industry and entered into by Lessee in the ordinary course of its business with respect to its entire A320-200 fleet so long as (i) in the case of pooling of an Engine, such Engine is returned to Lessee within six (6) months, (ii) no transfer of title to the Engine occurs, (iii) all other terms of this Lease continue to be observed with respect to the Engines or Parts, including but not limited to Articles 8, 10, 12, 14, 15, 16, 17, 18, 19 and 29, (iv) Lessee continues to be fully responsible to Lessor for the performance of all of its obligations hereunder, (v) CIT shall remain as sole loss payee with respect to the insurance maintained with respect to such Engine and (vi) such Engine shall not be registered in another jurisdiction.

12.8    Performance of Work by Third Parties.  Whenever maintenance and repair work on the Aircraft or Engines will be performed by a Person other than Lessee, such Person will be an EASA-authorized or a FAA-authorized or Aviation Authority-authorized repair station.

12.9    [Reserved].

12.10    Information Regarding Maintenance Program.  Lessee will provide Lessor or its representative with a copy of or information regarding the Maintenance Program for the Aircraft, as requested by Lessor.  Lessor agrees to keep the Maintenance Program for the Aircraft confidential.

12.11    Lessor Rights to Inspect Aircraft.  On reasonable notice, Lessor and/or its authorized agents or representatives will have the right to inspect the Aircraft and Aircraft Documentation.  Lessor agrees that such requests will be coordinated with Lessee so as not to cause disturbance to Lessee's operation or its personnel, as long as no Event of Default has occurred and is continuing.  Lessee agrees to cooperate with Lessor in making the Aircraft and Aircraft Documentation available to such authorized technical teams.  Lessor will have no duty to make any such inspection and will not incur any liability or obligation by reason of (and

31

Lessee's indemnity obligations pursuant to Article 17 will apply notwithstanding) not making any such inspection or by reason of any reports it receives or any reviews it may make of the Aircraft Documentation. The cost to the Lessor of such inspections and surveys shall be paid by the Lessor unless the Lessor determines, acting reasonably, that Lessee has not complied with its obligations in this Lease, in which case the cost of such inspections and surveys shall be paid by the Lessee. All time taken in respect of such inspections or surveys shall form part of the Lease Term. Lessor shall have no duty to make any such inspection or survey and shall not incur any liability or obligation by reason of not making any such inspection.

12.12   <u>Airworthiness Directive Cost Sharing</u>. If during the Lease Term, the Lessee is required to comply with any Airworthiness Directive or any mandatory modifications required by the Aviation Authority in respect of the Aircraft and: (i) such Airworthiness Directive or mandatory modification requires terminating action only; (ii) such terminating action is mandatory; and (iii) the cost of complying with such Airworthiness Directive or mandatory modification exceeds $50,000; so long as no Default has occurred and is continuing, the Lessor shall, within thirty (30) days of receipt of an invoice in respect of the same, reimburse to Lessee an amount calculated in accordance with the following formula:

$$\frac{(C - X) \times (60 - N)}{60}$$

where:

"C"   equals the cost of complying with such Airworthiness Directive or mandatory modification ;

"X"   equals $50,000; and

"N"   equals the total number of months from the month in which such compliance is completed until the end of the Lease Term.

If the product of this formula is a negative figure, the Lessor shall make no payment to the Lessee. Without in any way affecting Lessee's obligations to comply with all Airworthiness Directives and mandatory modifications, the aggregate payments made by Lessor to Lessee under this Article 12.12 shall not exceed $250,000, it being understood that the parties agree to negotiate in good faith regarding the sharing of any costs exceeding such amount.

## ARTICLE 13

## GENERAL UNDERTAKINGS

13.1   <u>Lessee Undertakings</u>.

13.1.1   Lessee undertakes with Lessor that it will:

(a)   <u>Notification of Default or Event of Default</u>. promptly inform Lessor of any occurrence of which it becomes aware which might adversely affect its ability to perform its obligations under any of the Operative Documents and of any Default or Event of Default

32

forthwith upon becoming aware thereof and will from time to time, if so requested by Lessor, confirm to Lessor in writing that, save as otherwise stated in such confirmation, no Default or Event of Default has occurred and is continuing;

(b)    Consents and Authorizations.  obtain or cause to be obtained, maintain in full force and effect and comply in all material respects with the conditions and restrictions (if any) imposed in, or in connection with, every consent, authorization, license or approval of governmental or public bodies or authorities or courts and do, or cause to be done, all other acts and things, which may from time to time be necessary or desirable under applicable law for the continued due performance of all its obligations under each of the Operative Documents;

(c)    Preparation of Financial Statements.  cause to be prepared in each financial year and cause to be certified by its auditors financial statements and consolidated financial statements including balance sheet, income statement and statement of cash flows (collectively, "**Financial Statements**") which are prepared in accordance with generally accepted accounting principles and practices in Europe which have been consistently applied and present fairly and accurately the financial position of each of Lessee and Guarantor as at the end of the relevant financial year and the consolidated results of the operations of each of Lessee and Guarantor for the relevant financial year, which discloses all significant liabilities (contingent or otherwise) of each of Lessee and Guarantor and, prepare unaudited financial statements in the form of a one page profit and loss statement, one page balance sheet and one page cash flow statement in respect of each quarter;

(d)    Supply of Financial Statements.  deliver (or cause to be delivered) to Lessor the Financial Statements referred to in Article 13.1.1(c) as soon as practicable but not later than ninety (90) days (in the case of annual audited financial statements) or thirty (30) days (in the case of unaudited quarterly financial statements) after the end of the financial period to which they relate and every report, notice or like document concerning Lessee's ability to meet its financial obligations generally as they fall due issued by it to its creditors (at the time of issue thereof);

(e)    Information Concerning the Lessee and Guarantor.  promptly provide Lessor with such financial and other information concerning Lessee and Guarantor and each of their affairs and subsidiaries (as is available to the Lessee and Guarantor) and their respective affairs as Lessor may from time to time reasonably require and, in particular, but without limitation to the generality of the foregoing, (i) at reasonable intervals throughout the Lease Term permit Lessor to visit Lessee's and Guarantor's premises for the purposes of discussing Lessee's and Guarantor's general affairs and finances with Lessee's and Guarantor's principal officers, and (ii) promptly provide Lessor with details of any Indebtedness in respect of which a Security Interest (other than a Permitted Lien) may arise over the Aircraft;

(f)    Utilization Report.  on the tenth (10th) day of each month (except that, if such day is not a Business Day, then on the immediately preceding Business Day) and on the Expiration Date provide Lessor with a Monthly Utilization Report in the form of Exhibit H on the Aircraft and the Engines containing or indicating (i) the serial numbers of the engines then installed on the Aircraft and the owners thereof, (ii) the serial numbers, condition and whereabouts of any Engines not then installed on the Aircraft, (iii) the Airframe Flight Hours and

CHICAGO/#1626279.11

Engine Flight Hours and Airframe Cycles and Engine Cycles since Delivery or, if later, the delivery of the previous status report, (iv) APU hours and cycles, (v) details of all scheduled and unscheduled engine and APU changes since Delivery or, if later, delivery of the previous status report, and (vi) the latest amendment status of the Maintenance Program including any revisions, if applicable;

(g)     Technical Reports following "C" Check and Major Check.  provide Lessor with detailed technical reports, including any damage reports, modification status and updates of the component fitment record which document the technical condition of the Aircraft following the completion of any "C" Check or Major Check, together with full details of the Excluded Parts at each "C" Check or Major Check then installed on the Aircraft;

(h)     Information Concerning the Aircraft.  promptly provide Lessor with such other information regarding the location, operation, use, insurance, maintenance and condition of the Aircraft as Lessor may from time to time reasonably require, and without prejudice to the generality of the foregoing, shall, if requested, supply Lessor with copies of any agreement that may affect or prejudice Lessor's (or any Relevant Party's) interest in, or rights to, the Aircraft in Lessee's possession;

(i)     No Operational Interest.  procure that neither Lessor or any Relevant Party is at any time represented as carrying goods or passengers on the Aircraft, or as being in any way connected or associated with any operation of carriage which may be undertaken by Lessee or any other operator of the Aircraft, or as having any operational interest in, or responsibility for, the Aircraft;

(j)     Compliance with Insurances.  comply, and procure compliance by any other operator of the Aircraft, with the terms and conditions of the Insurances, and not do, consent to, or permit any act or omission which might invalidate or render unenforceable the whole or any part of the Insurances;

(k)     Permitted Liens.  discharge any Permitted Lien (save for any Security Interest created by any act or default of Lessor or any Security Interest created by Lessor or any Relevant Party which is permitted by, or created pursuant to, the terms of the Operative Documents, provided in each case such Security Interest does not arise, directly or indirectly, by reason of the occurrence of any Relevant Event) which may arise over the Aircraft forthwith upon the Indebtedness in respect of which such Permitted Lien arises becoming payable and provide Lessor with evidence of such discharge;

(l)     Air Traffic Control Information.  use reasonable endeavors to assist Lessor in obtaining from the DGAC and any relevant air traffic control authority or airport, upon Lessor's request from time to time, statements of account of all sums due by Lessee to such authorities or airports in respect of all aircraft (including, but not limited to, the Aircraft) operated by Lessee;

(m)     Disposal and Encumbrance of the Aircraft.  not attempt or hold itself out as having any power to sell, charge, lease or otherwise encumber or dispose of the Aircraft, any

34

Engine or any Part thereof (except as set forth in Article 11 or Article 12), nor create, incur or suffer to exist any Security Interest over the Aircraft (other than Permitted Liens);

(n)    Prevention of Arrest.  not do, and will use its best endeavors to prevent, any act which could reasonably be expected to result in the Aircraft being arrested, confiscated, seized, taken in execution, impounded, forfeited, detained in exercise or purported exercise of any possessory lien or other claim or otherwise taken from the possession of Lessee and, if any such arrest, confiscation, seizure, taking, impounding, forfeiture or detention occurs, Lessee will give Lessor immediate written notice thereof, and will procure the prompt release of the Aircraft;

(o)    No Pledging of Credit.  not pledge, nor allow any other operator of the Aircraft to pledge, the credit of Lessor or any Relevant Party for any maintenance, service, repairs, overhauls of, or modifications to, or changes or alterations in, the Aircraft or for any other purpose whatsoever; or

(p)    Protection of Rights in the Aircraft.  not, and will procure that any other operator of the Aircraft will not, do or permit to be done any act or thing which might jeopardize the title, rights and interest of CIT or Lessor or any Relevant Party in the Aircraft and/or omit or permit to be omitted to be done any act which might prevent that title and those rights and interest from being jeopardized.  Without prejudice to the generality of the foregoing, Lessee will:

(1)    at its own cost and expense, do all acts and things, including, without limitation, those acts set forth in Articles 14.2 and 14.3, which Lessor may reasonably require to preserve the title, rights and interest of Lessor and CIT to and in the Aircraft within the jurisdiction of any signatory which has ratified the terms of the Geneva Convention and in the territory in which the Aircraft is or may be operated, and to protect the title, rights and interest of Lessor and CIT in the Aircraft against the claims of any other party or parties; and

(2)    in the event of any enactments or provisions being made or becoming operative relating to recognition of rights in aircraft and which may apply to the Aircraft, including, without limitation, the Cape Town Convention (as hereinafter defined), at no cost to Lessor, promptly do and join with Lessor in doing all such acts or things, including, without limitation, those acts set forth in Articles 14.2 and 14.3, as may be necessary or reasonably desirable to perfect recognition of the title, rights and interest of Lessor and CIT in respect of the Aircraft.

## ARTICLE 14

## TITLE AND REGISTRATION

14.1    Title to the Aircraft During Lease Term.  Title to the Aircraft will be and remain vested in CIT.  Lessor and Lessee intend this Lease to be a "true lease".  Lessee will have no right, title or interest in the Aircraft except as provided in this Lease.

14.2    Registration of Aircraft.  Lessee at its sole cost and expense will (i) register and maintain registration of the Aircraft in the State of Registration, except, subject to Article 11

35

hereof, if the Aircraft is subleased, during the term of which the Aircraft may be registered in the relevant jurisdiction for such sublease, and (ii) from time to time take all other steps then required by Law (including the Geneva Convention if applicable) or by practice, custom or understanding or as Lessor may reasonably request to protect and perfect Lessor's and CIT's interest in the Aircraft and this Lease in the State of Registration or in any other jurisdictions in or over which Lessee may operate the Aircraft. Upon the request of Lessor, at the end of the Lease Term, Lessee shall arrange for the deregistration of the Aircraft (at Lessee's own cost and expense).

      14.3   <u>Filing of this Lease</u>. To the extent permitted by Law and in accordance with the requirements of the Law from time to time, Lessee at its sole cost and expense will cause this Lease (and any sublease, as applicable) to be kept, filed, recorded and refiled or rerecorded in the State of Registration (and International Registry, as the case may be) and in any other offices necessary to protect Lessor's and CIT's rights hereunder. Lessor and Lessee agree from time to time to do and perform such other and further acts and execute and deliver any and all such other instruments as may be required by Law, reasonably requested by the auditors of the other party or requested by the other party to establish, maintain or protect the rights and remedies of the requesting party or to carry out and effect the intent and purpose of this Lease. Lessor and Lessee undertake that as soon as practicable following the date on which the Cape Town Convention shall become applicable to, and take effect in, Spain, to the extent necessary, this Lease shall be amended, restated, revised, or otherwise adapted in such a manner as to permit the interests created hereunder to constitute "international interests" under the Cape Town Convention. Lessor and Lessee intend that the priority of any security interest granted pursuant to this Lease shall not be prejudiced by any change made pursuant to this Article 14.3. In the event that Lessor, acting reasonably, shall determine that an unacceptable risk of such prejudice to any such security interest will or is reasonably likely to arise as a result of any change made pursuant to this Article 14.3, this Lease shall remain in full force and effect, subordinated as to enforcement only, to any new documents which the parties may execute and deliver in order to effect application of the Cape Town Convention to the Aircraft and this Lease. The parties further agree that each international interest arising under the Cape Town Convention as a result of actions taken pursuant to this Article 14.3 shall be registered in the International Registry (as such term is defined in the Cape Town Convention) as soon as possible following the Cape Town Convention taking effect in Spain, and that such registration(s) shall be made by, or with the consent of, the Lessor, or any duly authorized agent thereof, and shall be consented to by any other party hereto as necessary to complete such registration. All costs and expenses (solely with respect to protecting Lessor's and CIT's rights hereunder) arising as a result of actions taken pursuant to this Article 14.3, including but not limited to registration fees and costs incurred by Lessor and CIT in connection with obtaining a Spanish tax identification number, reasonable attorney's fees and other registration fees, shall be for the account of Lessee.

      14.4   <u>Evidence of Registration and Filings</u>. As Lessor may reasonably request from time to time, Lessee will furnish to Lessor an opinion of counsel or other evidence reasonably satisfactory to Lessor of the registrations and filings required hereunder.

CHICAGO/#1626279.11

## ARTICLE 15

## IDENTIFICATION PLATES

Immediately following Delivery, Lessor shall supply airframe and engine identification plates and Lessee will affix and at all times (including, for the avoidance of doubt, on any Engine while subject to any interchange or pooling arrangements) maintain on the Airframe and each Engine, at Lessee's own cost and expense, the identification plates containing the following legends or any other legend requested by Lessor in writing:

### Airframe Identification Plates

| | |
|---|---|
| Location: | one to be affixed to the Aircraft structure above the forward entry door adjacent to and not less prominent than that of the Airframe Manufacturer's data plate and another in a prominent place on the flight deck. |
| Size: | No smaller than 10cm X 7cm |
| Legend: | "THIS AIRCRAFT IS OWNED BY C.I.T. LEASING CORPORATION, IS SUBJECT TO A LEASE TO WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, AS TRUSTEE, AS LESSEE, AND IS SUBJECT TO A SUBLEASE TO AIR COMET, S.A., AS SUBLESSEE" |

### Engine Identification Plates

| | |
|---|---|
| Location: | The legend on the plate must be no less prominent than the Engine data plate and must be visible. |
| Size: | No smaller than 10cm X 7cm |
| Legend (Engines): | "THIS ENGINE IS OWNED BY C.I.T. LEASING CORPORATION, IS SUBJECT TO A LEASE TO WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, AS TRUSTEE, AS LESSEE, AND IS SUBJECT TO A SUBLEASE TO AIR COMET, S.A., AS SUBLESSEE" |

Lessee hereby agrees to promptly affix identification plates on the Airframe and each Engine as may be requested by Lessor to reflect the Security Interest therein held by CIT.

## ARTICLE 16

## TAXES

16.1    _General Obligation of Lessee._  Except as set forth in Article 16.2, Lessee agrees to pay promptly when due, and to indemnify and hold harmless each Indemnitee (as such term is defined in Article 17.1) on a full indemnity basis from, all license and registration fees and all taxes, fees, levies, imposts, duties (including, without limitation, customs or import duties), charges, deductions or withholdings of any nature (including without limitation any value added, franchise, transfer, sales, gross receipts, use, business, excise, personal property, stamp or other tax) together with any assessments, penalties, fines, additions to tax or interest thereon, however

37

or wherever imposed (whether imposed upon Lessee, such Indemnitee, on all or part of the Aircraft, the Engines or otherwise), by any Government Entity or taxing authority in Spain or any foreign country or by any international taxing authority of any jurisdiction in which the Aircraft is operated, upon or with respect to, based upon or measured by any of the following (collectively, "**Taxes**"):

        (a)     the Aircraft, the Engines or any Parts.

        (b)     the use, operation or maintenance of the Aircraft or carriage of passengers or freight during the Lease Term (whether hereunder or pursuant to a sublease permitted hereunder).

        (c)     this Lease, any permitted sublease, the payments due hereunder or thereunder and the terms and conditions hereof.

        (d)     the ownership, delivery, import or export, return, payment of Total Loss Proceeds or other disposition of the Aircraft; and

        (e)     the execution, formalization and delivery of the Guarantee.

    16.2   <u>Exceptions to Indemnity</u>.  Lessee shall not be obligated to indemnify the Indemnitees under Article 16.1 in the case of any of the following Taxes:

        (a)     Taxes which are Lessor's Taxes;

        (b)     Taxes arising or imposed to the extent the same results from any act or omission of an Indemnitee which is not permitted or contemplated by this Lease (other than acts or omissions of an Indemnitee which are attributable to Lessee) or otherwise attributable to such Indemnitee's gross negligence, willful misconduct or breach of this Lease, or from any material representation or warranty made or given by such Indemnitee being incorrect when given or made;

        (c)     Taxes which are in the nature of penalties, additions to Tax, fines or interest paid, arising or imposed as a result of any delay or failure on the part of an Indemnitee to notify Lessee of the liability to a Tax in which Lessee is obligated to indemnify such Indemnitee hereunder, or in filing any returns, statements or other documentation, or in accounting for such Tax on time (unless such delay or failure has been consented to, or is caused by requested by Lessee);

        (d)     Taxes levied or imposed on any assignee or transferee of an Indemnitee (permitted or otherwise) to the extent that such Taxes exceed or are in addition to those which would have been imposed has no assignment or transfer taken place (unless such assignment or transfer occurs as a consequence of the occurrence of any Event of Default);

        (e)     Taxes in respect of which Lessee has indemnified Lessor pursuant to any other provision of this Lease; and

CHICAGO/#1626279.11

(f)      Taxes which are caused by or which arise out of or as a consequence of a Lessor Lien.

16.3    <u>After-Tax Basis</u>.  The amount which Lessee is required to pay with respect to any Taxes indemnified against under Article 16.1 is an amount sufficient to restore the Indemnitee on an after-tax basis to the same position such Indemnitee would have been in had such Taxes not been incurred.  Lessee will indemnify each Indemnitee (without regard to the exceptions set forth in Article 16.2) on an after-tax basis against any withholding Taxes, any interest and penalties with respect thereto, and any costs (including attorneys' fees) incurred in connection with any claim involving withholding Taxes.  If the Lessee shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or any other documents to be delivered hereunder to any Indemnitee, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Article 16.3) such Indemnitee receives an amount equal to the sum it would have received had no such deductions been made, (ii) Lessee shall make such deductions and (iii) Lessee shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Law and provide such Indemnitee with appropriate evidence of such payment within thirty (30) days after making such payment.

16.4    <u>Timing of Payment</u>.  Any amount payable pursuant to this Article 16 will be paid within ten (10) days after receipt of a written demand therefor from the Indemnitee accompanied by a written statement describing in reasonable detail the basis for such indemnity and the computation of the amount so payable provided, however, that such amount need not be paid by Lessee prior to the earlier of (i) the date any Tax is payable to the appropriate Government Entity or taxing authority or (ii) in the case of amounts which are being contested by Lessee in good faith or by the Indemnitee pursuant to Article 16.5, the date such contest is finally resolved.

16.5    <u>Contests</u>.  If claim is made against an Indemnitee for Taxes with respect to which Lessee is liable for a payment or indemnity under this Lease, such Indemnitee will promptly give Lessee notice in writing of such claim provided, however, that the failure to give such notice will not relieve Lessee of its obligations hereunder unless such failure materially impairs or precludes Lessee's ability to contest the claim.  So long as (i) a contest of such Taxes does not involve any danger of the sale, forfeiture or loss of the Aircraft or any interest therein, (ii) if such Indemnitee so requests, Lessee has provided the Indemnitee with an opinion of independent tax counsel that a reasonable basis exists for contesting such claim and (iii) adequate reserves have been made for such Taxes or, if required, an adequate bond has been posted, then such Indemnitee at Lessee's written request will in good faith, with due diligence and at Lessee's expense, contest (or permit Lessee to contest in the name of Lessee or the Indemnitee) the validity, applicability or amount of such Taxes by (i) resisting payment thereof if reasonably practicable, (ii) paying the same only under protest, if protest is necessary or proper, or (iii) if payment is made, by seeking a refund thereof in appropriate administrative or judicial proceedings.

16.6    <u>Refunds</u>.  If one party (the "**payee**") shall realize any Tax savings (by way of refund, deduction, credit or otherwise) in respect of any amount to which the other party (the "**payor**") shall have made a payment (or increased payment) pursuant to Articles 5.8, 16.3, 17.3 or shall have indemnified the payee pursuant to Article 16.1, and such Tax savings shall not have been previously taken into account in calculating any indemnity payment made by the payor,

39

then the payee shall, to the extent that it can do so without prejudice to the retention of the relevant savings and subject to the payor's obligation to repay such amount to the payee if the relevant savings are subsequently disallowed or cancelled, pay to the payor such amount, as the payee shall in its reasonable opinion have concluded to be the amount of such Tax savings (together with, in the case of a refund, any interest attributable thereto); provided, however, that the payee shall not be obligated to make any payment to the payor pursuant to this Article 16.6 to the extent that the amount of any Tax savings in respect of which such payment is to be made would exceed the aggregate amount of all prior payments made by the payor to, on behalf of, or as an indemnification of, the payee under this Lease for Taxes less the amount of all prior payments made pursuant to this Article 16.6 in respect of such Tax savings. Each party acknowledges that nothing contained in this Article 16.6 shall interfere with the right of the payee to arrange its tax affairs in whatsoever manner it thinks fit and, in particular, the payee shall be under no obligation to claim any Tax savings in priority to any other savings available to it.

16.7    Cooperation in Filing Tax Returns.  Lessee will cooperate with such Indemnitee in good faith in providing such Indemnitee with information within Lessee's control which may be reasonably required by such Indemnitee to fulfill such Indemnitee's tax filing requirements and any audit information request arising from such filing (other than for Lessor's Taxes) with respect to the transactions contemplated by this Lease or the operation of the Aircraft by Lessee.

16.8    Survival of Obligations.  The representations, warranties, indemnities and agreements of Lessee provided for in this Article 16, and in Articles 20.1.21 and 20.2.10 (together with any obligations of Lessee deriving from the accuracy of the foregoing) will survive the Termination Date.

## ARTICLE 17

## INDEMNITIES

17.1    General Indemnity.  Except as set forth in Article 17.2, Lessee agrees to indemnify and hold harmless each of Lessor, Participant, CIT and any other Relevant Party identified to Lessee in writing, each of their respective affiliates, subsidiaries, successors and assigns, and the officers, directors, employees, agents, members, managers and shareholders of all of the foregoing (each, individually, an "**Indemnitee**" and together, collectively, the "**Indemnitees**") from any and all liabilities, losses, damages, penalties, claims, actions, suits, costs, disbursements and expenses (including legal fees, costs and related expenses) of every kind and nature (collectively, "**Expenses**") imposed on, incurred by or asserted against any Indemnitee in any way relating to, based on or arising out of any of the following whether during or after the Lease Term (but not before):

(a)    The Aircraft, Engines or engines installed on the Aircraft, any Part, any Aircraft Documentation any other thing delivered under any Operative Document, this Lease or any Operative Document or any transactions contemplated hereby or thereby.

(b)    the operation, possession, use, non-use, control, leasing, subleasing, maintenance, storage, Overhaul, testing, C Check, Major Check, inspections or acceptance

40

flights at delivery or return of the Aircraft, any Engine or any Part during the Lease Term by Lessee, any sublessee or any other Person, whether or not the same is in compliance with the terms of this Lease, including, without limitation, claims for death, personal injury, property damage, other loss or harm to any Person and claims relating to any Laws, including without limitation environmental control, noise and pollution laws, rules or regulations.

(c)    the design, acceptance, rejection, delivery, return, import, export, condition, repair, modification, servicing, rebuilding, enforcement of warranties whether in Lessor's or Lessee's name, airworthiness, registration, reregistration, deregistration, performance, sublease, merchantability, fitness for use, substitution or replacement of the Aircraft, Engine or any Part under this Lease or other transfer of use or possession of the Aircraft, Engine or any Part, including under a pooling or interchange arrangement, including without limitation, latent and other defects, whether or not discoverable, and patent, trademark or copyright infringement or the imposition of any Lien (other than a Lessor Lien) on the Aircraft, any Engine, any Part or any other thing delivered under any Operative Document or any interest therein.

(d)    any non-compliance by Lessee with any term of this Lease or the falsity or inaccuracy of any representation or warranty of Lessee set forth herein.

(e)    the prevention or attempt to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of the Aircraft, or in securing the release of the Aircraft.

(f)    as a consequence of any Default in payment by Lessee of any sum to be paid by Lessee when due under this Lease or any other Default by Lessee in the due and punctual performance of its obligations under this Lease.

The foregoing indemnity by Lessee is intended to include and cover any Expense to which an Indemnitee may be subject (in contract, tort, strict liability or under any other theory) regardless of the negligence, active or passive or any other type, of such Indemnitee, so long as such Expense does not fall within any of the exceptions listed in Article 17.2.

17.2    Exceptions to General Indemnities. The indemnity provided for in Article 17.1 will not extend to Expenses of any Indemnitee to the extent resulting from or arising out of any of the following:

(a)    Expenses which Lessee and Lessor mutually agree or, absent mutual agreement, are judicially determined to have resulted from the willful misconduct, gross negligence or recklessness of such Indemnitee.

(b)    Expenses which have been judicially determined to be attributable to acts or events which occur after the Termination Date and return of the Aircraft to Lessor in the condition required hereunder, but in any such case only to the extent not attributable to acts or omissions of Lessee.

(c)    Expenses representing Taxes, it being acknowledged that the terms of Article 16 apply exclusively to Lessee's indemnity obligations with respect to Taxes.

41

(d)     Expenses due to the breach by Lessor of its covenant of quiet enjoyment pursuant to Article 21.2 or any failure on the part of the Lessor to comply with any of the express terms of this Lease or any representation and warranty given by the Lessor not being true and correct when made or deemed made.

(e)     Expenses which constitute ordinary and usual operating or overhead expenses of the Indemnitee except to the extent that the same arise on the occurrence of a Default or Event of Default.

(f)     Expenses which constitute a cost, expense or liability which is required to be borne by the Lessor in accordance with any other provision of this Lease.

(g)     Expenses which represent or result from any decline in the market value of the Aircraft (unless such decline arises out of a Default or Event of Default).

(h)     Expenses which are caused by a Lessor's Lien or which arise out of any claim of title to or against the Aircraft by any creditor of the Lessor claiming its capacity as such, except to the extent that such expenses arise out of the occurrence of any Default or Event of Default.

(i)     Expenses which are caused by or arise out of any breach by an Indemnitee of its contractual obligations to any third party other than as a result of any action or non-action by Lessee.

(j)     Expenses to the extent that such arise in connection with the Aircraft in respect of an event or circumstance which occurs, exists or arises prior to the Delivery Date or after the Termination Date which is not attributable to any act or omission on the part of Lessee.

17.3     <u>After-Tax Basis</u>.  The amount which Lessee will be required to pay with respect to any Expense indemnified against under Article 17.1 will be an amount sufficient to restore the Indemnitee, on an after-tax basis, to the same position such Indemnitee would have been in had such Expense not been incurred.

17.4     <u>Timing of Payment</u>.  It is the intent of the parties that each Indemnitee will have the right to indemnification for Expenses hereunder as soon as a claim is made and as soon as an Expense is incurred, whether or not meritorious and whether or not liability is established (but subject to Article 17.8).  Lessee will pay an Indemnitee for Expenses pursuant to this Article 17 within ten (10) days after receipt of a written demand therefor from such Indemnitee accompanied by a written statement describing in reasonable detail the basis for such indemnity. Notwithstanding the foregoing, Lessee and the Lessor shall consult with one another in good faith in order to determine what action (if any) may reasonably be taken to avoid or mitigate the Expense in question (and the Lessor shall use all reasonable endeavours to procure that any Indemnitee other than the Lessor shall similarly consult with Lessee).  Lessee shall, with the written consent of Lessor, such consent not to be unreasonably withheld or delayed, have the right to take all reasonable action (on behalf of, and, if necessary, in the name of the Lessor or, as the case may be, any other Indemnitee) in order to resist, defend or compromise (provided such compromise is accompanied by payment) any claims by third parties in respect of such claims, provided always that (i) Lessee shall not be entitled to take any such action unless adequate

42

provision reasonably satisfactory to the Lessor shall have been made in respect of the third party claim and the costs thereof and (ii) no such defense or compromise shall involve any admission of liability on the part of Lessor.  Lessee shall be entitled to select any counsel to represent it and/or the Lessor (or as the case may be any other Indemnitee) in connection with any such action, subject to the approval of the Lessor (or other Indemnitee), such approval not to be unreasonably withheld or delayed and any action taken by Lessee shall be on a full indemnity basis in respect of the Lessor (or such other Indemnitee).

 17.5 <u>Subrogation</u>.  Upon the payment in full of any indemnity pursuant to this Article 17 by Lessee, Lessee will be subrogated to any right of the Indemnitee in respect of the matter against which such indemnity has been made.

 17.6 <u>Notice</u>.  Each Indemnitee and Lessee will give prompt written notice one to the other of any liability of which such party has knowledge for which Lessee is, or may be, liable under Article 17.1 provided, however, that failure to give such notice will not terminate any of the rights of Indemnitees under this Article 17 except to the extent that Lessee has been materially prejudiced by the failure to provide such notice.

 17.7 <u>Refunds</u>.  If the payee shall realize any savings (by way of refund, deduction, credit or otherwise) in respect of any amount to which the payor shall have made a payment (or increased payment) pursuant to Article 17.3 or shall have indemnified the payee pursuant to Article 17.1, and such savings shall not have been previously taken into account in calculating any indemnity payment made by the payor, then the payee shall, to the extent that it can do so without prejudice to the retention of the relevant savings and subject to the payor's obligation to repay such amount to the payee if the relevant savings are subsequently disallowed or cancelled, pay to the payor such amount, as the payee shall in its reasonable opinion have concluded to be the amount of such savings (together with, in the case of a refund, any interest attributable thereto); provided, however, that the payee shall not be obligated to make any payment to the payor pursuant to this Article 17.7 to the extent that the amount of any savings in respect of which such payment is to be made would exceed the aggregate amount of all prior payments made by the payor to, on behalf of, or as an indemnification of, the payee under this Article 17 less the amount of all prior payments made pursuant to this Article 17.7 in respect of such savings.  Each party acknowledges that nothing contained in this Article 17.7 shall interfere with the right of the payee to arrange its business in whatsoever manner it thinks fit and, in particular, the payee shall be under no obligation to claim any savings in priority to any other savings available to it.

 17.8 <u>Defense of Claims</u>.  Unless a Default has occurred and is continuing, Lessee and its insurers will have the right (in each such case at Lessee's sole expense) to investigate or, provided that Lessee or its insurers have not reserved the right to dispute liability with respect to any insurance policies pursuant to which coverage is sought, defend or compromise any claim covered by insurance for which indemnification is sought, pursuant to Article 17.1 and each Indemnitee will cooperate with Lessee or its insurers with respect thereto.  If Lessee or its insurers are retaining attorneys to handle such claim, such counsel must be reasonably satisfactory to the Indemnitees.  If not, the Indemnitees will have the right to retain counsel of their choice at Lessee's expense.

43

17.9    Survival of Obligation.  Notwithstanding anything in this Lease to the contrary, the provisions of this Article 17 will survive the Termination Date and continue in full force and effect notwithstanding any breach by Lessor or Lessee of the terms of this Lease, the termination of the lease of the Aircraft to Lessee under this Lease or the repudiation by Lessor or Lessee of this Lease.

## ARTICLE 18

## INSURANCE

18.1    Categories of Insurance.  Throughout the Lease Term and until the Termination Date Lessee will, at its own expense, effect and maintain in full force and effect the types of insurance and amounts of insurance (including deductibles) described in Exhibit B; provided, that (a) all risk for ground and flight hull and hull war risks (including, without limitation, war, acts of terrorism, confiscation, expropriation (or appropriation), nationalization and seizure including coverage against the government of registry) coverage for the Aircraft shall be procured based on an Agreed Value of Eighteen Million Dollars ($18,000,000) and (b) comprehensive airline liability insurance (including, without limitation, passenger liability, products liability and war risk liability coverages per AVN52D/E form up to the liability limit hereunder) for the Aircraft shall be procured which carries a combined single limit of not less than Five Hundred Million Dollars ($500,000,000).  The insurance procured and maintained hereunder shall also either: (i) denominate an agreed value for each Engine when held as a spare or (ii) provide replacement cost coverage for spares and parts.

18.2    Insurance for Indemnitees.  The insurance referred to in Article 18.1 will in each case include and insure (to the extent of the risks covered by the policies) the indemnity provisions of Article 17, name CIT as loss payee on all hull coverages and (together with the Prior Owners and other Relevant Parties) as additional insured on all liability coverages, and Lessee will maintain such liability insurance of the Lessor, Participant, CIT and any other Relevant Party identified to Lessee in writing for a minimum of two (2) years following the Termination Date.  The insurance procured and maintained hereunder shall also either: (i) denominate an agreed value for each Engine when held as a spare or (ii) provide replacement cost coverage for spares and parts.

18.3    Renewal.  Not less than two (2) Business Days before the expiration or termination date of any insurance required hereunder, Lessee will provide or will cause to be provided to Lessor and CIT a fax confirmation from Lessee's insurance brokers of insurance evidencing the renewal or replacement of such insurance and complying with Exhibit B.  Within seven (7) days after such renewal, Lessee will furnish its brokers' certificates of insurance to Lessor and CIT.

18.4    Assignment of Rights by Lessor.  If Lessor assigns all or any of its rights under this Lease as permitted by this Lease or otherwise disposes of any interest in the Aircraft to CIT or any other Person, Lessee will, upon request, direct that CIT or such Person (as the case may be) be added as loss payee (for the amount of such Person's financial interest) and/or additional insured in the policies effected hereunder and enjoy the same rights and insurance enjoyed by Lessor under such policies.  Lessor will nevertheless continue to be covered by such policies.

44

18.5    Deductibles. If there is a material adverse change in the financial condition of Lessee which Lessor or CIT reasonably believes will not enable Lessee to pay the deductible upon the occurrence of a partial loss of the Aircraft or an Engine, then Lessor or CIT may require Lessee at Lessee's expense to lower its deductibles on the insurance maintained hereunder to a level which is available on commercially reasonable terms in the insurance market.

18.6    Additional Requirements. All policies of insurance and reinsurance carried by Lessee for the Aircraft pursuant to this Lease shall be evidenced by one or more certificates in form and substance satisfactory to Lessor and CIT, and shall, among other things:

        (a)    include a severability of interest clause which provides that the insurance shall operate to give each assured the same protection as if there were a separate policy issued to each additional insured party;

        (b)    contain a provision confirming that the policy is primary without right of contribution and the liability of the insurers shall not be affected by any other insurance of which any additional insured party or Lessee have the benefit so as to reduce the amount payable to the additional insured parties under such policies;

        (c)    provide that in respect of the respective interests of each additional insured party in such policies the insurance shall not be invalidated or impaired by any action or inaction of Lessee or any other additional insured party, and shall insure the respective interests of each such additional insured party, as they appear, regardless of any breach or violation of any warranty, declaration or condition contained in such policies by Lessee or by any other Person;

        (d)    provide that no additional insured party shall have any obligation or responsibility for (i) the payment of any premiums due (but reserve the right to pay the same should any of them elect so to do) or (ii) any warranties or representations made to underwriters, and that the insurers will not exercise any right of set-off or counter-claim in respect of any premium due against the respective interests of an additional insured party; and

        (e)    provide that the insurance shall continue unaltered for the benefit of each additional insured party for at least thirty (30) days after written notice by registered mail or telex of any cancellation, changes, event of non-payment of premium or installment thereof shall have been sent to Lessor and CIT, except in the case of war risks for which seven (7) days will be given, or in the case of war between the five great powers or nuclear peril for which termination is automatic.

18.7    Information. Lessee shall from time to time upon request by the Lessor or CIT provide the Lessor and CIT with evidence satisfactory to the Lessor and CIT that any premiums which have become payable in respect to the Insurances have been paid in accordance with the terms of the relevant policy. On or before Delivery, Lessee shall provide the Lessor and CIT with evidence satisfactory to the Lessor and CIT (including, without limitation, a letter of undertaking addressed by Lessee's insurance brokers to the Lessor and CIT) that the Insurances are and will continue in full force after Delivery for the balance of the policy year (subject in the case of war risks policies to usual termination or cancellation rights). At each renewal of insurance, Lessee shall direct its brokers to provide to the Lessor and CIT a renewal of insurance

45

undertaking as described above. Within seven (7) days of the renewal date the renewal certificates and letters of undertaking with respect to the Insurances shall be furnished to the Lessor and CIT. In addition Lessee shall furnish to the Lessor and CIT, as and when required by the Lessor or CIT, current copies of policies or certificates of brokers or other evidence satisfactory to the Lessor and CIT that the requirements of this Article 18.7 and Exhibit B are being complied with and letters of undertaking from Lessee's insurance brokers.

18.8    Currency. All proceeds of insurance pursuant to this Lease will be payable in Dollars except as may be otherwise agreed by Lessor and CIT.

18.9    Grounding of Aircraft. If at any time any of the insurance required pursuant to this Lease will cease to be in full force and effect, Lessee will forthwith ground the Aircraft and keep the Aircraft grounded until such time as such insurance is in full force and effect again.

18.10    Failure to Insure. If at any time Lessee fails to maintain insurance in compliance with this Article 18, Lessor and CIT will be entitled but not bound to do any of the following after giving notice to Lessee (without prejudice to any other rights which it may have under this Lease by reason of such failure):

(a)    To pay any premiums due or to effect or maintain insurance satisfactory to Lessor and CIT or otherwise remedy such failure in such manner as Lessor and CIT consider appropriate (and Lessee will upon demand reimburse Lessor and/or CIT in full for any amount so expended in that connection).

(b)    At any time while such failure is continuing, to require the Aircraft to remain at any airport or (as the case may be), proceed to and remain at any airport designated by Lessor, until such failure is remedied to Lessor's and CIT's satisfaction.

(c)    Declare, by such notice, an immediate Event of Default and exercise any and all remedies available to Lessor hereunder and under applicable Law (including, without limitation, terminating this Lease and, to the extent permitted by applicable Law, repossess the Aircraft).

18.11    Reinsurance. Any reinsurance placed by Lessee's insurance broker will be maintained with reinsurers and brokers approved by Lessor and CIT. Such reinsurance will contain each of the following terms and will in all other respects (including amount) be satisfactory to Lessor and CIT:

(a)    The same terms as the original insurance.

(b)    A cut-through and assignment clause satisfactory to Lessor and CIT.

(c)    Payment will be made notwithstanding (i) any bankruptcy, insolvency, liquidation or dissolution of any of the original insurers and/or (ii) that the original insurers have made no payment under the original insurance policies.

18.12    Limit on Hull in Favor of Lessee. Lessee may carry hull all risks or hull war and allied perils on the Aircraft in excess of the Agreed Value (which is payable to CIT) only to the

CHICAGO/#1626279.11

extent such excess insurance which would be payable to Lessee in the event of a Total Loss does not exceed ten percent (10%) of the Agreed Value and only to the extent that such additional insurance will not prejudice the Insurances required herein or the recovery by CIT thereunder. Lessee agrees that it will not create or permit to exist any liens or encumbrances over the Insurances, except as constituted by this Lease. If any of the Insurances referred to in Exhibit B are subject to an annual aggregate limit and, by reason of any claims made thereunder during the course of any policy year in respect of any property subject to such policy, the aggregate amount of coverage available thereunder in respect of the balance of such policy year shall have been reduced:

> (a)    Lessee shall forthwith notify the Lessor and CIT of the amount of any such claim; and

> (b)    the Lessor and CIT shall be entitled to require Lessee to increase forthwith the aggregate limit under the relevant policy to such amount as the Lessor and CIT may reasonably require.

18.13   <u>Assignment of Insurances</u>.  Lessee shall, on or prior to the Delivery Date, execute and deliver to Lessor and CIT the notice to the insurers regarding the Assignment of Insurances and the acknowledgement by the insurers of such Assignment of Insurances, each in the form set forth in Exhibit I hereto.

## ARTICLE 19

## LOSS, DAMAGE AND REQUISITION

Throughout the Lease Term and until the Termination Date, Lessee will bear all risk of loss, theft, damage and destruction to the Aircraft.

19.1   <u>Definitions</u>.  In this Article 19:

"**Agreed Value**" means Eighteen Million Dollars ($18,000,000) to be reduced on each anniversary of the Delivery Date by four percent (4%).

"**Total Loss**" means any of the following in relation to the Aircraft, Airframe or any Engine and "**Total Loss Date**" means the date set forth in parenthesis after each Total Loss:

> (a)    destruction, damage beyond repair or being rendered permanently unfit for normal use for any reason for any period of time (the date such event occurs or, if not known, the date on which the Aircraft, Airframe or Engine was last heard of).

> (b)    actual, constructive, compromised, arranged or agreed total loss (the earlier of the date on which the loss is agreed or compromised by the insurers or thirty (30) days after the date of notice to Lessee's brokers or insurers claiming such total loss).

> (c)    requisition of title, confiscation, forfeiture or any compulsory acquisition or other similar event (the date on which the same takes effect).

47

(d)    sequestration, detention, seizure or any similar event for more than thirty (30) consecutive days (the earlier of the date on which insurers make payment on the basis of a total loss or the date of expiration of such period).

(e)    requisition for use for more than one hundred and eighty (180) consecutive days (the earlier of the date on which the insurers make payment on the basis of a total loss or the date of expiration of such period).

(f)    in the case of an Engine, the event described in Article 12.5.3 (the date on which the same takes effect).

(g)    any sale of the Aircraft in connection with a Lessee bankruptcy, whether by an administrator, trustee or court (the date on which the intent to sell the Aircraft becomes known).

(h)    any sale of the Aircraft in connection with any relevant air traffic control authority or airport charges (the date on which the sale occurs).

(i)    any other occurrence not permitted under this Lease which deprives Lessee of use or possession for a period of sixty (60) consecutive days or longer (the 60th day of such period).

"**Total Loss Proceeds**" means the proceeds of any insurance or any compensation or similar payment arising in respect of a Total Loss.

19.2    Notice of Total Loss. Lessee will notify Lessor in writing within two (2) Business Days after a Total Loss Date of any Total Loss with respect to the Aircraft, the Airframe or any Engine.

19.3    Total Loss of Aircraft or Airframe. If a Total Loss of the Aircraft or Airframe occurs during the Lease Term, the following will occur:

(a)    After the Total Loss Date and until receipt by Lessor of the Agreed Value as set forth in Exhibit B and all other amounts then due under this Lease, Lessee will continue to pay Rent and the parties will perform all of their other obligations under this Lease.

(b)    On the date which is the earlier of the following dates: (1) the date on which the Total Loss Proceeds of the Aircraft or the Airframe are paid by Lessee's insurance underwriters or brokers; and

(2)    the date which falls sixty (60) days after the Total Loss Date, Lessee will pay to Lessor an amount equal to the sum of:

(i)    the Agreed Value; and

(ii)    all other amounts then accrued under this Lease,

less an amount equal to the Total Loss Proceeds received by Lessor by such date.

48

(c)     Lessor will apply the Total Loss Proceeds and any amounts received from Lessee pursuant to this Article 19.3(c) as follows:

(1)     first, in discharge of any unpaid Rent and any other amounts accrued and unpaid up to the date of Lessor's receipt of the Agreed Value;

(2)     second, in discharge of the Agreed Value together with interest thereon calculated at the Default Rate for any period from the due date set forth in Article 19.3(b) up to the date of discharge; and

(3)     third, payment of the balance, if any, to Lessee.

(d)     Upon receipt by Lessor of all monies payable by Lessee in Article 19.3, provided no Default or Event of Default has occurred and is continuing, this Lease will terminate except for Lessee's obligations under Articles 10.5, 16 and 17 which survive the Termination Date.  Lessor shall return to Lessee all Maintenance Supplemental Rent held by Lessor in the event of a Total Loss.

FOR AVOIDANCE OF DOUBT, THE AGREED VALUE OF THE AIRCRAFT WILL BE PAYABLE TO CIT PURSUANT TO THIS ARTICLE 19.3 WHEN A TOTAL LOSS OF THE AIRFRAME OCCURS EVEN IF THERE HAS NOT BEEN A TOTAL LOSS OF AN ENGINE OR ENGINES.

19.4    Surviving Engine(s).  If a Total Loss of the Airframe occurs and there has not been a Total Loss of an Engine or Engines, then, provided no Default or Event of Default has occurred and is continuing, at the request of Lessee (subject to agreement of relevant insurers) and on receipt of all monies due under Article 19.3 and payment by Lessee of all airport, navigation and other charges on the Aircraft, Lessor will cause CIT to transfer all its right, title and interest in the surviving Engine(s) to Lessee, but without any responsibility, condition or warranty on the part of Lessor and CIT other than as to freedom from any Lessor's Lien.

19.5    Total Loss of Engine and not Airframe.

19.5.1    Upon a Total Loss of any Engine not installed on the Airframe or a Total Loss of an Engine installed on the Airframe not involving a Total Loss of the Airframe, Lessee will give Lessor prompt written notice thereof.  Lessee at its own cost will replace such Engine as soon as reasonably possible by duly conveying to CIT title to another engine that is acceptable to Lessor and is (i) free and clear of all Security Interests (except Permitted Liens) of any kind or description, (ii) in airworthy condition and of the same or improved model, service bulletin and modification status and having a value and utility and marketability at least equal to the Engine which sustained the Total Loss, (iii) not older (by reference to serial number of manufacture date) than the Engine being replaced, (iv) in the same or better operating condition as the Engine which sustained a Total Loss, including time in service, hours and cycles since new and hours and cycles available to the next inspection, Overhaul or scheduled or anticipated removal and (v) has not and does not have any modules that have been operated at a higher thrust rating than the Engine which sustained the Total Loss.  Upon replacement as provided hereunder, Lessor will convey to Lessee Lessor's interest in the Engine which sustained a Total Loss.  Such replacement engine will be an Engine as defined herein and the Engine which sustained such

49

Total Loss will cease to be an Engine. Lessee shall (i) cause the existing lease filing to be amended to reflect such replacement engine (which amendment shall be approved by Lessor prior to the filing thereof), and (ii) modify the Insurances to reflect such replacement engine and provide Lessor with evidence of such modification. All Maintenance Supplemental Rent that was held by Lessor for the lost Engine shall be transferred and applied to the replacement engine.

19.5.2    Lessee agrees at its own expense to take such action as Lessor may reasonably request in order that any such replacement Engine becomes the property of CIT and is leased hereunder on the same terms as the destroyed Engine. Lessee's obligation to pay Rent will continue in full force and effect, but an amount equal to the Total Loss Proceeds received by Lessor with respect to such destroyed Engine will, so long as no Default or Event of Default shall have occurred and be continuing, and subject to Lessor's right to deduct therefrom any amounts then due and payable by Lessee under this Lease, be paid to Lessee.

19.6    Other Loss or Damage.

19.6.1    If the Aircraft or any part thereof suffers loss or damage not constituting a Total Loss of the Aircraft or the Airframe or any Engine, all the obligations of Lessee under this Lease (including payment of Rent) will continue in full force.

19.6.2    In the event of any loss or damage to the Aircraft or Airframe which does not constitute a Total Loss of the Aircraft or the Airframe, or any loss or damage to an Engine which does not constitute a Total Loss of such Engine, Lessee will at its sole cost and expense fully repair the Aircraft or Engine in order that the Aircraft or Engine is placed in an airworthy condition and substantially the same condition as it was prior to such loss or damage. All repairs will be performed in a manner which preserves and maintains all warranties and service life policies to the same extent as they existed prior to such loss or damage. Lessee will notify Lessor forthwith of any loss, theft or damage to the Aircraft for which the cost of repairs (excluding straight parts replacement) is estimated to exceed Two Hundred Thousand U.S. Dollars ($200,000), together with Lessee's proposal for carrying out the repair in advance of initiation of such repair. In the event that Lessor does not agree with Lessee's proposals for repair, Lessor will so notify Lessee within two (2) Business Days after its receipt of such proposal. Lessee and Lessor will then consult with Airframe Manufacturer and Lessee and Lessor agree to accept as conclusive, and be bound by, Airframe Manufacturer's directions or recommendations as to the manner in which to carry out such repairs. If Airframe Manufacturer declines to give directions or recommendations, Lessee will carry out the repairs in accordance with the directions of Lessor.

19.7    Government Requisition. If the Aircraft, Airframe or any Engine is requisitioned for use by any Government Entity and such requisition does not constitute a Total Loss, Lessee will promptly notify Lessor of such requisition. All of Lessee's obligations hereunder will continue as if such requisition had not occurred. So long as no Default has occurred and is continuing, all payments received by Lessor or Lessee from such Government Entity will be paid over to or retained by Lessee. If a Default has occurred and is continuing, all payments received by Lessee or Lessor from such Government Entity may be used by Lessor to satisfy any obligations owing by Lessee.

50

## ARTICLE 20

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSEE

20.1    <u>Representations and Warranties</u>. Lessee represents and warrants the following to Lessor as of the date of execution of this Lease and as of the Delivery Date:

20.1.1    <u>Corporate Status</u>. Lessee is a corporation duly organized and validly existing under the laws of Spain and has power to carry on its business as it is now being conducted and to own its property and other assets. Lessee has the power to execute, deliver and perform its obligations under the Operative Documents and all necessary corporate and other action has been taken to authorize the execution, delivery and performance of the same.

20.1.2    <u>Governmental Approvals</u>. No authorization, approval, consent, license or order of, or registration with, or the giving of notice to the Aviation Authority or any other Government Entity is required for the valid authorization, execution, delivery and performance by Lessee of this Lease, except as will have been duly effected as of the Delivery Date.

20.1.3    <u>Binding</u>. Lessee's has furnished valid and current public deeds evidencing authority of those individuals executing on Lessee's behalf this Lease, the Estoppel and Acceptance Certificate, the Assignment of Insurances, the deregistration Power of Attorney in the form of Exhibit F, any certificates, powers of attorney, side letters hereto and any other documentation in connection with the leasing of the Aircraft from Lessor (collectively, the **"Operative Documents"**) and perform its obligations under the Operative Documents. This Lease and the other Operative Documents have been duly executed and delivered by Lessee and represent the legal, valid, enforceable and binding obligations of Lessee in accordance with their respective terms except as enforceability may be limited by bankruptcy, insolvency, reorganization or other Laws of general application affecting the enforcement of creditors, rights.

20.1.4    <u>No Breach</u>. The execution and delivery of the Operative Documents, the consummation by Lessee of the transactions contemplated herein and compliance by Lessee with the terms and provisions hereof do not and will not (i) contravene any existing applicable Law, statute, rule or regulation or any judgment, decree or permit to which Lessee is subject and which is binding on it, (ii) conflict with, or result in any breach of any of the terms of, or constitute a default under, any agreement or other instrument to which Lessee is a party or is subject and which is binding on it or by which it or any of its property is bound, (iii) contravene or conflict with any provision of Lessee's constitutional documents, or (iv) result in any breach of or constitute any default under or result in the creation of any Security Interest upon any property of Lessee (other than the Security Interest created by this Lease and the Assignment of Insurances), pursuant to any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, corporate charter, by-law or other agreement or instrument to which Lessee is a party or by which Lessee or its properties or assets may be bound or affected. When executed by Lessee at Delivery, the same will apply to the Estoppel and Acceptance Certificate.

20.1.5    <u>Filings</u>. Except for the filing for recordation of duly notarized and consularized versions of this Lease, the Certificate of Acceptance (and certified Spanish translations thereof)

and an application for registration of the Aircraft with the DGAC, no further filing or recording of this Lease, the Certificate of Acceptance or of any other Operative Document and no further action, is necessary under the Laws of any Government Entity in order to (A) fully protect and establish Lessor's or CIT's title to, interest in and property rights with respect to the Aircraft as against Lessee or any third party and to ensure that the property rights of Lessor or CIT therein will have priority in all respects over the claims of all creditors of Lessee, or (B) ensure the validity, effectiveness and enforceability of this Lease and the Operative Documents to which Lessee is a party.

20.1.6   <u>Licenses</u>.  Lessee holds all necessary licenses, certificates and permits from applicable Government Entities in Spain and other jurisdictions in which it operates for the conduct of its business as an air carrier and performance of its obligations under this Lease.

20.1.7   <u>No Suits</u>.  There are no suits, arbitrations or other proceedings pending or threatened against Lessee or any of its subsidiaries or affiliates before any court or administrative agency against or affecting Lessee which, if adversely determined, would have a material adverse effect on the business, assets or financial condition of Lessee or its ability to perform under the Operative Documents.

20.1.8   <u>No Restrictions on Payments</u>.  Under the Laws of Spain there are no present restrictions on Lessee making the payments required by this Lease.

20.1.9   <u>General Obligations</u>.  The obligations of Lessee under this Lease are direct, general and unconditional obligations of Lessee and rank or will rank at least <u>pari passu</u> with all other present and future unsecured and unsubordinated obligations (including contingent obligations) of Lessee, with the exception of such obligations as are mandatorily preferred by law and not by reason of any encumbrance.

20.1.10   <u>No Sovereign Immunity</u>.  Lessee, under the Laws of Spain or of any other jurisdiction affecting Lessee, is subject to private commercial law and suit.  Neither Lessee nor its properties or assets is entitled to sovereign immunity under any such laws.  Lessee's performance of its obligations hereunder constitute commercial acts done for commercial purposes.

20.1.11   <u>Financials</u>.  The audited financial statements of Lessee and the consolidated audited financial statements of Lessee and the Guarantor in respect of the financial year ended on February 28, 2006, as delivered to the Lessor have been prepared in accordance with generally accepted accounting principles and practices in Europe which have been consistently applied and present fairly and accurately the financial position of Lessee and the consolidated financial position of Lessee as at such date and the consolidated results of the operations of Lessee for the financial year ended on such date, and, as at such date, Lessee had no significant liabilities (contingent or otherwise) which are not disclosed by, or reserved against in, such financial statements and Lessee had no unrealized or anticipated losses.  The financial statements referred to in this Article 20.1.11 fairly represent the financial position of Lessee as at the date thereof, and the results of Lessee for the period to which they relate, and there has been no material adverse change in the financial position of Lessee since that date which would materially affect the ability of Lessee to perform its obligations under this Lease or under the other Operative

52

Documents and as at such date Lessee has no material liabilities (contingent or otherwise) which are not disclosed by, or reserved against in, such financial statements. The financial and other information furnished by or on behalf of Lessee to Lessor does not contain any untrue statement or omit to state any material fact the omission of which makes the statements therein, in the light of the circumstances under which they were made, misleading, nor omits to disclose any material matter.

20.1.12  Tax Returns. All necessary returns which are due have been delivered by Lessee to all relevant taxation authorities in the jurisdiction of its organization and Lessee is not in default in the payment of any taxes due and payable.

20.1.13  No Material Adverse Effect. Lessee and its subsidiaries are not in default under any agreement to which any of them is a party or by which any of them may be bound which would have a material adverse effect on their respective business, assets or condition and no material litigation or administrative proceedings before any Government Entity is presently pending or to the knowledge of Lessee threatened against it or its assets which would have a material adverse effect on the business, assets or condition (financial or otherwise) of Lessee.

20.1.14  No Defaults. At the time of execution of this Lease, (i) no Default has occurred and is continuing and the financial statements provided to Lessor pursuant to Article 13.1 fairly present the financial condition of Lessee; and (ii) Lessee is not in default in the performance of any of its obligations (A) for the payment of indebtedness for borrowed money in a principal amount in excess of Five Hundred Thousand Dollars ($500,000) or of any interest or premium thereon or (B) for the payment of rent under any agreement to lease any other real, personal or mixed property where the aggregate rentals over the term thereof are more than Five Hundred Thousand Dollars ($500,000).

20.1.15  Reports. The information, exhibits and reports furnished by Lessee to the Lessor in connection with the matters contemplated by this Lease are true and accurate in all material respects and not misleading, do not omit material facts and all reasonable enquiries have been made to verify the facts and statements contained therein; there are no other facts the omission of which would make any fact or statement therein misleading.

20.1.16  Insurances. The Insurances will be in effect on the Delivery Date, and neither the Insurances nor any part thereof will be, on the Delivery Date, subject to any Security Interest save for any Permitted Lien or as may be created pursuant to the Operative Documents.

20.1.17  Representations and Warranties True and Correct. On and as of the Delivery Date and on each date on which Rent is due hereunder, Lessee shall be deemed to repeat the representations and warranties in Article 20 (and so that the representation and warranty in Article 20.1.11 shall for this purpose refer to the then latest audited financial statements delivered to the Lessor as if made with reference to the facts and circumstances existing on each such date).

20.1.18  Maintenance Program. The Maintenance Program complies with all EASA and DGAC requirements, and covenants that, at all times during the Lease Term, the Lessee will comply in all respects with the Maintenance Program and all EASA and DGAC requirements.

53

20.1.19  <u>Choice of Law</u>.  The choice of New York law to govern this Lease and the other Operative Documents to which Lessee is a party which by their terms are expressed to be governed by New York law is a valid choice of law and such choice will be upheld in the courts of Spain.

20.1.20  <u>Payments</u>.  (i) Lessee is authorized to make payments in Dollars from Spain in the manner contemplated by this Lease; and (ii) no foreign exchange approvals under applicable Law of Spain are required to be obtained to ensure the availability of Dollars to make any required payments under this Lease.

20.1.21  <u>Value Added Tax</u>.  Lessee hereby represents and warrants that it qualifies as an entity engaged mainly in international air navigation and conducting remunerated transport activities, as defined in the Spanish VAT Law, and will, throughout the Term of the Lease, be the exclusive user of the Aircraft, and the Aircraft will, throughout the Term of the Lease, be engaged in international air travel.

20.2  <u>Covenants</u>.  Lessee covenants to Lessor that it will comply with the following throughout the entire Lease Term:

20.2.1  <u>Licensing</u>.  Lessee will hold all necessary licenses, certificates and permits from applicable Government Entities in Spain and any other jurisdictions in which it operates for the conduct of its business as an air carrier and performance of its obligations under this Lease. Lessee will advise Lessor promptly in the event any such licenses, certificates or permits are cancelled, terminated, revoked or not renewed.

20.2.2  <u>Payments</u>.  If at any time any such restrictions may be applicable, Lessee will obtain all certificates, licenses, permits, exemptions and other authorizations which are from time to time required for the making of the payments required by this Lease on the dates and in the amounts and currency which are stipulated herein, and will maintain the same in full force and effect for so long as the same will be required.

20.2.3  <u>Sovereign Immunity</u>.  Lessee, under the laws of Spain or of any other jurisdiction affecting Lessee, will continue to be subject to private commercial law and suit. Neither Lessee nor its properties or assets will be entitled to sovereign immunity under any such laws. Lessee's performance of its obligations hereunder will constitute commercial acts done for commercial purposes. Lessee will advise Lessor promptly of any change in the foregoing.

20.2.4  <u>Information about Suits</u>.  Lessee will promptly give to Lessor a notice in writing of any suit, arbitration or proceeding before any court, administrative agency or Government Entity which, if adversely determined, would materially adversely affect Lessee's or any of its subsidiaries' financial condition, affairs or operations and Lessee's ability to perform under this Lease.

20.2.5  <u>Change Event</u>.  Lessee shall not (i) enter into any transaction of merger or consolidation or any commitment with respect thereto, (ii) sell, transfer, or otherwise dispose of all or substantially all of its assets in a single transaction or a series of related transactions, (iii) permit any substantial change in the ownership or control of its capital stock or (iv) change the form of organization of its business (each, and collectively, a "**Change Event**"), unless after

54

giving effect to such Change Event, Lessee (in the case of clauses (ii), (iii), or (iv) above) or the surviving entity (in the case of clause (i) above) shall have a tangible net worth equal to or greater than the tangible net worth of Lessee prior to such Change Event.

20.2.6    Restriction on Relinquishment of Possession.  Lessee will not, without the prior consent of Lessor, deliver, transfer or relinquish possession of the Aircraft except in accordance with Articles 11 and 12.

20.2.7    No Security Interests.  Lessee will not create or agree or permit to arise any Security Interest (other than Permitted Liens) on or with respect to the Aircraft, title thereto or any interest therein.  Lessee will forthwith, at its own expense, take all action as may be necessary to discharge or remove any such Security Interest (other than a Permitted Lien) if it exists at any time.  Lessee will within twenty-four (24) hours after becoming aware of the existence of any such Security Interest give written notice thereof to Lessor.

20.2.8    Representations to Other Parties.  Lessee will not represent or hold out Lessor, CIT, any Prior Owner or the Relevant Parties as carrying goods or passengers on the Aircraft or as being in any way connected or associated with any operation of the Aircraft.

20.2.9    Rights and Remedies.  The rights and remedies of the Lessor in relation to any misrepresentation or breach of warranty on the part of Lessee shall not be prejudiced by any investigation by or on behalf of the Lessor into the affairs of any person being a party to any Operative Document, by the performance of any Operative Document, or by any other act or thing which may be done or omitted to be done by the Lessor under any Operative Document and which would or might, but for this Article 20.2.9, prejudice such rights and remedies.

20.2.10    Spanish VAT Qualification.  Lessee hereby covenants that it will continue to qualify, throughout the Term of the Lease, as an entity engaged mainly in international air navigation and conducting remunerated transport activities, as defined in the Spanish VAT Law, and will, throughout the Term of the Lease, be the exclusive user of the Aircraft, and the Aircraft will, throughout the Term of the Lease, be engaged in international air travel.

## ARTICLE 21

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSOR

21.1    Representations and Warranties.  Lessor represents and warrants the following to Lessee as of the date of execution of the Lease and as of the Delivery Date and ALL OTHER WARRANTIES, EXPRESS OR IMPLIED HAVE BEEN WAIVED IN ACCORDANCE WITH ARTICLE 8:

21.1.1    Corporate Status.  Lessor is a national banking association duly organized, validly existing and in good standing under the laws of the United States of America.  It has the power and authority to carry on its business as presently conducted and to perform its obligations hereunder.  Lessor has the power to execute, deliver and perform its obligations under the Operative Documents and all necessary corporate action has been taken to authorize the execution, delivery and performance of the same.

21.1.2    Governmental Approvals.  No authorization, approval, consent, license or order of, or registration with, or the giving of notice to the Aviation Authority or any Government Entity is required for the valid authorization, execution, delivery and performance by Lessor of this Lease.

21.1.3    Binding.  This Lease and the other Operative Documents have been duly authorized, executed and delivered by Lessor and represent the valid, enforceable and binding obligations of Lessor except as enforceability may be limited by bankruptcy, insolvency, reorganization or other Laws of general application affecting the enforcement of creditors' rights.

21.1.4    No Breach.  The execution and delivery of the Operative Documents, the consummation by Lessor of the transactions contemplated herein and compliance by Lessor with the terms and provisions hereof do not and will not (i) contravene any Law of the State of Utah, U.S.A. or federal banking laws to which Lessor is subject, (ii) conflict with, or result in any breach of any of the terms of, or constitute a default under, any agreement or other instrument to which the Lessor is a party or is subject or by which it or any of its property is bound, (iii) contravene or conflict with any provision of Lessor's constitutional documents, or (iv) result in any breach of or constitute any default under any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, articles of association, by-law or other agreement or instrument to which Lessor is a party or by which Lessor or its properties or assets may be bound or affected.

21.2    Covenant of Quiet Enjoyment.

21.2.1    So long as no Default has occurred and is continuing hereunder, Lessor covenants that neither Lessor, nor any Person lawfully claiming through Lessor will interfere with Lessee's quiet, peaceful use and enjoyment of the Aircraft.

21.2.2    The Lessor undertakes to discharge at its own cost any Lessor's Lien (other than a Security Interest on the Aircraft in favor of a Relevant Party) that may arise over the Aircraft as soon as practicable after receiving notice thereof by Lessee provided that if such Lessor's Lien is not affecting Lessee's rights of quiet enjoyment under Article 21.2.1 hereof the obligation of the Lessor under this Article 21.2.2 shall be satisfied in circumstances where Lessor is contesting such Lessor's Lien in good faith.

21.3    Sovereign Immunity.  Lessor, under the laws of any other jurisdiction affecting Lessor, will continue to be subject to private commercial law and suit.  Neither Lessor nor its properties or assets will be entitled to sovereign immunity under any such laws.  Lessor's performance of its obligations hereunder will constitute commercial acts done for commercial purposes.  Lessor will advise Lessee promptly of any change in the foregoing.

56

# ARTICLE 22

# [RESERVED]

# ARTICLE 23

# RETURN OF AIRCRAFT

23.1    <u>Date and Location of Return</u>.  Upon the termination or expiration of this Lease, Lessee is obligated to return the Aircraft, Engines, Parts and Aircraft Documentation to Lessor, unless a Total Loss of the Aircraft has occurred prior to the Termination Date.  If Lessee is in Default hereunder by failing to return the Aircraft on the Termination Date or if an Event of Default occurs prior to the Expiration Date and Lessor repossesses the Aircraft, the return requirements set forth in this Article 23 and Schedule 2 hereto nonetheless must be met on the date the Aircraft is actually returned to Lessor or repossessed by Lessor.

23.2    <u>Reports</u>.  Six (6) months prior to the Expiration Date (and in an updated form at return of the Aircraft), Lessee will provide Lessor with a Monthly Utilization Report in the form and substance of Exhibit H, as revised, and, in addition upon Lessor's request, will make copies available of (i) drawings of the interior configuration of the Aircraft both as it presently exists and as it will exist at return, (ii) an Airworthiness Directive status list, (iii) a service bulletin incorporation list, (iv) rotable controlled, hard-time and life limited component listings, (v) a list of Lessee-initiated modifications and alterations, (vi) interior material burn certificates, (vii) the Aircraft Maintenance Program (which may be disclosed to potential buyers and operators of the Aircraft, but no copies shall be provided without Lessee's consent, not to be unreasonably withheld), (viii) the complete workscope for the checks, inspections and other work to be performed prior to return, (ix) current Engine disk sheets and a description of the last Engine Heavy Maintenance for each Engine and (x) any other data which is reasonably requested by Lessor.

23.3    <u>Return Location</u>.  Lessee at its expense will return the Aircraft, Engines, Parts and Aircraft Documentation to Lessor at an airport in Western Europe as may be mutually agreed to by Lessee and Lessor.

23.4    <u>Full Aircraft Documentation Review</u>.  For the period commencing at least fifteen (15) Business Days prior to the proposed redelivery date and continuing until the date on which the Aircraft is returned to Lessor in the condition required by this Lease, Lessee will provide for the review of Lessor and/or its representative all of the Aircraft Documentation in one central room at Lessee's maintenance facility at Madrid, Spain or at such other location as the parties may agree from time to time.

23.5    <u>Condition of Aircraft</u>.  At return, Lessee shall, at its sole risk, cost and expense, procure and deliver to Lessor evidence that the Aircraft is free and clear of all Security Interests (other than liens which existed prior to Delivery of the Aircraft to Lessee, Lessor Liens and Security Interests granted by Lessor to any party providing financing to Lessor with respect to the Aircraft) and that the Aircraft complies in all respects with the conditions and requirements set forth in Schedule 2.

57

23.6    Aircraft Inspection.

23.6.1    During the maintenance checks performed immediately prior to the proposed redelivery and at the actual return of the Aircraft, Lessor and/or its representatives will have an opportunity to conduct a full systems functional and operational inspection of the Aircraft (and other types of reasonable inspections based upon the Aircraft's type, age, use and other known factors with respect to the Aircraft) and a full inspection of the Aircraft Documentation (including records and manuals), all to Lessor's satisfaction.  Any deficiencies from the Aircraft return condition requirements set forth in this Article 23 and Schedule 2 hereto will be corrected by Lessee at its cost prior to the execution of the Return Acceptance Receipt and the acceptance flight described in Article 23.6.2 below.  In the event of minor deficiencies that do not affect the marketability of the Aircraft, Lessor shall have the option to be compensated by Lessee instead of requiring the completion of the repairs.  Such compensation shall be mutually agreed between the parties.

23.6.2    Immediately prior to the proposed redelivery of the Aircraft, Lessee will carry out for Lessor and/or Lessor's representatives an Aircraft acceptance flight in accordance with the Aviation Authority's standard flight test procedure or, if agreed in writing by Lessor, in accordance with an airline acceptance flight procedure, either of which will be for the duration necessary to perform such check flight procedures but in no event for more than two (2) hours.  Flight costs and fuel will be furnished by and at the expense of Lessee.  Any deficiencies from the Aircraft return condition requirements set forth in this Article 23 and Schedule 2 hereto will be corrected by Lessee at its cost prior to return of the Aircraft.  In the event of minor deficiencies that do not affect the marketability of the Aircraft, Lessor shall have the option to be compensated by Lessee instead of requiring the completion of the repairs.  Such compensation shall be mutually agreed between the parties.

23.6.3    To the extent that the ground inspection and acceptance flight extend beyond the Expiration Date, the Lease Term will be deemed to have been automatically extended and the obligations of Lessee hereunder (including Article 23.9(c)) will continue on a day-to-day basis until the Aircraft is accepted by Lessor executing the Return Acceptance Receipt.

23.7    Certificate of Airworthiness Matters.

23.7.1    The Aircraft will possess a current certificate of airworthiness issued by the Aviation Authority ("**Certificate of Airworthiness**") (although this Certificate of Airworthiness shall later be substituted by the Export Certificate of Airworthiness or equivalent if requested by Lessor pursuant to Article 23.8).

23.7.2    If the Aircraft is to be registered in a country other than the State of Registration after return from Lessee, Lessor shall consult with Lessee and may, in its sole discretion, waive the requirements of Article 23.7.1 and instead require that Lessee, at Lessor's expense, put the Aircraft in a condition to meet the requirements for issuance of a Certificate of Airworthiness of the aviation authority of the next country of register, provided that sufficient notice is given and that the Aircraft would not need to be withdrawn from service any earlier than would otherwise have been required and such modifications do not materially affect the return schedule of the Aircraft.

58

23.8    Export and Deregistration of Aircraft. At Lessor's request, Lessee at its cost will (i) provide an export certificate of airworthiness or its equivalent from the State of Registration so that the Aircraft can be exported to the country designated by Lessor ("**Export Certificate of Airworthiness**"), (ii) assist with deregistration of the Aircraft from the register of aircraft in the State of Registration, (iii) assist with arranging for prompt confirmation of such deregistration to be sent by the registry in the State of Registration to the next country of registration and (iv) perform any other acts reasonably required by Lessor in connection with the foregoing.

23.9    Lessee's Continuing Obligations. In the event that Lessee does not return the Aircraft to Lessor on the Expiration Date and in the condition required by this Article 23 for any reason (whether or not the reason is within Lessee's control):

(a)    The obligations of Lessee under this Lease will continue in full force and effect on a day-to-day basis until such return. This will not be considered a waiver of Lessee's Event of Default or any right of Lessor hereunder.

(b)    Until such return, the Agreed Value will be an amount equal to the Agreed Value on the day the Aircraft should have been returned to Lessor pursuant to this Lease.

(c)    Instead of paying the Rent specified in this Article 23, Lessee will pay one and one-quarter (1.25) times the amount of Rent for each day for the first two weeks from the scheduled Expiration Date and one and one-half (1.5) times the amount of Rent for each day thereafter and until the Termination Date (the monthly Rent payable under Article 5.3 will be prorated based on the actual number of days in the applicable month). Payment will be made upon presentation of Lessor's invoice.

(d)    Lessor may elect, in its sole and absolute discretion, to accept the return of the Aircraft prior to the Aircraft being put in the condition required by this Article 23 and Schedule 2 and thereafter have any such non-conformance corrected at such time as Lessor may deem appropriate (but within ninety (90) days following the return of the Aircraft) and at commercial rates then charged by the Person selected by Lessor to perform such correction. Any direct expenses incurred by Lessor for such correction will become additional Rent payable by Lessee within fifteen (15) days following the submission of a written statement by Lessor to Lessee, identifying the items corrected and setting forth the expense of such corrections. Lessee's obligation to pay such supplemental rent will survive the Termination Date.

(e)    If the only non-conformance of the Aircraft is cosmetic and/or does not adversely affect the airworthiness or marketability of the Aircraft, and does not interfere with the delivery of the Aircraft to the next operator or purchaser, Lessor will accept the return of the Aircraft and thereafter have any such non-conformance corrected at such time as Lessor may deem appropriate (but not later than within ninety (90) days following the return of the Aircraft) and at commercial rates then charged by the Person selected by Lessor to perform such correction. Any direct and actual expenses incurred by Lessor for such correction will become Supplemental Rent payable by Lessee within fifteen (15) days following the submission of a written invoice by Lessor to Lessee, identifying the items corrected and setting forth the cost of such corrections. Lessee's expressly agrees that its obligation to pay such amounts shall survive the Termination Date.

59

23.10   Airport and Navigation Charges.  Lessee will ensure that at return of the Aircraft any and all airport, navigation and other charges then due and owing which give rise or may if unpaid give rise to any lien, right of detention, right of sale or other Security Interest in relation to the Aircraft, Engine or any Part, whether incurred in respect of the Aircraft or any other aircraft operated by Lessee, have been paid and discharged in full and will at Lessor's request produce evidence thereof satisfactory to Lessor.

23.11   Return Acceptance Certificate.  Upon return of the Aircraft in accordance with the terms of this Lease, Lessee will prepare and execute two (2) Return Acceptance Certificates in the form and substance of Exhibit G and Lessor will countersign and return one such Return Acceptance Certificate to Lessee.

23.12   Indemnities and Insurance.  The indemnities and insurance requirements set forth in Articles 17 and 18, respectively, will apply to Indemnitees and Lessor's representatives during return of the Aircraft, including the ground inspection and acceptance flight.  With respect to the acceptance flight, Lessor's representatives will receive the same protections as Lessor on Lessee's Aviation and Airline General Third Party Liability Insurance specified in Exhibit B.

23.13   Storage.  At Lessor's request, Lessee will continue to lease the Aircraft under this Lease for a period not to exceed thirty (30) days.  During this period, so long as Lessee otherwise has complied with this Article 23 and Schedule 2, Lessee will have no obligations under this Lease except to park and store the Aircraft, at Lessor's cost, in accordance with Airframe Manufacturer's recommended short term storage program at one of Lessee's principal maintenance facilities in Spain and, at Lessor's cost, to maintain all insurance on the Aircraft. Lessee will not utilize the Aircraft for any reason during this period.  The costs reimbursed by Lessor to Lessee during such storage period shall be at Lessee's preferred customer rate.

23.14   Non-Incident Statement.  Lessee shall certify in writing whether the Aircraft has been involved in any incidents or accidents, hard landings or lightning strikes, and, if so, Lessee shall certify in a letter full disclosure of all such events involving the Aircraft providing all relevant details.

## ARTICLE 24

## ASSIGNMENT; PROTECTIONS

24.1   No Assignment by Lessee.  NO ASSIGNMENT NOVATION, TRANSFER, MORTGAGE OR OTHER CHARGE MAY BE MADE BY LESSEE OF ANY OF ITS RIGHTS OR OBLIGATIONS WITH RESPECT TO THE AIRCRAFT, ANY ENGINE OR PART OR THIS LEASE.

24.2   Sale or Assignment by Lessor.  Subject to Lessee's rights pursuant to this Lease and the provision of Article 24.5, Lessor may at any time and without Lessee's consent sell, assign or transfer its rights and interest hereunder or with respect to the Aircraft to any assignee or transferee ("**Lessor's Assignee**").  For a period of two (2) years after the earlier of such sale or assignment and the next Major Check of the Aircraft, but at no additional cost to Lessee,

60

Lessee will continue to name each Relevant Party as an additional insured under the Aviation and Airline General Third Party Liability Insurance specified in Exhibit B.

24.3    Subordination.  This Agreement, and the rights of Lessor and Lessee hereunder, shall be subject and subordinate to the Head Lease and the rights of CIT thereunder.

24.4    Lessee Cooperation.  On request by Lessor, Lessor's Assignee or CIT, Lessee will execute all such documents (such as a lease assignment agreement) as Lessor, Lessor's Assignee or CIT may reasonably require to confirm Lessee's obligations under this Lease and obtain Lessee's acknowledgement that Lessor is not in breach of the Lease.  Lessee will provide all other reasonable assistance and cooperation to Lessor, Lessor's Assignee and CIT in connection with any such sale or assignment or the perfection and maintenance of any such security interest, including, at Lessor's cost, making all necessary filings and registrations in the State of Registration and providing all opinions of counsel with respect to matters reasonably requested by Lessor, CIT or Lessor's Assignee.  Lessor will reimburse Lessee for its reasonable out-of-pocket costs in reviewing documents required by Lessor or CIT.

24.5    Protections.

24.5.1    Lessor will obtain for the benefit of Lessee an acknowledgment from any Lessor's Assignee, transferee or CIT that, so long as no Default has occurred and is continuing hereunder, such Person will not interfere with Lessee's quiet, peaceful use and enjoyment of the Aircraft.

24.5.2    Wherever the term "Lessor" is used in this Lease in relation to any of the provisions relating to disclaimer, title and registration, indemnity and insurance contained in Articles 8, 14, 17 and 18, respectively, or with respect to Article 20.2.8, the term "Lessor" will be deemed to include Lessor's Assignee and CIT, if applicable.

24.5.3    Lessee shall not be obliged to pay any Person any greater amount under the Lease as assigned or transferred than that which it would have been obliged to pay hereunder if no such assignment or transfer had taken place, including any greater liability in respect of Taxes in relation to such payments.  Any such transfer or assignment shall not otherwise increase Lessee's obligations or diminish Lessee's rights hereunder or under any Operative Documents.

24.5.4    To the extent that Lessor's Assignee or transferee incurs increased costs, Lessor and Lessee agree to cooperate in good faith to determine a mutually beneficial solution in order to mitigate such increase in costs.

24.5.5    Lessee shall not be obligated to pay any costs or expenses associated with the grant of and registration of a Security Interest by Lessor or any other party as security for any such parties obligations to a financier.

# ARTICLE 25

## DEFAULT OF LESSEE

25.1    <u>Lessee Notice to Lessor</u>.  Lessee will promptly notify Lessor if Lessee becomes aware of the occurrence of any Default.

25.2    <u>Events of Default</u>.  The occurrence of any of the following will constitute an Event of Default and material breach of this Lease by Lessee:

(a)    Lessee fails to take delivery of the Aircraft when obligated to do so under the terms of this Lease.

(b)    Lessee fails to make a payment of Rent or other payment due hereunder in the manner and by the date provided herein and fails to make such payment within five (5) Business Days after such payment is due.

(c)    Lessee fails to obtain or maintain the insurance required by Article 18 or Lessee breaches any warranty or condition of any such insurance.

(d)    An "Event of Default" shall have occurred and be continuing under the Other Lease.

(e)    Lessee fails to return the Aircraft to Lessor on the Expiration Date in accordance with Article 23 and Schedule 2.

(f)    Lessee fails to observe or perform any of its other obligations hereunder or under any Operative Document and fails to cure the same within fifteen (15) days after written notice thereof to Lessee.

(g)    Any representation or warranty made (or deemed to be repeated) of Lessee herein proves to be incorrect, inaccurate or misleading in any material respect when made or deemed to be repeated and, if such misrepresentation is capable of remedy, such misrepresentation remains unremedied for a period exceeding fifteen (15) days.

(h)    The registration of the Aircraft is cancelled other than as a result of an act or omission of Lessor.

(i)    Lessee abandons the Aircraft or Engines.

(j)    Lessee or an approved sublessee no longer has unencumbered control (other than Permitted Liens) or possession of the Aircraft or Engines, except as otherwise permitted by this Lease.

(k)    Lessee threatens to or temporarily or permanently discontinues business or sells or otherwise disposes of all or substantially all of its assets other than a Change Event.

CHICAGO/#1626279.11

(l)     Any consent, authorization, license or approval of, or registration with or declaration to, governmental or public bodies or authorities or courts required by Lessee to authorize, or required by Lessee in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of any of the Operative Documents or the performance by Lessee of its obligations under any of the Operative Documents is modified in a manner prejudicial to the Lessor or is not granted or is revoked or terminated or expires and is not renewed or otherwise ceases to be in full force and effect.

(m)     Lessee (i) suspends payment on its debts or other obligations, (ii) is unable to or admits its inability to pay its debts or other obligations as they fall due, (iii) is adjudicated or becomes bankrupt or insolvent or (iv) proposes or enters into any composition or other arrangement for the benefit of its creditors generally.

(n)     Any proceedings, resolutions, filings or other steps are instituted or threatened with respect to Lessee relating to the bankruptcy, liquidation, reorganization or protection from creditors of Lessee or a substantial part of Lessee's property. If instituted by Lessee, the same will be an immediate Event of Default. If instituted by another Person, the same will be an Event of Default if not dismissed, remedied or relinquished within sixty (60) days.

(o)     Any order, judgment or decree is entered by any court of competent jurisdiction appointing a receiver, trustee or liquidator of Lessee or a substantial part of its property, or if a substantial part of Lessee's property is to be sequestered. If instituted by or done with the consent of Lessee, the same will be an immediate Event of Default. If instituted by another Person, the same will be an Event of Default if not dismissed, remedied or relinquished within sixty (60) days.

(p)     Any Indebtedness for borrowed moneys or a guarantee or similar obligation owed by Lessee with an unpaid balance of at least Five Hundred Thousand U.S. Dollars ($500,000) becomes due or is capable of being declared due before its stated maturity or Lessee is in default (and any applicable cure periods have expired) under any other purchase agreement, lease, conditional sale agreement or other agreement pursuant to which Lessee has possession of any aircraft (unless Lessee is contesting the calling of such default in good faith and on reasonable grounds).

(q)     Any judgment for the payment of money in excess of One Million U.S. Dollars ($1,000,000) (excluding any amount insured by a solvent insurer who has admitted coverage for the underlying claim) is rendered against Lessee (or any of its affiliates), and the same shall remain undischarged for a period of thirty (30) days during which execution of such judgment shall not be effectively stayed.

(r)     Any relevant air traffic control authority or airport has notified Lessor that there are unpaid charges due from Lessee (unless such charges are being contested in good faith and by appropriate proceedings, an adequate bond has been provided and such proceedings do not involve any danger of the detention, interference with the use or operation, sale, forfeiture or loss of the Aircraft) and such charges remain outstanding for a period of thirty (30) days from the date of such authority's notice to Lessor provided that such thirty (30) day grace period will not

apply if there is a danger of detention, interference with the use or operation, sale, forfeiture or loss of the Aircraft.

(s)    Any approved sublessee acts so as to prevent present or future performance by Lessee of its obligations under this Lease.

(t)    Any of the Operative Documents (unless superceded by agreement between Lessor and Lessee) shall at any time and for any reason be or become invalid or unenforceable or otherwise ceases to remain in full force and effect, or if the validity or enforceability of any of the Operative Documents shall at any time and for any reason be contested by any party thereto (other than Lessor) (except where the same is not prejudicial, or likely to be prejudicial, to the rights or interests of Lessor under any Operative Document, in which case Lessee shall be entitled to five (5) Business Days from notification thereof to remedy such invalidity or unenforceability to the satisfaction of Lessor) or if any such party shall deny that it has any, or any further, liability thereunder or shall otherwise repudiate any of the Operative Documents or do or cause or permit to be done any act or thing evidencing an intention to repudiate any of the Operative Documents.

(u)    It becomes impossible or unlawful for Lessee to fulfill or perform any of the covenants or obligations expressed to be assumed by it in any of the Operative Documents or for Lessor to exercise the rights (or any of them) vested in it under any of the Operative Documents or otherwise.

(v)    The Guaranty ceases to remain in full force and effect as the legal, valid and binding obligation of Guarantor.

(w)    Any change in the person, or group of persons, who or which owns and controls the Lessee or the Guarantor shall occur, without the prior written consent of the Lessor and CIT, provided that:

(1)    if it is proposed that a change of control of the Guarantor shall occur, Lessee shall promptly notify Lessor and CIT in writing of the proposed transaction (a "proposed transaction") and in any event shall notify Lessor and CIT no less than twenty (20) Business Days prior to any proposed transaction being effected;

(2)    following any notification referred to in clause (1) of this Article 25.2(w), Lessee shall procure that Guarantor shall, together with Lessee, consult with Lessor and CIT in good faith, and shall provide to Lessor and CIT, on a confidential basis, such information which is available to Guarantor and Lessee, which Lessor or CIT may reasonably request in order that Lessor and CIT may evaluate whether to give their consent to the relevant proposed transaction and, if appropriate, to discuss any potential steps which could be taken to mitigate any adverse impact which might result from such proposed transaction;

(3)    if, following the consultation described in clause (2) of this Article 25.2(w), Lessor and CIT determine that effecting such proposed transaction would not increase the likelihood of the occurrence of a material adverse effect, then Lessor and CIT shall give their consent to such proposed transaction by so notifying

64

Lessee, whereupon, if the proposed transaction described in Lessor's and CIT's notice is effected, the change in control of Guarantor which occurs at the time such proposed transaction is effected shall not constitute an Event of Default under this Article 25.2(w).

For purposes of this Article 25.2(w), "control" means (i) the power, directly or indirectly, to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities or by contract or otherwise and (ii) ownership, direct or indirect, of the equity interests of such person representing the majority of the economic interests of such equity interests, and "controlling," "controlled by" and "under common control with" have correlative meanings.

25.3    Lessor's General Rights Following an Event of Default.

25.3.1    At any time after the occurrence and during the continuance of an Event of Default, Lessor may, by notice to Lessee and subject to applicable Law immediately terminate this Lease (whereupon, as Lessee hereby agrees and acknowledges, Lessee's right and interest in and to the Aircraft, and to possess and operate the Aircraft, shall terminate) and retake possession of the Aircraft, and Lessee agrees that Lessor may for this purpose enter upon any premises where the Aircraft or any part thereof may be located, and Lessee shall pay to Lessor forthwith upon such termination such sum as shall equal the aggregate of:

(a)    all amounts due under the Operative Documents as shall be payable and remain outstanding;

(b)    all losses incurred by Lessor in connection with such termination including, without prejudice to the generality of the foregoing, all costs and expenses incurred in recovering possession of the Aircraft, and in carrying out any works or modifications required to bring the Aircraft up to the condition specified in Article 23;

(c)    any loss suffered by Lessor because of Lessor's inability to place the Aircraft on lease with another lessee on terms as favorable to Lessor as this Lease or because whatever use, if any, to which Lessor is able to put the Aircraft upon its return to Lessor, or the funds arising upon a sale or other disposal, of the Aircraft, does not yield to Lessor revenue or income equivalent to the sums which would otherwise have been recoverable by it under or pursuant to this Lease had the Lease Term not been terminated;

(d)    any loss, premium, penalty or expense which may be incurred in repaying funds raised to finance the Aircraft or in unwinding any swap, forward interest rate agreement or other financial instrument relating in whole or in part to Lessor's financing of the Aircraft; provided, however, to the extent an unwinding of any swap, forward interest rate agreement or other financial instrument relating to Lessor's financing of the Aircraft causes Lessor to be "in the money" in Lessor's reasonable opinion, then Lessor shall be obligated to apply such profit to reducing other costs for which Lessee may be liable pursuant to this Article 25.3.1; and

(e)    all loss, costs and expenses incurred by Lessor under the Operative Documents in connection with, or as a consequence of, such termination.

CHICAGO/#1626279.11

25.3.2    The rights and remedies of Lessor provided in this Lease are cumulative and are not exclusive of any rights and remedies provided by law.

25.4    <u>Deregistration and Export of Aircraft</u>.  If an Event of Default has occurred and is continuing, Lessor, in its sole discretion, may take all steps necessary (including, without limitation, obtaining any necessary and appropriate judgments or orders) to deregister the Aircraft in and export the Aircraft from the State of Registration.

25.5    <u>Lessee Liability for Damages</u>.  If an Event of Default occurs, in addition to all other remedies available at law or in equity, Lessor has the right to recover from Lessee and Lessee will pay Lessor within two (2) Business Days after Lessor's written demand, all of the following:

(a)    All amounts which are then due and unpaid hereunder and which become due prior to the earlier of Lessor's recovery of possession of the Aircraft or Lessee making an effective tender thereof.

(b)    Any loss of profits suffered by Lessor because of the Lessor's inability to place the Aircraft on lease with another lessee on terms as favorable as to Lessor as this Lease or because whatever use, if any, to which Lessor is able to put the Aircraft upon its return to Lessor or the funds arising upon a sale or disposition of the Aircraft is not as profitable to Lessor as this Lease.

(c)    All costs associated with Lessor's exercise of its remedies hereunder, including but not limited to repossession costs, legal fees, insurance, ferry flight/repositioning, Aircraft storage costs, Aircraft re-lease or sale costs and Lessor's internal costs and expenses (including the cost of personnel time calculated based upon the compensation paid to the individuals involved on an annual basis and a general Lessor overhead allocation).

(d)    Any amount of principal, interest, fees or other sums paid or payable on account of funds borrowed in order to carry any unpaid amount.

(e)    Any loss, premium, penalty or expense which may be incurred in repaying funds raised to finance the Aircraft or in unwinding any financial instrument relating in whole or in part to Lessor's financing of the Aircraft; provided, however, to the extent an unwinding of any swap, forward interest rate agreement or other financial instrument relating to the Lessor's financing of the Aircraft causes the Lessor to be "in the money" in Lessor's reasonable opinion, then Lessor shall be obligated to apply such profit to reducing other costs for which Lessee may be liable pursuant to this Article 25.5.

(f)    Any loss sustained by Lessor due to Lessee's failure to redeliver the Aircraft in the condition required by this Lease.

(g)    Any other loss, damage, expense, cost or liability which Lessor suffers or incurs as a result of the Event of Default and/or termination of this Lease.

25.6    <u>Waiver of Default</u>.  By written notice to Lessee, Lessor may at its election waive any Default or Event of Default and its consequences and rescind and annul any prior notice of

66

termination of this Lease. The respective rights of the parties will then be as they would have been had no Default or Event of Default occurred and no such notice been given.

25.7    Present Value of Payments. In calculating Lessor's damages hereunder, upon an Event of Default all Rent and other amounts which would have been due hereunder during the Lease Term if an Event of Default had not occurred will be calculated on a present value basis using a discounting rate of four percent (4%) per annum discounted to the earlier of the date on which Lessor obtains possession of the Aircraft or Lessee makes an effective tender thereof.

25.8    Use of "Termination Date". For avoidance of doubt, it is agreed that if this Lease terminates and the Aircraft is repossessed by Lessor due to an Event of Default, then, notwithstanding the use of the term "Termination Date" in this Lease, the period of the Lease Term and the "Expiration Date" will be utilized in calculating the damages to which Lessor is entitled pursuant to Article 25.5. For example, it is agreed and understood that Lessor is entitled to receive from Lessee the Rent and the benefit of Lessee's insurance and maintenance of the Aircraft until expiration of the Lease Term.

## ARTICLE 26

## NOTICES

26.1    Manner of Sending Notices. Any notice, request or information required or permissible under this Lease will be in writing and in English. Notices will be delivered in person or sent by letter (mailed airmail, certified and return receipt requested), by electronic mail or by expedited delivery addressed to the parties as set forth in Article 26.2. In the case of a notice sent by electronic mail, notice will be deemed received upon transmission and actual receipt by the intended recipient at the address provided herein (or such other address as such recipient may provide the other parties from time to time. In the case of a mailed letter, notice will be deemed received on the fifth (5th) day after mailing. In the case of a notice sent by expedited delivery, notice will be deemed received on the date of delivery set forth in the records of the Person which accomplished the delivery. If any notice is sent by more than one of the above listed methods, notice will be deemed received on the earliest possible date in accordance with the above provisions.

26.2    Notice Information. Notices will be sent:

If to Lessor:

Wells Fargo Bank Northwest,
National Association
299 South Main Street, 12th Floor
MAC: U1228-120
Salt Lake City, Utah 84111
USA
Facsimile: (801) 246-5053
Attention: Corporate Trust Department

67

with copies, which shall not constitute notice, to:

AARIFS (342) LLC
One AAR Place
1100 North Wood Dale Road
Wood Dale, Illinois  60191
USA
Facsimile:  (630) 227-2349
Attention:  John P. Johnson, CEO
E-mail:  john.johnson@aarcorp.com

AAR Financial Services, L.L.C.
One AAR Place
1100 North Wood Dale Road
Wood Dale, Illinois  60191
USA
Facsimile: (630) 227-2101
Attention:  Vice President
E-mail:  tromenesko@aarcorp.com

and with further copies, which shall not constitute notice, to:

Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street
Chicago, Illinois  60601
Facsimile:  (312) 609-5005
Attention:  Dean N. Gerber, Esq.
E-mail:  dgerber@vedderprice.com

and to:

C.I.T. Leasing Corporation
11 West 42nd Street, 12th Floor
New York, New York 10036
USA
Facsimile:  (212) 461-5402
Attention:  Chief Counsel-Transportation Finance

with a copy to:

McDermott, Will & Emery
2049 Century Park East
Suite 3800
Los Angeles, California 90067
USA
Facsimile:  (310) 277-4730
Attention:  Ronald W. Goldberg, Esq.

CHICAGO/#1626279.11

If to Lessee:

Air Comet Sociedad Anonima
Bahia de Pollensa, 21-23
28042 Madrid, Spain
Attn: Mr. Fernando Gil Rubio
Telephone: +34 91 203 6300
E-mail: fgilr@aircomet.com
Facsimile: +34 91 329 3511

or to such other places as either party directs in writing to the other party.

## ARTICLE 27

## GOVERNING LAW AND JURISDICTION

27.1   New York Law.  THIS LEASE SHALL BE DEEMED DELIVERED IN AND SHALL BE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

27.2   Non-Exclusive Jurisdiction.  Each of Lessor and Lessee irrevocably agrees that any legal action or proceedings in connection with this Lease or any Operative Document may be brought in any New York state or federal court sitting in The City and County of New York, and irrevocably and unconditionally submits to the jurisdiction of such courts.  The submission to such jurisdiction shall not (and shall not be construed so as to) limit the rights of the Lessor to take proceedings against Lessee in the courts of any other competent jurisdiction, nor shall the taking of proceedings in any one or more jurisdictions preclude the taking of proceedings in any other jurisdiction, whether concurrently or not.  Lessee irrevocably waives any objection it may now or hereafter have to the laying of venue of any action or proceeding in any court and any claim it may now or hereafter have that any action or proceeding has been brought in an inconvenient forum.

27.3   Service of Process.  The parties hereby consent to the service of process (i) out of any of the courts referred to above, or (ii) in accordance with the Hague Convention, if applicable.  Lessee hereby irrevocably and unconditionally appoints Law Debenture (the "**Process Agent**"), with an office on the date hereof at 400 Madison Avenue, 4th Floor, New York, NY 10017, United States of America, as its agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any such action or proceeding in any such New York state or federal court referred to in Section 27.2 above, or such other address as Lessee may from time to time designate by written notice.

27.4   Prevailing Party in Dispute.  If any legal action or other proceeding is brought in connection with or arises out of any provisions in this Lease, the prevailing party will be entitled to recover reasonable attorneys' fees and other costs incurred in such action or proceedings.  The

69

prevailing party will also, to the extent permissible by Law, be entitled to receive pre- and post-judgment Default Interest.

27.5  <u>Waiver</u>. LESSEE AND LESSOR HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY. LESSEE AND LESSOR HEREBY IRREVOCABLY WAIVE ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS LEASE BROUGHT IN ANY OF THE COURTS REFERRED TO IN ARTICLE 27.2, AND HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

## ARTICLE 28

## MISCELLANEOUS

28.1  <u>Press Releases</u>. No party will provide any news, articles or other releases to the public media regarding this Lease or the Aircraft without the written consent of the other party.

28.2  <u>Power of Attorney</u>. Lessee hereby irrevocably appoints Lessor as its attorney, which power is being given by way of security for the performance by Lessee of its obligations under this Lease, such power to arise only on the occurrence of an Event of Default and for so long as such Event of Default is continuing, for the purpose of putting into effect following an Event of Default the return, repossession, deregistration and exportation of the Aircraft. To evidence this appointment, Lessee has executed the Power of Attorney in the form of Exhibit F. Lessee will take all steps required under the Laws of the State of Registration to provide such power of attorney to Lessor. The power of attorney granted pursuant to this Article 28.2 is a power coupled with an interest and shall be irrevocable until all the obligations of Lessee under this Lease are completely and indefeasibly performed in full.

28.3  <u>Lessor Performance for Lessee</u>. The exercise by Lessor of its remedy of performing a Lessee obligation hereunder is not a waiver of and will not relieve Lessee from the performance of such obligation at any subsequent time or from the performance of any of its other obligations hereunder.

28.4  <u>Lessor's Payment Obligations</u>. Any obligation of Lessor under this Lease to pay or release any amount to Lessee is conditioned upon (i) all amounts then due and payable by Lessee to Lessor under this Lease or under any other agreement between Lessor and Lessee having been paid in full and (ii) no Default having occurred and continuing hereunder at the time such payment or release of payment is payable to Lessee.

28.5  <u>Application of Payments</u>. Any amounts paid or recovered in respect of Lessee liabilities hereunder may be applied to Rent, Default Interest, fees or any other amount due hereunder in such proportions, order and manner as Lessor determines.

28.6  <u>Usury Laws</u>. In the event that the Default Interest rate shall be deemed to be unlawful, then there shall be substituted the highest lawful rate. Notwithstanding anything to the contrary in the Operative Documents, Lessee will not be obligated to pay Default Interest or

70

other interest in excess of the maximum non-usurious interest rate, as in effect from time to time, which may by applicable Law be charged, contracted for, reserved, received or collected by Lessor in connection with the Operative Documents. During any period of time in which the then-applicable highest lawful rate is lower than the Default Interest rate, Default Interest will accrue and be payable at such highest lawful rate however, if at later times such highest lawful rate is greater than the Default Interest rate, then Lessee will pay Default Interest at the highest lawful rate until the Default Interest which is paid by Lessee equals the amount of interest that would have been payable in accordance with the interest rate set forth in Article 5.7.

28.7    Delegation by Lessor. Lessor may delegate to any Person(s) all or any of the rights, powers or discretion vested in it by this Lease and any such delegation may be made upon such terms and conditions as Lessor in its absolute discretion thinks fit and Lessee agrees to recognize any such delegation.

28.8    Confidentiality. The Operative Documents and all non-public information obtained by either party about the other are confidential and are between Lessor and Lessee only and will not be disclosed by a party to third parties (other than to such party's auditors or legal advisors, a party providing financing to Lessor with respect to the Aircraft or as required in connection with any filings of this Lease in accordance with Article 14) without the prior written consent of the other party. If disclosure is required as a result of applicable Law, Lessee and Lessor will cooperate with one another to obtain confidential treatment as to the commercial terms and other material provisions of this Lease.

28.9    Rights of Parties. The rights of the parties hereunder are cumulative, not exclusive, may be exercised as often as each party considers appropriate and are in addition to its rights under general Law. The rights of one party against the other party are not capable of being waived or amended except by an express waiver or amendment in writing. Any failure to exercise or any delay in exercising any of such rights will not operate as a waiver or amendment of that or any other such right any defective or partial exercise of any such rights will not preclude any other or further exercise of that or any other such right and no act or course of conduct or negotiation on a party's part or on its behalf will in any way preclude such party from exercising any such right or constitute a suspension or any amendment of any such right.

28.10    Further Assurances. Each party agrees from time to time to do and perform such other and further acts and execute and deliver any and all such other instruments as may be required by Law, reasonably requested by the auditors of the other party or requested by the other party to establish, maintain or protect the rights and remedies of the requesting party or to carry out and effect the intent and purpose of this Lease.

28.11    Use of Word "including". The term "including" is used herein without limitation and by way of example only.

28.12    Headings. All article and paragraph headings and captions are purely for convenience and will not affect the interpretation of this Lease. Any reference to a specific article, paragraph or section will be interpreted as a reference to such article, paragraph or section of this Lease.

CHICAGO/#1626279.11

28.13   Invalidity of any Provision.  If any of the provisions of this Lease become invalid, illegal or unenforceable in any respect under any Law, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired.

28.14   Time is of the Essence.  Time is of the essence in the performance of all obligations of the parties under this Lease and, consequently, all time limitations set forth in the provisions of this Lease will be strictly observed.

28.15   Amendments in Writing.  The provisions of this Lease may only be amended or modified by a writing executed by Lessor and Lessee.

28.16   Counterparts.  This Lease may be executed in any number of identical counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same instrument when each party has signed and delivered one such counterpart to the other party.

28.17   Delivery of Documents by Fax.  Delivery of an executed counterpart of this Lease or of any other documents in connection with this Lease by fax will be deemed as effective as delivery of an originally executed counterpart.  Any party delivering an executed counterpart of this Lease or other document by fax will also deliver an originally executed counterpart, but the failure of any party to deliver an originally executed counterpart of this Lease or such other document will not affect the validity or effectiveness of this Lease or such other document.

28.18   Entire Agreement.  This Lease and the other Operative Documents constitute the entire agreement. between the parties in relation to the leasing of the Aircraft by Lessor to Lessee and supersede all previous proposals, agreements and other written and oral communications in relation hereto.  The parties acknowledge that there have been no representations, warranties, promises, guarantees or agreements, express or implied, except as set forth herein.

28.19   Transaction Expenses.  Each party shall bear its own costs and expenses incurred in connection with the negotiation, preparation and consummation of this Lease and any related documents and the transactions contemplated hereby and thereby.  The fees and expenses of Lessor's special U.S. counsel and special Spanish counsel incurred in connection with the negotiation, preparation and consummation of this Lease and any related documents shall be solely for the account of Lessor. Any and all costs and expenses (including, without limitation, the reasonable fees and expenses of Lessor's special Spanish counsel) incurred in connection with the filing for recordation of this Lease and any related documents with the Aviation Authority or any other registry or body within the State of Registration or with the International Registry (as such term is defined in the Cape Town Convention) shall be solely for the account of Lessee.

28.20   No Brokers.  Each party hereto represents and warrants to the other that it has not retained any agent or broker in connection with the transactions contemplated hereby, other than Gamble Aviation Management Limited, in the case of Lessee, and JetStar Partners, Inc., in the case of Lessor, and each party shall indemnify and hold the other party harmless against any

72

claim for broker's and finder's fees based on the alleged or the actual retention of a broker or finder by the indemnifying party.

    28.21    Concerning the Trustee.  Wells Fargo Bank Northwest, National Association (the "**Trust Company**") is executing this Agreement solely in its capacity as trustee under the Trust Agreement and not in its individual capacity and in no case shall the Trust Company (or any entity acting as trustee under such Trust Agreement) be personally liable for or on account of any of the statements, representations, warranties, covenants or obligations stated to be those of the Lessor under this Agreement, all such liability (if any) being expressly waived by the parties hereto and any person claiming by, through or under such party; provided that the Trust Company (or any successor trust company shall be personally liable under this Agreement for its own gross negligence or willful misconduct or for its own breach of its statements, representations, warranties, covenants or obligations container herein, to the extent covenanted or made in its individual capacity.

## ARTICLE 29

## MAINTENANCE SUPPLEMENTAL RENT; COST SHARING

    29.1    Supplemental Rent.

    (a)    From the Delivery Date, on the fifteenth (15th) day of each calendar month following the month in which the Delivery Date occurs during the Term, Lessee will pay to Lessor, as Supplemental Rent, Engine LLP Supplemental Rent, Airframe 6 Year Supplemental Rent, Airframe 12 Year Supplemental Rent, Engine Full Performance Restoration Supplemental Rent, APU Supplemental Rent and Landing Gear Supplemental Rent (collectively, "**Maintenance Supplemental Rent**") in respect of the hours and cycles flown in the previous calendar month during the Term, including in the payment covering use of the Aircraft during the first month of the Lease Term any such amount due with respect to the ferry flight which occurred prior to the Lease Term.  Maintenance Supplemental Rent shall be payable in the amounts set forth as follows:

| | |
|---|---|
| Engine LLP Supplemental Rent: | US $81 per engine cycle per Engine |
| Landing Gear Supplemental Rent: | US $2,760 per month |
| Airframe 6 Year Supplemental Rent: | US $11,500 per month |
| Airframe 12 Year Supplemental Rent: | $5,000 per month |
| Engine Full Performance Restoration Supplemental Rent: | $110 per Engine per engine flight hour |
| APU Supplemental Rent: | US $15 per flight hour |

    Maintenance Supplemental Rent shall be paid to Lessor as Rent, as compensation for Lessee's use of the Aircraft and, without prejudice to Lessee's rights under this Article 29, Lessee shall have no right or interest in or to the Maintenance Supplemental Rent when paid to Lessor hereunder.  Lessor shall have the right to apply payments of Maintenance Supplemental

CHICAGO/#1626279.11

Rent against any accrued and unpaid obligations of Lessee arising from time to time under this Lease.

(1)     Provided that no Default or Event of Default has occurred and is continuing, Lessor has reviewed and accepted the relevant workscope in advance for each Engine (such acceptance not to be unreasonably withheld), and provided further that the overhaul is not for foreign object damage, improper operations or maintenance by Lessee, for each Engine, Lessee shall be entitled to reimbursement for costs (x) incurred for Engine Heavy Maintenance up to the amount of Engine Full Performance Restoration Supplemental Rent paid in respect of each Engine less amounts previously reimbursed to Lessee for Engine Heavy Maintenance for such Engine and (ỹ) incurred for each replacement of an LLP during an Engine Overhaul (whether or not such Overhaul is Engine Heavy Maintenance) up to Lessee's share (as calculated below) of Lessee's cost for the replacement LLP (with reductions for replacement of any Engine LLPs with more than 5% stub life remaining, unless replacement is as a result of any such Engine LLP being replaced only due to a return condition requirement, in which case Lessee will first consult with Lessor prior to replacement and the replaced part will become the property of CIT subject to the Head Lease and Lessor's interest therein). For purposes of this Article 29.1(a)(1)(y), Lessee's share of its cost of any LLP shall equal the product of (A) the amount paid by Lessee in respect of such LLP multiplied by (B) a fraction, the numerator of which is the remaining life (in Cycles) of such LLP at Delivery, or since the time such LLP was originally installed by Lessee, as applicable, and the denominator of which is the expected full life (in Cycles) of such LLP. However, in the case of the replacement of an LLP for a failure prior to expiration of the expected full life other than (m) due to foreign object damage or improper operations or maintenance by Lessee, (n) due to any cause covered by applicable manufacturer warranties or (o) if a repair is available for such LLP (in which case the cost of repair of such LLP (in lieu of replacement) shall be shared as set forth below), Lessee's share of its cost of the relevant LLP shall equal the product of (A) the amount paid by Lessee in respect of such LLP multiplied by (B) a fraction, the numerator of which is the life (in Cycles) of such LLP used by Lessee from Delivery, or since initial installation by Lessee, as applicable, through replacement (or repair, as the case may be) and the denominator of which is the expected full life (in Cycles) of such LLP.

(2)     Provided that no Default or Event of Default has occurred and is continuing, and provided, further, that Lessor has reviewed and accepted (such acceptance not to be unreasonably withheld) in advance a workscope for such Landing Gear Overhaul, for each Landing Gear, Lessee shall be entitled to reimbursement for costs incurred for a Landing Gear Overhaul (other than overhauls due to foreign object damage or improper operations or maintenance by Lessee), including any exchange fee for fully overhauled landing gear, up to the amount of Landing Gear Supplemental Rent paid in respect of each Landing Gear less amounts previously reimbursed to Lessee for Landing Gear Overhauls for such Landing Gear.

(3)     Provided that no Default or Event of Default has occurred and is continuing, and provided, further, that Lessor has reviewed and accepted (such acceptance not to be unreasonably withheld) in advance a workscope for such Airframe 6

74

Year Check, for the Airframe, Lessee shall be entitled to reimbursement for costs incurred for an Airframe 6 Year Check (other than overhauls due to foreign object damage or improper operations or maintenance by Lessee) up to the amount of Airframe 6 Year Supplemental Rent paid in respect of the Airframe less amounts previously reimbursed to Lessee for Airframe 6 Year Checks for the Airframe.

(4)     Provided that no Default or Event of Default has occurred and is continuing, and provided, further, that Lessor has reviewed and accepted (such acceptance not to be unreasonably withheld) in advance a workscope for such Airframe 12 Year Check, for the Airframe, Lessee shall be entitled to reimbursement for costs incurred for an Airframe 12 Year Check (other than overhauls due to foreign object damage or improper operations or maintenance by Lessee) up to the amount of Airframe 12 Year Supplemental Rent paid in respect of the Airframe less amounts previously reimbursed to Lessee for Airframe 12 Year Checks for the Airframe.

(5)     Provided that no Default or Event of Default has occurred and is continuing, and provided, further, that Lessor has reviewed and accepted (such acceptance not to be unreasonably withheld) in advance a workscope for such APU overhaul, for the Airframe, Lessee shall be entitled to reimbursement for costs incurred for an APU overhaul (other than overhauls due to foreign object damage or improper operations or maintenance by Lessee) up to the amount of APU Supplemental Rent paid in respect of the Airframe less amounts previously reimbursed to Lessee for APU overhaul for the Airframe.

(6)     To the extent that the cost of any Initial Qualifying Maintenance Event exceeds the relevant amount of Maintenance Supplemental Rent paid pursuant to this Article 29.1, Lessee shall be entitled to defer any further payment of such corresponding Maintenance Supplemental Rent for such item until the amount so deferred equals the excess of the amount expensed by Lessee on such Initial Qualifying Maintenance Event over the amount of Maintenance Supplemental Rent paid hereunder. In the event that any outstanding balances remain due to Lessee on the Termination Date, Lessor shall reimburse Lessee for all such remaining amounts.

(7)     No reimbursement shall be made in respect of replacements, repairs or overhauls caused by ingestion, faulty maintenance or any accidental cause, or any cost which is reimbursable by insurance or manufacturer's warranty or material guarantees after due diligence in effecting recovery.

(8)     Lessor shall make payment to Lessee within ten (10) days of the receipt by Lessor of full supporting documentation, including copies of all relevant receipts, invoices marked "paid in full" and such other information as Lessor may request to support the claim for payment for the Maintenance Supplemental Rent. To the extent Lessee has not paid any relevant invoice, Lessor may, at its sole option (acting reasonably), elect to directly pay the relevant maintenance provider in lieu of paying Lessee pursuant to this Article 29(a) and such payment shall satisfy Lessor's obligations under this Article 29(a) in respect of the relevant invoice. Lessor shall pay to Lessee 80%

75

of the invoice amount upon receipt and approval of a preliminary invoice with respect to such relevant maintenance.

(9)     Any claim for Maintenance Supplemental Rent reimbursement in accordance with this Article 29.1 for work performed during the Lease Term must be notified to Lessor prior to the Termination Date and must be submitted not more than ninety (90) days after the Termination Date, unless Lessee can justify an extension beyond such date and Lessor in its sole discretion (acting reasonably) approves such extension.

(10)    All payments of Maintenance Supplemental Rent shall be, and at all times shall remain (including at the end of the Lease Term) the sole property of Lessor. Except as provided in this Article 29, Lessee shall have no right or claim to any such payments in respect of amounts paid by Lessee as Maintenance Supplemental Rent. Lessor shall have no obligation to pay interest on any payment of Maintenance Supplemental Rent and may commingle such funds.

(11)    Lessee and Lessor hereby acknowledge and agree that the Maintenance Supplemental Rent rates set forth herein are based upon an expected annual utilization of Lessee of 1,500 cycles and an assumed ratio of two (2) flight hours for every one (1) cycle and are subject to adjustment on an annual basis to account for market conditions and the cost of maintenance labor and parts. Lessee further agrees that, if at any time during the Term its utilization ratio falls below 1.5:1 as described herein, Lessee shall, on or prior to the next date on which Maintenance Supplemental Rent is payable hereunder, pay to Lessor the amount of any resulting shortfall such that Lessor receives the amount it would have received based on a 1.5:1 utilization ratio. In the event that the assumed flight hour to cycle ratio varies over the life of the lease, then a time-based weighted average of the various cycle ratios shall be used to determine whether an excessive cycles compensation is due and payable to Lessor.

(12)    On each anniversary of the Delivery Date, the Maintenance Supplemental Rent amounts shall be escalated by three and one half percent (3.5%).

(b)     Default. If a Default or Event of Default shall have occurred and be continuing, Lessor may, but shall not be obliged to, (i) apply the Maintenance Supplemental Rent in whole or in part for the payment of any Rent, indemnities, legal fees and other expenses, insurance and other casualty payments and any other amount owing from time to time by Lessee under this Lease, for the payment of any loss or damage suffered by Lessor as a result of any Default or (ii) utilize the Maintenance Supplemental Rent in whole or in part to perform any of Lessee's obligations under this Lease or to otherwise remedy any circumstance giving rise to a Default or Event of Default, including the redelivery condition of the Aircraft, without prejudice to any other remedy of Lessor (it being understood that an application of the Maintenance Supplemental Rent shall not constitute a cure of any Default unless and until Lessee shall have complied with the following sentence). In any event Lessee shall, on demand, restore the full amount of the Maintenance Supplemental Rent by payment to Lessor of an amount in immediately available Dollars equal to the amount by which the balance of the Maintenance Supplemental Rent is required under the terms of this Lease.

      (c)      Notwithstanding the foregoing, Lessee shall remain responsible for all maintenance costs other than as explicitly set forth in this Lease.

*   *   *

77

[Aircraft Lease Agreement (342)]

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Lease to be executed by their respective officers as of the day and year first written above.

WELLS FARGO BANK NORTHWEST,
NATIONAL ASSOCIATION, not in its
individual capacity but solely as trustee

By: _____

    Name:

    Its:

AIR COMET SOCIEDAD ANONIMA

By: _____

    Name:

    Its:

By: _____

    Name: *Ignacio Rosival, CEO*

    Its:

IN WITNESS WHEREOF, Lessee and Lessor have caused this Lease to be executed by their respective officers as of the day and year first written above.

WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, not in its individual capacity but solely as trustee

By: _____

Name: _Luis VEGA-PENICHET_

Its: _ATTORNEY IN FACT_

AIR COMET SOCIEDAD ANONIMA

By: _____

Name:

Its:

By: _____

Name:

Its:

78

## EXHIBIT A

## AIRCRAFT DESCRIPTION

| | |
|---|---|
| Airframe Manufacturer and Model: | Airbus A320-200 |
| Airframe Serial Number: | 342 |
| Aircraft Registration Mark: | EC-_____ |
| Engine Manufacturer and Model: | CFM International, Inc. CFM56-5A1 |
| Engine Serial Numbers: | 731681 and 731682 |
| Engine Thrust: | 20,000 pounds (B1 power) |
| Additional Delivery Items: | See Schedule 1 (Delivery Receipt) to Exhibit D |

CHICAGO/#1626279.11

# EXHIBIT B

## CERTIFICATE OF INSURANCE

### [TO BE INSERTED]

CHICAGO/#1626279.11

## EXHIBIT C-1

## FORM OF EUROCONTROL LETTER

_____, __, 2007

Eurocontrol
Central Route Charges Office
Rue de la Fusée, 96
B-1130 Brussels
Belgium

Fax  00 322 230 2297

Dear Sir,

### Subject:  Eurocontrol Statement of Accounts relative to
### AIR COMET, S.A.

We hereby confirm that AIR COMET, S.A. has entered into an Aircraft Lease Agreement (342) dated as of June 15, 2007, with WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, not in its individual capacity but solely as trustee (the "**Lessor**") relating to one Airbus A320-200 aircraft, msn 0342 (the "**Aircraft**").  The Aircraft is owned by C.I.T. LEASING CORPORATION (the "**Owner**").

We hereby irrevocably authorize you to release to the Owner and/or the Lessor (or their duly authorized representative), upon Owner's and/or Lessor's request from time to time, a statement of accounts of all sums due by us to you, as of the date of each such request, in respect of all aircraft operated by Lessee, including but not limited to the Aircraft.

Yours faithfully,

**AIR COMET, S.A.**

By: _____

Title: _____

EXHIBIT C-1
Page 1

## EXHIBIT C-2

## FORM OF AENA LETTER

**AENA**
Dirección Económico-Financiera
División de Gestión de Clientes
c/ Peonias, 2, 5ª planta
28043 Madrid

| | |
|---|---|
| _____, ___ de _____ 2007 | _____, ___ of _____ 2007 |
| **Estado de Cuentas relativo a AIR COMET, S.A. Aeronave Airbus A320-200 con número de serie de fabricante 0342 (la Aeronave)** | **Statement of accounts relating to AIR COMET, S.A. Aircraft Airbus A320-200 with manufacturer's serial number 0342 (the Aircraft)** |

Estimado Sres.:
Por el presente les confirmamos que **AIR COMET, S.A.** ha celebrado, con fecha 15 de Junio de 2007, un Contrato de Arrendamiento de Aeronave (el "**Arrendamiento**") con **WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, no en su capacidad individual sino como "trustee" (el "**Arrendador**"). La Aeronave es propiedad de **C.I.T. LEASING CORPORATION** (el "**Propietario**").
Por el presente les autorizamos a facilitar al Propietario y/o al Arrendador, previo al requerimiento de cualquiera de ellos, el estado de nuestra cuenta, especificando las cantidades que adeudemos a ustedes como a otras entidades en concepto de tasas de navegación, aterrizaje y otros gastos aeroportuarios con respecto a cualquier aeronave operada por nuestra compañía, incluyendo sin limitación la Aeronave.
Atentamente,

Dear Sirs,
We hereby confirm that **AIR COMET, S.A.** has entered into an Aircraft Lease Agreement (342) dated as of June 15, 2007 (the "**Lease**") with **WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, not in its individual capacity but as trustee (the "**Lessor**"). The Aircraft is owned by **C.I.T. LEASING CORPORATION** (the "**Owner**").

We hereby authorize you to release to the Owner and/or the Lessor, upon the request of any of them, a statement of our account with you, specifying any amounts due by us to you or other entities in respect of navigational, landing and airport charges, regarding any aircraft operated by us including, but not limited to, the Aircraft.

Yours faithfully,

_____
**AIR COMET, S.A.**
By:_____
Title:_____

EXHIBIT C-2
Page 1

## EXHIBIT D

### ESTOPPEL AND ACCEPTANCE CERTIFICATE

**THIS ESTOPPEL AND ACCEPTANCE CERTIFICATE** (this "**Certificate of Acceptance**") is dated as of _____, 2007.

W I T N E S S E T H:

**WHEREAS, WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,** a national banking association organized under the laws of the United States of America, not in its individual capacity but solely as trustee ("**Lessor**"), and **AIR COMET SOCIEDAD ANONIMA,** a company organized under the laws of Spain with its principal place of business at Bahia de Pollensa, 21-23, 28042 Madrid, Spain ("**Lessee**"), have heretofore entered into that certain Aircraft Lease Agreement (342) dated as of _____, 2007 (the "**Lease**"), which provides for the execution and delivery by Lessee of a Certificate of Acceptance in substantially the form hereof for the purpose of leasing the Aircraft in accordance with the terms thereof; and

**WHEREAS,** capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Lease.

**NOW, THEREFORE,** in consideration of the foregoing premises, Lessee does hereby represent, acknowledge, warrant and agree as follows:

1.     On the ____ day of _____, 2007 (Time: _____a.m./p.m.) at _____, Lessor has delivered and leased to Lessee, and Lessee has accepted and leased from Lessor and received possession of:

(a)     One (1) Airbus A320-200 airframe bearing Airframe Manufacturer's serial number 342 and Registration Mark EC-_____, together with two (2) CFM56-5A1 engines bearing Engine Manufacturer's Serial Numbers 731681 and 731682 attached thereto and as further described in Schedule 1 attached hereto and incorporated herein, all in airworthy condition.

(b)     All Aircraft Documentation, including the usual and customary manuals, logbooks, flight records and historical information regarding the Aircraft, Engines and Parts, as listed in Schedule 1 hereto.

(c)     The loose equipment set forth in the list in Schedule 1 attached hereto.

2.     The Airframe, Engines and Parts had the hours/cycles set forth in Schedule 1 attached hereto.

3.     The above specified aircraft, engines and documentation are hereby accepted by Lessee subject to the provisions of the Lease.

EXHIBIT D
Page 1

4.    Pursuant to the terms of the Lease, all monthly Basic Rent is due and payable as provided in Article 5.3.1 of the Lease and all monthly Maintenance Supplemental Rent is due and payable as provided in Article 29.1 of the Lease.

5.    The Aircraft, Engines, Parts and Aircraft Documentation as described in the Lease have been fully examined by Lessee and have been received in a condition fully satisfactory to Lessee and in full conformity with the Lease in every respect.

6.    The Lease is in full force and effect.  Lessor has fully, duly and timely performed all of its obligations of every kind or nature thereunder and Lessee has no claims, offsets, deductions, set-off or defenses of any kind or nature in connection with the Lease.

7.    Prior to the Delivery Date, Lessee has obtained all required permits, authorizations, licenses and fees of the State of Registration or any Government Entity thereof necessary in order for Lessee to operate the Aircraft as permitted by the terms of the Lease.

8.    This Certificate of Acceptance shall in all respects be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflict of laws (other than Section 5-1401 and 5-1402 of the New York General Obligations Law).

*        *        *

CHICAGO/#1626279.11

[Aircraft Lease Agreement (342)]

Dated on the date set forth above.

**AIR COMET SOCIEDAD ANONIMA**

By:_____

Title:_____


By:_____

Title:_____

EXHIBIT D
Page 3

[Aircraft Lease Agreement (342)]

## **<u>Schedule 1</u>**

[See Attached]

CHICAGO/#1626279.11

## EXHIBIT E-1

## FORM OF DELIVERY DATE CERTIFICATE

## DELIVERY DATE CERTIFICATE

*(MSN 0342)*

From / De:    WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, not in its individual capacity but solely as trustee

To / A :    AIR COMET, S.A.

| | |
|---|---|
| Aircraft Lease Agreement (342) dated as of _____, 2007 (the "**Lease Agreement**") relating to one Airbus A320-200 Aircraft with manufacturer's serial number 0342. | Contrato de Arrendamiento de Aeronave (342) de __ de _____ de 2007 (el "**Contrato de Arrendamiento**") relativo a la Aeronave Airbus A320-200 con número de serie del fabricante 0342. |
| A.    Words and expressions used in this certificate shall, unless otherwise defined herein or the context requires otherwise, have the same meaning as the equivalent words and expressions used in the Lease Agreement. | 1.    Las palabras y expresiones utilizadas en este certificado, salvo que se definan de otro modo en el presente o que el contexto requiera otra cosa, tendrán el mismo significado que las palabras y expresiones equivalentes utilizadas en el Contrato de Arrendamiento. |
| B.    We refer to the Lease Agreement and hereby inform you that the Delivery Date occurred on the ____of _____ 2007. | 2.    Nos referimos al Contrato de Arrendamiento y por el presente les informamos que la Fecha de Entrega ha tenido lugar el __ de _____ de 2007. |

For and on behalf of/Por y en nombre de
**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, not in its individual capacity but solely as trustee

By/Por:
Title/Cargo:
Date/fecha: ____ _____ 2007

EXHIBIT E-1
Page 1

**EXHIBIT E-2**

**FORM OF CONDITIONS PRECEDENT CERTIFICATE**

<u>**CONDITIONS PRECEDENT CERTIFICATE**</u>

*(MSN 0342)*

| | |
|---|---|
| **TO:** | **A:** |
| The Spanish Aircraft Matriculation Registry General Directorate of Civil Aviation Ministerio de Fomento Madrid | Registro de Matrícula de Aeronaves Dirección General de Aviación Civil Ministerio de Fomento Madrid |
| AIR COMET, S.A. Bahia de Pollensa 21-23 28042 Madrid | AIR COMET, S.A. Bahia de Pollensa 21-23 28042 Madrid |
| _____ _____ 2007 | ___ de _____ de 2007 |
| Gentlemen, | Señores: |
| **Re:    One Airbus A320-200 Aircraft, Manufacturer's serial number 0342** | **Re:    Aeronave Airbus A320-200, Número de serie del fabricante 0342** |
| We refer to the Aircraft Lease Agreement (342) dated as of _____, 2007 (hereinafter the "**Lease**") entered into among WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, not in its individual capacity but solely as trustee | Hacemos referencia al Contrato de Arrendamiento de Aeronave (342) de fecha ___ de _____ de 2007 (en adelante el "**Arrendamiento**") celebrado entre WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, not in its individual capacity but solely as trustee |
| We hereby confirm that either all conditions precedent included in Article 7.1.1 of the Lease have been complied with to our complete satisfaction or we have waived them. | Por el presente les confirmamos que las condiciones suspensivas incluidas en el Arrendamiento han sido cumplidas a nuestra entera satisfacción o hemos renunciado a las mismas. |
| Capitalized terms used herein shall have the same meaning as in the Lease. | Los términos en mayúsculas utilizados en el presente tienen el mismo significado que en el Arrendamiento. |

**WELLS FARGO BANK NORTHWEST, NATIONAL
ASSOCIATION**, not in its individual capacity but solely as trustee

(Name/Nombre):_____
Title/Título:_____

CHICAGO/#1626279.11

## EXHIBIT E-3

## FORM OF OWNER'S CONSENT CERTIFICATE

To:

The Spanish Aircraft Matriculation Registry
General Directorate of Civil Aviation
Ministerio de Fomento
Madrid

AIR COMET, S.A.
Bahia de Pollensa 21-23
28042 Madrid

_____ _____ 2007

Gentlemen,

**Re:    Airbus A320-200 Aircraft,
Manufacturer's serial number 0342**

We refer to the Aircraft Lease Agreement
dated as of _____, ___ 2007
(hereinafter the "**Lease Agreement**")
entered into between WELLS FARGO
BANK NORTHWEST, NATIONAL
ASSOCIATION, not in its individual
capacity but solely as Trustee, and AIR
COMET, S.A.

In our capacity as Owner and Headlessor of
the Aircraft, we hereby confirm our consent
to the Lease Agreement.

Capitalized terms used herein shall have the
same meaning as in the Lease Agreement.

A:

Registro de Matrícula de Aeronaves
Dirección General de Aviación Civil
Ministerio de Fomento
Madrid

AIR COMET, S.A.
Bahia de Pollensa 21-23
28042 Madrid

__ de _____ de 2007

Señores:

**Re:    Aeronave Airbus A320-200,
Número de serie del fabricante 0342 (la
"Aeronave")**

Hacemos referencia al Contrato de
Arrendamiento de Aeronave de fecha __ de
_____ de 2007 (en
adelante el "**Contrato de
Subarrendamiento**") celebrado entre
WELLS FARGO BANK NORTHWEST,
NATIONAL ASSOCIATION, not in its
individual capacity but as Trustee, y AIR
COMET, S.A.

Por el presente les confirmamos, como
Propietario y Arrendador Principal de la
Aeronave, nuestro consentimiento al
Contrato de Arrendamiento.

Los términos en mayúsculas utilizados en el
presente tienen el mismo significado que en
el Contrato de Arrendamiento.

## C.I.T. LEASING CORPORATION

(Name/Nombre):_____ _____ ___
Title/Título:_____ _____ _____

**EXHIBIT F**

**FORM OF POWER OF ATTORNEY**

**PUBLIC DEED / ESCRITURA PUBLICA**
**DE-REGISTRATION POWER OF ATTORNEY / PODER DE CANCELACION**

| | |
|---|---|
| He hereby declares and grants a special power of attorney (the *Power of Attorney*) in favour of: (1) **C.I.T. LEASING CORPORATION** (the *Head Lessor*), a corporation organized under the laws of the State of Delaware and having offices at 11 West 42nd Street, 12th Floor, New York, NY 10036 USA, and (2) **WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,** not in its individual capacity but solely as owner trustee (the *Lessor),* a national banking association organized and existing under the laws of the United States of America, with its principal place of business located at 299 South Main Street, 12th Floor, MAC: U1228-120, Salt Lake City, Utah 84111, U.S.A., in relation to one Airbus A320-200 aircraft bearing manufacturer's serial number 0342 (the *Aircraft),* with two (2) CFM56-5A1 engines, leased by the Company pursuant to that certain Aircraft Lease Agreement (342) dated as of June 15, 2007 (the *Lease*), so that, through any of its respective attorneys and legal representatives may take severally, in the name and behalf of the Company, even incurring in case of self-contract, any of the following actions upon the Head Lessor and/or Lessor simple notice to the Company of the cancellation, termination or expiration of the Lease: | Por la presente otorga un poder especial (el Poder) a favor de: (1) **C.I.T. LEASING CORPORATION** (el *Arrendador Principal*), sociedad constituida conforme a las leyes del Estado de Delaware, con domicilio en 11 West 42nd Street, 12th Floor, New York, NY 10036 USA, y (2) **WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,** no en su capacidad individual pero como "owner trustee" (el *Arrendador*), una asociación nacional de Banca constituida y existente conforme a las leyes de los Estados de Unidos de America, con domicilio en 299 South Main Street, 12th Floor, MAC: U1228-120, Salt Lake City, Utah 84111, U.S.A., en relación con la aeronave Airbus, modelo A320-200, con número de serie de fabricante 0342 (la *Aeronave*), con dos (2) motores CFM56-5A1, arrendada por la Sociedad poderdante mediante un contrato de arrendamiento de aeronave de fecha 15 de Junio de 2007 (el *Arrendamiento*), para que a través de sus apoderados y representantes legales, actuando solidariamente, pueda en nombre y representación de la Sociedad, incluso cuando esto suponga incurrir en autocontratación, realizar, tras la simple notificación por parte del Arrendador Principal y/o del Arrendador a la Sociedad, de la cancelación, terminación o expiración del Contrato de Arrendamiento, cualquiera de las siguientes actuaciones: |
| A   to carry out any actions that may result convenient for the Head Lessor and/or Lessor to repossess and remove the | A realizar cuantas actuaciones sean convenientes para que el Arrendador Principal y/o el Arrendador recobre la |

| | |
|---|---|
| Aircraft from Spain or from any jurisdiction where the Aircraft may be located and de-register the Aircraft from the "Aircraft Matriculation Registry" (*Registro de Matrícula de Aeronaves*) or any other registry, initiating and continuing for this purpose the proceedings that might be necessary or convenient before any Spanish and/or foreign authorities, governmental entities and courts , and in particular to enter into and sing, in the terms he deems convenient any agreement for the termination of the Lease, even if by so doing it incurs in self contracting; | posesión de la Aeronave y la traslade desde España o desde cualquier otra jurisdicción donde esté ubicada, y para la cancelación de su inscripción en el Registro de Matrícula de Aeronaves o en cualquier otro registro, iniciando o continuando con este propósito los procedimientos que sean necesarios o convenientes ante cualquier autoridad, entidad gubernamental o juzgados españoles o de cualquier otra nacionalidad y, en particular, celebrar y firmar, en los términos que estime conveniente, cualquier acuerdo para la terminación del Contrato de Arrendamiento, incluso cuando esto suponga incurrir en autocontratación; |
| B  perform all convenient actions in connection with the repossession and deregistration from the Aircraft Matriculation Registry or any other registry of the Aircraft, along with its engines, equipment, and documentation related to the Aircraft and its exportation from the jurisdiction and territory where the Aircraft is located; | B realizar cuantas actuaciones sean convenientes para la recuperación de la posesión de la Aeronave junto con sus motores, equipamiento y documentación y la cancelación de su inscripción en el Registro de Matrícula de Aeronaves o en cualquier otro registro y su traslado desde la jurisdicción o territorio donde la Aeronave esté ubicada; |
| C  to complete any actions that may be considered convenient in the exercise of the above-mentioned faculties, including the faculty to represent the Lessee before the Spanish Civil Aviation General Directorate (*Dirección General de Aviación Civil*) or before any of its entities or agencies, or before any Spanish Ministry Department or other governmental institutions; | C realizar cuantas actuaciones sean convenientes en el ejercicio de las facultades otorgadas, incluyendo la facultad de representar a la Sociedad ante la Dirección General de Aviación Civil, cualquier entidad u organismo de la misma, o ante cualquier ministerio u organismos gubernamentales de España; |
| D  to make any declarations or statements and execute any public or private documents which he may be considered convenient or appropriate for the specific purposes of this power | D realizar cuantas declaraciones y manifestaciones y otorgar cuantos documentos públicos o privados puedan ser convenientes o apropiados para los específicos propósitos de este |

of attorney;

E  command the employees of the Company to deliver the possession of the Aircraft in any jurisdiction where it might be located, even eventually, demanding, if necessary, its delivery with the support of the corresponding local authority, including the airport authorities, local police and other entities, and even interrupting whatever flight it might be performing or were about to carry out, provided that such command may not affect the safety and well being of such employees, the crew, or the passengers of the Aircraft; and

F  to appoint substitutes or delegate the powers conferred herein, in whole or in part, to any individual(s).

The Company shall indemnify the Head Lessor and/or Lessor and any of its respective attorneys and legal representatives against all costs, claims, expenses and liabilities howsoever incurred resulting form their lawful exercise of the faculties granted herein.

The Lessee further undertakes to ratify and confirm whatsoever the Head Lessor and/or Lessor or any of its respective attorneys and representatives do or cause to be done in or by virtue of this Power of Attorney.

This power of attorney is granted for the benefit of the Head Lessor and/or Lessor. This power of attorney shall be irrevocable and shall not be amended or limited in any manner without the express consent of the Head Lessor and Lessor.

---

para los específicos propósitos de este Poder;

E  ordenar a los empleados de la Sociedad que entreguen la posesión de la Aeronave en cualquier jurisdicción que se encuentre, intimándoles si fuera necesario para su entrega con el apoyo de la autoridad local correspondiente, incluyendo a las autoridades aeroportuarias, policía local y cualquier otra entidad, interrumpiendo incluso cualquier vuelo que pueda estar llevándose a cabo siempre que dicha instrucción no afecte a la seguridad de dichos empleados, la tripulación o los pasajeros de la Aeronave; y

F  delegar o sustituir a favor de una o varias personas, en todo o en parte, las facultades conferidas en el presente Poder.

La Sociedad indemnizará al Arrendador Principal y/o al Arrendador y a cualquiera de sus apoderados y representantes legales de todos los costes, reclamaciones, gastos y responsabilidades, cualquiera que fuera la forma en que se hubieran producido, resultantes del ejercicio lícito de las facultades aquí otorgadas.

La Sociedad se compromete a ratificar y confirmar cualesquiera actuaciones realizadas por el Arrendador Principal y/o el Arrendador o cualquiera de sus apoderados y representantes legales en el ejercicio de las facultades otorgadas a los mismos en virtud del presente Poder.

El presente Poder se otorga en beneficio del Arrendador Principal y/o el Arrendador. El presente Poder será irrevocable y no podrá ser modificado o limitado de forma alguna sin el consentimiento del Arrendador Principal y

el Arrendador.

## EXHIBIT G

## RETURN ACCEPTANCE RECEIPT

**THIS RETURN ACCEPTANCE RECEIPT** (this **"Return Acceptance Receipt"**) is dated as of _____, 200__ and is between **WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,** a national banking association organized under the laws of the United States of America, not in its individual capacity but solely as trustee (**"Lessor"**), and **AIR COMET SOCIEDAD ANONIMA,** a company organized under the laws of Spain with its principal place of business at Bahia de Pollensa 21-234, 28042 Madrid, Spain (**"Lessee"**).

## W I T N E S S E T H:

**WHEREAS**, Lessor and Lessee have previously entered into that certain Aircraft Lease Agreement (342) dated _____, 2007 (the **"Lease"**), which provides for the execution and delivery of a Return Acceptance Receipt in substantially the form hereof on return of the Aircraft to Lessor at an airport in [_____].

**NOW, THEREFORE**, in consideration of the foregoing premises, Lessor and Lessee hereby agree as follows:

(1)    **Definitions**

Unless otherwise defined herein, all capitalized terms used herein, shall have the respective meanings given them in the Lease.

(2)    **Acknowledgment of Receipt**

Lessor has this_____ day of _____, 200 [ ] (Time: _____) at _____ received from Lessee possession of:

(a)    one Airbus A320-200 aircraft (the **"Aircraft"**), which Aircraft as of the date hereof consists of the following components:

(i)    airframe:  Spanish registration mark EC-_____ and manufacturer's serial number 342; and

(ii)    two (2) CFM International, Inc. Model CFM56-5A1 engines bearing Manufacturer's Serial Numbers 731681 and 731682 (each of which has 750 or more rated takeoff horsepower or the equivalent of such horsepower); and

(b)    the Aircraft Documentation, including those items set forth in Attachment 1 to Schedule 2 to the Lease.

CHICAGO/#1626279.11

(3)     **End of Lease Term**

Lessor hereby confirms Lessee's satisfaction of the Return Conditions as set forth in the Lease and it is hereby agreed that the Lease Term is hereby terminated.

(4)     **Status of Aircraft**

Lessee hereby confirms that the status of the Aircraft as at the date of this Return Acceptance Receipt is as set out in Appendix I hereto.

(5)     **Counterparts**

This Return Acceptance Receipt may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

(6)     **Governing Law**

This Return Acceptance Receipt shall in all respects be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflict of laws (other than Section 5-1401 and 5-1402 of the New York General Obligations Law).

*     *     *

EXHIBIT G
Page 2

**IN WITNESS WHEREOF**, Lessor and Lessee have each caused this Return Acceptance Receipt to be duly executed by their authorized officers on the date first above written.

**LESSOR:**

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,** not in its individual capacity but solely as trustee

By:_____
Name:
Title:

**LESSEE:**

**AIR COMET SOCIEDAD ANONIMA**

By:_____
Name:
Title:

CHICAGO/#1626279.11

# APPENDIX I
# TO RETURN ACCEPTANCE RECEIPT

## AIRCRAFT STATUS, AIRBUS A320-200 MSN 342

On [     ], 200[ ] at [     ] h., the Aircraft was in the following condition:

**Section 1:**    Airframe

Manufacturer Serial Number
Aircraft Registration

| Total Flight Hours since new | Total Cycles since new | Total Flight Hours since Delivery Date | Total Cycles since Delivery Date |
|---|---|---|---|
|  |  |  |  |

6 Year-Check

| Type and date of last 6 Year-Check | Time in months since last 6 Year-Check | Total Flight Hours since last 6 Year-Check | Total Cycles since last 6 Year-Check | Total Flight Hours since Delivery Date | Total Cycles since Delivery Date |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

12 Year-Check

| Type and date of last 12 Year-Check | Time in months since last 12 Year-Check | Total Flight Hours since last 12 Year-Check | Total Cycles since last 12 Year-Check | Total Flight Hours since Delivery Date | Total Cycles since Delivery Date |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

C-Check (C1, C2, C3, C4, C5)

| Type and date of last C-Check | Time in months since last C-Check | Total Flight Hours since last C-Check | Total Cycles since last C-Check | Total Flight Hours since Delivery Date | Total Cycles since Delivery Date |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

**Section 2:**     Engines

Engine type: CFM56-3C1

Engine No. 1

| Engine Serial Number | Total Engine Hours since new | Total Engine Cycles since new | Total Engine Hours since Engine Heavy Maintenance | Total Engine Cycles since Engine Heavy Maintenance | Total Engine Hours since Delivery Date | Total Engine Cycles since Delivery Date | Engine Cycle Limiter |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

Engine No. 2

| Engine Serial Number | Total Engine Hours since new | Total Engine Cycles since new | Total Engine Hours since Engine Heavy Maintenance | Total Engine Cycles since Engine Heavy Maintenance | Total Engine Hours since Delivery Date | Total Engine Cycles since Delivery Date | Engine Cycle Limiter |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

**Section 3:**     Landing Gear

Landing Gear Manufacturer

Nose Gear
Serial Number

| Manufacturing Date | Time since new | Total Cycles since new | Time since last Overhaul | Total Cycles since last Overhaul | Total Cycles since Delivery Date | Time since Delivery Date |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

LH Main Gear
Serial Number

| Manufacturing Date | Time since new | Total Cycles since new | Time since last Overhaul | Total Cycles since last Overhaul | Total Cycles since Delivery Date | Time since Delivery Date |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

RH Main Gear
Serial Number

| Manufacturing Date | Time since new | Total Cycles since new | Time since last Overhaul | Total Cycles since last Overhaul | Total Cycles since Delivery Date | Time since Delivery Date |
|---|---|---|---|---|---|---|
| | | | | | | |

**Section 4:**    <u>APU</u>

APU type

| APU Serial Number | Total APU Hours since new | Total APU Cycles since new | Total APU Hours since last Overhaul and HIS | Total APU Cycles since last Overhaul and HIS |
|---|---|---|---|---|
| Hours remaining until next Overhaul and HIS | Cycles remaining until next Overhaul and HIS | Total APU Hours since Delivery Date | Total APU Cycles since Delivery Date | APU Hours and Cycles Limiter |
| | | | | |

**Section 5:**    <u>Other</u>

DESCRIBE ANY REPAIRS, MODIFICATIONS, INCIDENTS OR ACCIDENTS TO THE AIRCRAFT DURING THE LEASE TERM

\*    \*    \*

EXHIBIT G
Page 6

Signatures:

**LESSOR:**                          **LESSEE:**

**WELLS FARGO BANK NORTHWEST,**      **AIR COMET SOCIEDAD ANONIMA**
**NATIONAL ASSOCIATION,** not in its
individual capacity but solely as trustee

By:_____          By:_____
Name:                                Name:
Title:                               Title:

CHICAGO/#1626279.11

# EXHIBIT H

## MONTHLY UTILIZATION REPORT

### AIR COMET SOCIEDAD ANONIMA - Monthly Status Report

#### Month Ending ____(DATE AND YEAR)____

| AIRCRAFT TYPE | REGISTRATION Mark | SERIAL NUMBER | DELIVERED –ESN ENGINE No. 1 POS. | DELIVERED –ESN ENGINE No. 2 POS. |
|---|---|---|---|---|
| A320-200 | EC-_____ | 342 | 731681 (CFM56-5A1) | 731682 (CFM56-5A1) |

## 1.  AIRCRAFT UTILIZATION:

(a)  Airframe Total Flight Hours                              _____

(b)  Airframe Total Cycles                                      _____

(c)  Airframe Flight Hours for Month                    _____

(d)  Airframe Cycles for Month                              _____

(e)  Airframe Hours since C-Check and C-Check Interval    _____(hrs)    _____(intv)

(f)  Airframe Cycles since C-Check and C-Check Interval    _____(cyc)    _____(intv)

(g)  Airframe Hours since Shop Visit and Work Task    _____(hrs)    _____(task)

(h)  Airframe Cycles since Shop Visit and Work Task    _____(cyc)    _____(task)

## 2.  POWERPLANT STATUS:

|  |  | No. 1 Position | No. 2 Position |
|---|---|---|---|
| (a) | Serial Nos. of Delivered Engines | 731681 | 731682 |
| (b) | Serial Nos. of Replacement Engines (if applicable) | _____ | _____ |
| (c) | Serial Nos. of installed Engines (if different from (a) or (b) above) | _____ | _____ |
| (d) | Current Location of Delivered or Replacement Engines (as applicable) (if not installed on Airframe) | _____ | _____ |
| (e) | Total Hours Since New of Delivered of Replacement Engines (as applicable) | _____(hrs) | _____(hrs) |
| (f) | Total Cycles Since New of Delivered or Replacement Engines (as applicable) | _____(cyc) | _____(cyc) |

EXHIBIT H

Page 1

Engines (as applicable)

(g)  Total Hours Since Last Service                                          _____(hrs)        _____(hrs)

(h)  Total Cycles Since Last Service                                         _____(cyc)        _____(cyc)

(i)  Flight Hours to Limiter                                                 _____(hrs)        _____(hrs)

(j)  Cycles to Limiter                                                       _____(cyc)        _____(cyc)

(k)  Disk or Other Limiter                                                   _____              _____

(l)  Total Flight Hours for the Month for Each Delivered or                  _____(hrs)        _____(hrs)
     Replacement Engine (as applicable)

(m)  Total Cycles for the Month for each Delivered or                        _____(cyc)        _____(cyc)
     Replacement Engine (as applicable)

## 3.  **APU STATUS:**

(a)  Serial No. of Delivered APU                                                                   _____

(b)  Serial No. of Replacement APU (if applicable)                                                 _____

(c)  Serial No. of Installed APU (if different from (a) or (b)                                     _____
     above)

(d)  Current Location of Delivered or Replacement APU                                              _____
     (as applicable) (if not installed on Airframe)

(e)  Total Hours / Cycles Since New of Delivered or                          _____(hrs)        _____(cyc)
     Replacement APU (as applicable)

(f)  Total Hours / Cycles for the month of Delivered or                      _____(hrs)        _____(cyc)
     Replacement APU (as applicable)

(g)  Total Hours / Cycles Since last overhaul of Delivered                   _____(hrs)        _____(cyc)
     or Replacement APU (as applicable)

(h)  Total Hours / Cycles since last HSI of Delivered or                     _____(hrs)        _____(cyc)
     Replacement APU (as applicable)

(i)  Total Hours / Cycles until next scheduled shop visit of                 _____(hrs)        _____(cyc)
     Delivered or Replacement APU (as applicable)

                                                                             _____(workscope)

(j)  Limiting Disk and Limiting Amount of Delivered Or                       _____(Disk)       _____(cyc)
     replacement APU (as applicable)

EXHIBIT H
Page 2

replacement APU (as applicable)

**4.    ROUTINE CHECKS / A.D. AND S.B. COMPLIANCE:**  (all checks and compliance performed at Lessee's facilities in [_____])

(a)    Routine Checks (A and above) performed during the Month:

(b)    Airworthiness Directives complied with during Month:

(c)    All Service Bulletins complied with during Month:

(d)    Modification or alteration performed during the Month:

**5.    INCIDENTS, ACCIDENTS AND DAMAGE TO AIRCRAFT AND ENGINES:**

(a)    Details of any incidents, accidents and damage to the aircraft and engines and any repairs carried out (all done at Lessee's facilities in [_____]):

**6.    UNSCHEDULED ENGINE OR AIRFRAME SHOP VISITS:**

(a)    Details of any unscheduled engine or airframe unscheduled shop visits including workscope performed (all done at Lessee's facilities in [_____]):

**7.    UPCOMING MAINTENANCE CHECKS**

(a)    Maintenance Checks (C-Check and or Other segment) scheduled or expected to be performed on the Airframe during the next 12 months:

(b)    Scheduled shop visits or heavy maintenance visits scheduled or expected to be performed on the Leased Engines during the next 12 months:

(c)    Overhauls, or replacements scheduled or expected to be performed on the Leased APU or Leased Landing Gear during the next 12 months:

**8.    OPERATION FLIGHTS:**

(a)    List of Cities and number of aircraft landings at each airport for both revenue service and for maintenance purposes:

**AIR COMET SOCIEDAD ANONIMA**

By:_____

Name:_____

Title:_____

Date:_____

EXHIBIT H
Page 3

# EXHIBIT I

## FORM OF ASSIGNMENT OF INSURANCES

**THIS ASSIGNMENT OF INSURANCES** (this "**Assignment**") is made as of the ____ day of June, 2007 between:

(1)     **AIR COMET SOCIEDAD ANONIMA**, a company organized under the laws of Spain with its principal place of business at Bahia de Pollensa, 21-23, 28042 Madrid, Spain (the "**Assignor**"); and

(2)     **WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, a national banking association organized under the laws of the United States of America with its principal place of business at 299 South Main street, 12th Floor, MAC: 41228-120, Salt Lake City, Utah, 84111, United States of America, not in its individual capacity but solely as trustee ("**Lessor**")

**WHEREAS**, Assignor shall lease the Aircraft from Assignee pursuant to that certain Aircraft Lease Agreement (342) dated as of _____, 2007 (the "**Lease**"), and Assignee wishes for an assignment of the insurance relating to the Aircraft in order to secure the obligations of Assignor under the Lease;

**NOW THEREFORE**, in consideration of and subject to the mutual covenants, terms and conditions contained in this Assignment, Assignor and Assignee agree as follows:

1.     Definitions

1.1     In this Assignment the term "Aircraft" shall have the following meaning:

One (1) Airbus Model A320-200 airframe bearing Manufacturer Serial Number 342 and Aircraft Registration Mark EC-_____, together with two (2) CFM International, Inc. Model CFM56-5A1 engines bearing Manufacturer's Serial Numbers 731681 and 731682.

1.2     In this Assignment the term "Secured Obligations" shall mean any and all obligations of the Assignor whether now or at any time owed to the Assignee under the Lease or this Assignment.

1.3     Terms defined (whether by reference to another document or otherwise) in the Lease and not otherwise defined herein shall bear the same meanings when used herein.

2.     Assignment

2.1     As security for the Secured Obligations, the Assignor hereby assigns and agrees to assign to the Assignee all of its rights, title and interest present and future in and to (1) all hull policies and contract of insurance taken out in respect of the Aircraft, and (2) all the benefits of such policies and contracts of insurance (including all claims of whatsoever nature thereunder and the return of premiums in respect thereof) (together, the "**Collateral**") and the Assignee

EXHIBIT I
Page 1

hereby accepts such assignments provided that until an Event of Default under the Lease has occurred and is continuing, the Assignor shall be entitled to exercise all of such right, title and interest in and to the Collateral in such manner as it deems appropriate to the exclusion of Assignee. The Assignor declares that, except as otherwise provided in the Lease, it will hold the proceeds of any such insurance received by it in trust for the Assignee, and shall pay such proceeds to the Assignee on demand.

2.2    If the Secured Obligations are discharged, the Assignee will at the request of the Assignor reassign the right and interest in and to the Collateral and execute such documents as may be necessary to effect such assignment and notify the parties of such assignment. The Collateral shall be re-assigned to Assignor free of any Security Interest created by the Assignee.

3.    <u>Assignor's Covenants</u>. Assignor hereby covenants with Assignee that:

3.1    except as contemplated hereby, it shall not assign any of its right, title and interest in or to the Collateral or any part thereof, it shall not create or grant or, permit to subsist or suffer to exist, any Security Interest over the Collateral or any part thereof or any interest therein other than Permitted Liens, it shall duly and promptly at its own cost and expense pay or cause to be paid all sums required to be paid and take such other action as may be necessary to discharge any such Security Interest so created, permitted to subsist or suffered to exist by it as aforesaid, and it shall not knowingly do anything or take any action which has or would have the effect of prejudicing the rights of Assignee in any part of the Collateral;

3.2    it shall (i) no later than the Delivery Date, execute the notice of assignment of insurances (substantially in the form of Exhibit A hereto), (ii) promptly after execution thereof deliver such notice to the insurer, and (iii) as soon as reasonably practicable after the Delivery Date (and in any event within thirty (30) days), use all reasonable efforts to ensure that an acknowledgment by the insurer of such notice of assignment of insurances (substantially in the form of Exhibit A hereto) is delivered to Assignee; and

3.3    in the event of the Insurances being renewed with insurers, other than the insurer to whom the notice of assignment has been delivered, it shall deliver to such new insurers the notice of assignment of insurances (substantially in the form of Exhibit A hereto).

4.    <u>Further Assurance</u>. The Assignor covenants that it shall, from time to time at the request of the Assignee, do all such things and execute all such documents as are necessary for giving full effect to this Assignment or for securing the rights of the Assignee hereunder.

5.    <u>Power of Attorney</u>. The Assignor hereby irrevocably appoints the Assignee its attorney for and on its behalf and in its name and as its attorney-in-fact to execute, seal and otherwise perfect any document as it itself could have done or executed in relation to any insurance taken out in respect of the Aircraft provided that, subject to Section 13 below (1) the Assignee shall not exercise the power contained in this Section 5 until the occurrence of an Event of Default under the Lease and (2) the exercise of such power by the Assignee shall not put any person dealing with it upon any enquiry as to whether an Event of Default under the Lease has occurred nor shall any person be in any way affected by notice to the contrary and the exercise

EXHIBIT I
Page 2

by the Assignee of the power contained in this Section 5 shall (as between the Assignee and any such person) be conclusive of the rights of the Assignee to exercise the same.

6.    Application of Insurance Proceeds.  All insurance proceeds received by the Assignor and/or the Assignee shall be dealt with and applied in accordance with the Lease.

7.    Successors in Title.  The obligations on the part of the Assignor contained herein shall bind it and its successors and permitted assigns and shall inure to the benefit of the Assignee and its respective permitted successors and assigns, whether so expressed or not.

8.    Continuing and Independent Security

8.1    This Assignment and the security hereby created shall be a continuing security and in particular but without limitation shall not be, and shall not be considered as, satisfied by any immediate discharge or payment of or on account of any liabilities or any settlement of accounts between the Assignor and the Assignee.

8.2    This Assignment and the security hereby created shall be in addition to and not in substitution of or derogation of any other security (whether given by the Assignor or otherwise) now or from time to time thereafter held by the Assignee in respect of or in connection with any monies and liabilities hereby secured.

8.3    The Assignee need not, before exercising any of the rights, powers or remedies conferred upon it by this Assignment or by the law, (a) take action or obtain judgment against the Assignor or any other person in any court; (b) make or file claim or proof in winding up or liquidation of the Assignor or any other person; or (c) enforce or seek to enforce the recovery of the monies and liabilities hereby secured or any other security such as is mentioned in Section 8.2 hereof.

8.4    The Assignee may in its discretion grant time or other indulgence or make any other arrangement in respect of any of the moneys and liabilities hereby secured or of any other security therefore or of any person or persons nor parties hereto.  Any variation of any provision of the Lease or any related document shall be without prejudice to this security and the security created by this Assignment and shall not be in any way discharged or impaired by reason of any circumstances which might (but for this provision) constitute a legal or equitable discharge of such security.

8.5    The security created by this Assignment shall not (i) be discharged, impaired, prejudiced or otherwise affected by any amendment, modification, variation, supplement, novation, restatement or replacement of all or any part of the obligations of Assignor under the Lease; and (ii) be discharged, impaired, prejudiced or otherwise affected by any other act, fact, matter, event, circumstance, omission or thing (including, without limitation the invalidity, unenforceability or illegality of any of the Secured Obligations or the bankruptcy, liquidation, winding-up, insolvency, dissolution, administration, reorganization or amalgamation of, or other analogous event of or with respect to Assignor or any other person) which, but for this provision, might operate to discharge, impair, prejudice or otherwise affect the rights of Assignee under this Assignment, the Lease or any other Operative Document or which, but for this provision, might constitute a legal or equitable discharge of the security hereby created.

EXHIBIT I
Page 3

9.    Notices

9.1    Upon execution of this Assignment, Assignor shall give notice of this Assignment to the insurance brokers of the Aircraft, substantially in the form set out in Exhibit A hereto, and shall provide to the Assignee a copy of the acknowledgment from the insurers to the Assignor forthwith upon receipt thereof.

9.2    All notices under, or in connection with, this Assignment will unless otherwise stated, be given in writing by letter or electronic mail.  Any such notice is deemed to be given as follows:

> (i)    if by letter, when delivered; or

> (ii)    if by electronic mail, when transmitted and received by the intended recipient at the address provided herein (or at such other address as such recipient shall notify the other parties from time to time).

9.3    Notices will be sent:

If to Lessor:

Wells Fargo Bank Northwest,
National Association
299 South Main Street, 12th Floor
MAC:  U1228-120
Salt Lake City, Utah  84111
USA
Facsimile:  (801) 246-5053
Attention:  Corporate Trust Department

with copies, which shall not constitute notice, to:

AARIFS (342) LLC
One AAR Place
1100 North Wood Dale Road
Wood Dale, Illinois  60191
USA
Facsimile:  (630) 227-2349
Attention: John P. Johnson, CEO
E-mail:  john.johnson@aarcorp.com

EXHIBIT I
Page 4

AAR Financial Services, L.L.C.
One AAR Place
1100 North Wood Dale Road
Wood Dale, Illinois  60191
USA
Facsimile: (630) 227-2101
Attention: Vice President
E-mail: tromenesko@aarcorp.com

and with further copies, which shall not constitute notice, to:

Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street
Chicago, Illinois  60601
Facsimile:  (312) 609-5005
Attention:  Dean N. Gerber, Esq.
E-mail: dgerber@vedderprice.com

and to:

C.I.T. Leasing Corporation
11 West 42nd Street, 12th Floor
New York, New York 10036
USA
Facsimile:  (212) 461-5402
Attention:  Chief Counsel-Transportation Finance

with a copy to:

McDermott, Will & Emery
2049 Century Park East
Suite 3800
Los Angeles, California 90067
USA
Facsimile:  (310) 277-4730
Attention:  Ronald W. Goldberg, Esq.

If to Lessee:

Air Comet Sociedad Anonima
Bahia de Pollensa, 21-23
28042 Madrid, Spain
Attn: Mr. Fernando Gil Rubio
Telephone: +34-91-203-6300
E-mail: fgilr@aircomet.com
Facsimile: +34-91-329-3511

EXHIBIT I
Page 5

or to such other places and numbers as either party directs in writing to the other party.

10.    Law, Jurisdiction, Process Agent

10.1    Governing Law. THIS ASSIGNMENT SHALL BE DEEMED DELIVERED IN AND SHALL BE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

10.2    Non-Exclusive Jurisdiction in New York. For the benefit of the Assignee, the Assignor irrevocably agrees that any legal action or proceedings in connection with this Assignment against the Assignor or any of its assets may be brought in any New York state or federal court sitting in The City and County of New York, which shall have non-exclusive jurisdiction to settle any disputes arising out of or in connection with this Assignment and irrevocably and unconditionally submits to the jurisdiction of such court in New York State or, to the extent permitted by law, in such federal court. The submission to such jurisdiction shall not (and shall not be construed so as to) limit the rights of the Assignee to take proceedings against the Assignor in the courts of any other competent jurisdiction, nor shall the taking of proceedings in any one or more jurisdictions preclude the taking of proceedings in any other jurisdiction, whether concurrently or not. The Assignor irrevocably waives any objection it may now or hereafter have to the laying of venue of any action or proceeding in any court and any claim it may now or hereafter have that any action or proceeding has been brought in an inconvenient forum.

10.3    Service of Process. The parties hereby consent to the service of process (i) out of any of the courts referred to above, or (ii) in accordance with the Hague Convention, if applicable.

10.4    Prevailing Party in Dispute. If any legal action or other proceeding is brought in connection with or arises out of any provisions in this Assignment, the prevailing party will be entitled to recover reasonable attorneys' fees and other costs incurred in such action or proceedings. The prevailing party will also, to the extent permissible by Law, be entitled to receive pre- and post-judgment Default Interest.

10.5    Waiver. Assignor and Assignee hereby waive the right to a trial by jury. Assignor and Assignee hereby irrevocably waive any objection which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or related to this Assignment brought in any of the courts referred to in Section 10.2, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

11.    Counterparts. This Assignment may be executed by the parties hereto in separate counterparts, each of which when so executed shall be an original, and each such counterpart shall together constitute one and the same instrument.

12.    Continuing Obligations. Notwithstanding anything herein contained, Assignor shall remain liable with respect to the Collateral to perform all the obligations assumed by it with

EXHIBIT I
Page 6

CHICAGO/#1626279.11

respect to the Collateral and no exercise by Assignee of any of its rights under this Assignment shall constitute or be deemed to constitute an assumption or acceptance by Assignee of any obligation of Assignor with respect to the Collateral.

13.    Enforcement of Lien.  Upon the occurrence and during the continuation of an Event of Default, the lien constituted by this Assignment shall become enforceable and Assignee shall be entitled:

13.1    to the extent not in conflict with the terms and conditions of the Insurances, to settle, adjust, collect, recover, compromise and give a good discharge for all claims then outstanding or thereafter arising under any of the Insurances;

13.2    to the extent not in conflict with the terms and conditions of the Insurances, to bring, prosecute, enforce, defend and abandon all such suits, legal actions and other proceedings in relation to the Collateral or any part thereof as may seem to Assignee to be expedient;

13.3    to the extent not in conflict with the terms and conditions of the Insurances, to do all such other acts or things which Assignee may consider necessary or desirable for the realization of the Collateral or any part thereof or incidental or conductive to any of the matters, powers, authorities or discretions conferred on Assignee under or by virtue of this Assignment and to exercise in relation to the Collateral or any part thereof all such powers, authorities and discretions as Assignee would be capable of exercising if Assignee were the absolute beneficial owner of the same; provided that such action may not affect contracts or policies of insurance maintained by Assignor in respect of aircraft other than the Aircraft; and

13.4    otherwise put into force and effect all rights, powers and remedies available to the Assignee, pursuant to applicable Law or otherwise, as assignee of the Collateral.

14.    Other Provisions.

14.1    No failure or delay on the part of Assignee to exercise any right, power or remedy under this Assignment shall operate as a waiver thereof, nor shall any single or partial exercise by Assignee of any right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy, nor shall the giving by Assignee of any consent to any act which by the terms of this Assignment requires such consent prejudice the right of Assignee to withhold or give consent to the doing of any other similar act.  The remedies provided in this Assignment are cumulative and are not exclusive of any remedies provided by applicable Law.

14.2    Assignee shall not be obliged to make any inquiry as to the nature or sufficiency of any payment received by it under this Assignment, or to make any payment or to make any claim or to take any action to collect any monies hereby assigned or to enforce any rights and benefits hereby assigned to Assignee or to which Assignee may at any time be entitled under this Assignment.

14.3    Assignee shall not be under any obligation of any kind or assume or be under any obligation with respect to the Collateral or be under any liability whatsoever as a result of any failure of Assignor to perform its respective obligations in connection with this Assignment.

EXHIBIT I
Page 7

Assignee shall not be liable as an assignee in respect of the security created hereunder to account or be liable for any loss upon the realization thereof, other than with respect to its gross negligence or willful misconduct or any breach by it of the Operative Documents.

14.4    Any settlement or discharge between Assignee and Assignor and/or any other person shall be conditional upon no security or payment to Assignee by Assignor or any other person being avoided or set aside or ordered to be refunded or reduced by virtue of any provision or enactment relating to bankruptcy, liquidation, winding-up, insolvency, dissolution, administration, reorganization, amalgamation or other analogous event or proceedings for the time being in force.

[Remainder of Page Left Blank Intentionally]

EXHIBIT I
Page 8

CHICAGO/#1626279.11

**IN WITNESS WHEREOF** this Assignment has been entered into on the day and year first above written.

**AIR COMET SOCIEDAD ANONIMA**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, not in its individual capacity but solely as trustee

By:_____
    Name:
    Title:

EXHIBIT I
Page 9

CHICAGO/#1626279.11

## EXHIBIT A

### Form of Notice of Assignment

To:    [Insurer]

From:  AIR COMET SOCIEDAD ANONIMA (the "**Assignor**")

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, not in its individual capacity but solely as trustee (the "**Assignee**")

Re:    **One (1) Airbus Model A320-200 airframe bearing Manufacturer's Serial Number 342 and Aircraft Registration Mark EC-_____, together with two (2) CFM International, Inc. Model CFM56-5A1 engines bearing Manufacturer's Serial Numbers 731681 and 731682.**

We hereby give you notice that by an assignment (the "**Assignment**") dated as of _____, 2007 Assignor assigned and agreed to assign to Assignee all its right title and interest in and to the insurances (other than the proceeds of third party liability insurance payable to third parties) (as amended and renewed from time to time) in respect of the above Aircraft.

Those insurances comprise:

(1)    "All Risk" hull insurance on the Aircraft (including all flight and ground risks and ingestion coverage) on an agreed value basis payable in Dollars in a sum not less than Eighteen Million Dollars ($18,000,000);

(2)    "All Risks" insurance on aircraft spares including the Engines while not installed on any airframe on an agreed value basis payable in Dollars in a sum per Engine of not less than the replacement value, subject to adjustment in respect of the Flight Hours/Flight Cycles performed;

(3)    Third party legal liability, bodily injury and property damage, passenger and cargo legal and airline general third party liability including [war risk and] products liability for a combined single limit of not less than Five Hundred Million Dollars ($500,000,000) per any one accident/occurrence (but in the aggregate in respect of product liability);

(4)    Hull, War and Allied Risk coverage in accordance with LSW555B wording including, without limitation, confiscation by Government of Registry.

Notwithstanding the Assignment, it is agreed that, until you are notified to the contrary by Assignee, all insurance proceeds of any property, damage or loss to the Aircraft, any Engine or any Part not constituting a Total Loss as defined in the Aircraft Lease Agreement (342) dated as of June___, 2007 executed between Assignor, as Lessee, and Assignee, as Lessor (the "**Lease**") and in excess of $100,000 (the "**Damage Notification Threshold**") shall be paid to Assignee and applied in accordance with Articles 18 and 19 of the Lease. Insurance proceeds in amounts below the Damage Notification Threshold may be paid by the insurer directly to Assignor for and on behalf of Assignee in accordance with Articles 18 and 19 of the Lease.

EXHIBIT I
Page 10

CHICAGO/#1626279.11

[Aircraft Lease Agreement (342)]

This Notice shall be deemed delivered in and shall be governed by and shall be construed in accordance with the laws of the State of New York without regard to its conflict of laws principles (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law).

[Remainder of Page Left Blank Intentionally]

EXHIBIT I
Page 11

CHICAGO/#1626279.11

On [INSURER] letterhead:

We acknowledge receipt of this notice and confirm that we have not previously received any notice of any other assignment of the interests of Assignee in the above mentioned insurances. We confirm our consent and agreement to such assignment and agree to be bound thereby. Save as set out in the notice, we shall effect payments under the insurance only to Assignor and shall also otherwise treat only Assignee as creditor of the claims assigned, provided that we are still entitled to make payments to you as set out above.

_____

Name:
Title:


For and on behalf of
[INSURER]

Date:_____

EXHIBIT I
Page 12

CHICAGO/#1626279.11

## SCHEDULE 1
## TO LEASE AGREEMENT

## DELIVERY CONDITIONS

The Aircraft shall be delivered in at least as good of operating condition, ordinary wear and tear excepted, as at the time of Lessee's inspection, with all items of equipment, Engines, APU's, systems and appliances fully functional and operating in accordance with manufacturer specifications. At the time of delivery, the Aircraft shall conform to the following standards:

A.    The Aircraft shall be delivered within 30 days from a "C" Check carried out by Air Canada in accordance with the Airframe Manufacturer's latest MPD, which shall include all lower checks, CPCP tasks and out-of-phase inspections to the next "C" check interval, and ant Bridge Check cards required to place the Aircraft onto the Lessee's MPD maintenance program. LOPA will be 20 first class and 120 coach class passengers with existing galleys. The Aircraft shall have a MTOW of 169,756 pounds.

B.    The Aircraft shall be delivered with a valid and current Certificate of Airworthiness for Export issued by Transport Canada, and shall be immediately eligible for the issuance of a Certificate of Airworthiness, Transport Category (Passenger) by the Aviation Authority. The Aircraft, each Engine and all Parts as well as their records shall meet all regulatory requirements for continued airworthiness in compliance with applicable Aviation Authority requirements.

C.    The Aircraft shall be clean by commercial airline standards and in a condition acceptable for use in scheduled commercial airline service.

D.    The APU shall be delivered in serviceable condition.

E.    Complete and current maintenance records shall be delivered with the Aircraft and shall be in the English language and include complete documentation for all Airworthiness Directives, life limited parts (including back-to-birth records for all internal Engine life limited parts) and major repairs and alterations in accordance with Aviation Authority requirements. For each Airworthiness Directive that is applicable to the Aircraft, the records shall include the current status of the Aircraft, the date of compliance, and the method of compliance with appropriate supporting documentation.

F.    The Aircraft shall be painted white (or in Lessee's livery, at the sole expense of Lessee).

G.    The Aircraft shall have all temporary repairs replaced by permanent repairs per the Airframe Manufacturer's repair manual. The fuselage, wings and empennage shall be free of significant dents, abrasions and loose or pulled rivets.

H.    There shall be no evidence of untreated, improperly treated or noticeable corrosion. All CPCP inspections will be current and up to date, in accordance with Airframe Manufacturer specifications and Transport Canada requirements.

CHICAGO/#1626279.11

I.       The Aircraft shall be in compliance with all Transport Canada requirements for operation as a transport category aircraft including all Transport Canada issued Airworthiness Directives and, subject to Section 12.2(b), Airframe Manufacturer alert service bulletins that are issued prior to the Delivery Date and are applicable to the Aircraft, along with hard time items, without special deferment, exemption or alternate means of compliance, with terminating action completed on all FAA Airworthiness Directives and Airframe Manufacturer alert service bulletins which require terminating action within the 180 days immediately following the Delivery Date and which are applicable to the Aircraft.  The Aircraft shall conform to its type certificate data sheet.  All major modifications and repairs accomplished on the Aircraft shall have been performed in accordance with Transport Canada approved data that is to be redelivered with the Aircraft Documentation.  Any deficiencies with respect to Transport Canada requirements shall be corrected prior to the delivery of the Aircraft at Lessor's cost.

J.       There shall be no open, outstanding, or deferred maintenance items, scheduled or unscheduled, routine or non-routine, against the Aircraft, save as may be permitted by the relevant Airworthiness Directive, provided the Aircraft is in compliance with the requirements of Section I, above relative to termination of Airworthiness Directives.

K.       The Aircraft shall be clean, cosmetically acceptable, all compartments reasonably free of foreign objects, accumulated dirt, grime, grease and liquids, and be prepared for immediate placement into commercial service.  Any deterioration of paint or other protective coatings due to leakage, impact damage or other presence of foreign materials or liquids shall be repaired and replaced per Airframe Manufacturer specifications.

L.       Each calendar or time controlled component shall have no less than 12 months to their next scheduled overhaul, repair, or replacement, as appropriate.

M.       Each Engine shall pass power assurance performance tests without operational limitations in accordance with the Engine Manufacturer's maintenance manual.  The Aircraft and Engines shall be capable of certificated full rated (20,000 lb) (B1 power) performance without limitations throughout the entire operating envelope as defined by the Transport Canada approved Aircraft Flight Manual.  Neither Engine shall exhibit accelerated deterioration in takeoff EGT margin.

N.       Each Engine shall pass a complete video borescope inspection, conducted by Lessee, of all accessible Engine sections (accessible whether by borescope port or other means) in accordance with Engine Manufacturer specifications.  If any Engine fails to pass a borescope inspection, Lessor must correct each found defect at its sole expense.  In the event Lessor shall cause any Engine to be removed from any Aircraft to accomplish repairs by the above, Lessor shall bear all costs associated with the installation and lease of a loaner engine and reinstallation of the respective Engine.

O.       No Engine shall be on engineering watch or on a reduced interval inspection of any nature that could lead to premature removal of the Engine.

P.       All Landing Gear shall have not less than 24 months remaining before next scheduled Overhaul or replacement and with full back-to-birth traceability.

CHICAGO/#1626279.11

Q.    The APU shall be returned in serviceable condition with no more than 2,000 APU hours and cycles (whichever is more limiting) since the last hot section inspection or overhaul.

R.    Complete and current maintenance records, which comply with all Transport Canada requirements, shall be delivered with the Aircraft.  For each Airworthiness Directive that is applicable to the Aircraft, the records shall include the current status of the Aircraft, the date of compliance, and the method of compliance with appropriate supporting documentation.  Any deficiencies with Transport Canada requirements are to be corrected prior to delivery of the Aircraft at Lessor's cost.

S.    Any Airframe Manufacturer no-charge service kits which Lessor has received but not installed for the Aircraft shall be delivered to Lessee with the Aircraft.

T.    All windows shall be free of delamination, blemishes, and crazing that is beyond maintenance manual limits.

U.    All doors shall be free moving, correctly rigged and fitted with serviceable seals.

V.    All ceiling, sidewall and bulkhead panels shall be clean and free from significant or unserviceable damage.  All seats shall be serviceable and in good overall condition in accordance with international air carrier standards.

W.    All flight control surfaces and wing leading edges shall be free from damage that is beyond serviceable limits.

X.    All cargo compartment floor, sidewall and ceiling panels shall be in serviceable condition in accordance with Airbus maintenance manual limits.

Y.    A complete catalog of loose equipment and accessories shall be provided.

**SCHEDULE 2**
**TO LEASE AGREEMENT**

**RETURN CONDITIONS**

The Aircraft shall be returned in at least as good of operating condition, ordinary wear and tear excepted, as on the Delivery Date, with all items of equipment, Engines, APUs, systems and appliances fully functional and operating in accordance with Airframe Manufacturer specifications. At the time of return, the Aircraft shall conform to the following standards:

A.    The Aircraft shall be returned free and clear of all Security Interests (other than Lessor Liens) and rights of third parties under pooling, exchange, Overhaul, repair or other similar agreements and arrangements.

B.    The Aircraft shall not have been discriminated against whether by reason of its leased status or otherwise in maintenance, use, operation or in any other manner whatsoever, including, without limitation, as to the type of maintenance program applicable to the Aircraft, any Engine or as to compliance with Airworthiness Directives.

C.    The Aircraft shall be returned fresh from the next sequential MPD block "C" Check due including all structural and other lesser checks and scheduled CPCP tasks due within the next "C" Check interval, all in accordance with the Airframe Manufacturer's latest MPD. LOPA shall be based on the Lessor-approved LOPA configuration in place immediately prior to the Termination Date. The Aircraft shall have a MTOW equal to or greater than 169,756 pounds.

D.    Any deviations from MPD tasks shall be brought into compliance with the MPD prior to return.

E.    The Aircraft shall be returned with a valid and current transport category Certificate of Airworthiness or a valid and current Export Certificate of Airworthiness to such country as designated by Lessor (at Lessor's option pursuant to Section 23.7.2) issued by the Aviation Authority and shall have been deregistered from the registry maintained by the Aviation Authority (if so requested by Lessor). The Aircraft, Engines and Parts as well as the related Aircraft Documentation shall meet all regulatory requirements for continued airworthiness in compliance with all Aviation Authority requirements.

F.    The Aircraft shall have all temporary repairs replaced by permanent repairs per the Airframe Manufacturer's repair manual. The fuselage, wings and empennage shall be free of significant dents, abrasions and loose or pulled rivets in accordance with the then current Manufacturer's Maintenance Manual.

G.    There shall be no evidence of untreated, improperly treated or noticeable corrosion. All CPCP inspections will be current and up to date, in accordance with Airframe Manufacturer specifications and Aviation Authority requirements.

H.    The Aircraft shall be in compliance with all Aviation Authority requirements for operation as a transport category aircraft including all Aviation Authority issued Airworthiness

CHICAGO/#1626279.11

Directives and, subject to Section 12.2(b), Airframe Manufacturer mandatory service bulletins that are issued prior to the Expiration Date and are applicable to the Aircraft, along with hard time items, without special deferment, exemption or non-transferable alternate means of compliance, with terminating action completed on all EASA and Aviation Authority Airworthiness Directives and Airframe Manufacturer mandatory service bulletins which require terminating action within the 180 days immediately following the Expiration Date and which are applicable to the Aircraft. The Aircraft shall conform to its type certificate data sheet. All major modifications and repairs accomplished on the Aircraft shall have been performed in accordance with EASA and Aviation Authority approved data that is to be redelivered with the Aircraft Documentation. Any deficiencies with respect to EASA and Aviation Authority requirements shall be corrected prior to the return of the Aircraft at Lessee's cost.

I. There shall be no open, outstanding, or deferred maintenance items, scheduled or unscheduled, routine or non-routine, against the Aircraft, save as may be permitted by the relevant Airworthiness Directive, provided Lessee is in compliance with the requirements of Section H, above relative to termination of Airworthiness Directives.

J. The Aircraft shall be clean, cosmetically acceptable, all compartments reasonably free of foreign objects, accumulated dirt, grime, grease and liquids, and be prepared for immediate placement into commercial service. Any deterioration of paint or other protective coatings due to leakage, impact damage or other presence of foreign materials or liquids shall be repaired and replaced per Airframe Manufacturer specifications.

K. Each Engine shall have the same number of Engine Flight Hours since the last Full Performance Restoration Shop Visit as at delivery and the same number of Engine Cycles remaining until next scheduled Engine Heavy Maintenance or shall be fully returned to that condition by means of Supplemental Rent paid by Lessee to Lessor in accordance with the requirements herein. Each Engine shall be returned in serviceable condition with maintenance records that are satisfactory to Lessor. Each Engine shall have not more than 8,000 Engine Flight Hours since its last Engine Heavy Maintenance or at least 4,000 Engine cycles remaining to the next LLP Replacement or heavy shop visit (whichever is m ore restrictive) based upon Lessee's mean time between removals.

L. Each calendar or time controlled component shall have no less than 12 months to their next scheduled overhaul, repair, or replacement, as appropriate.

M. An EASA Form 1 or FAA Dual Release Form 8130-3 shall be provided for each and every hard-time component.

N. Each Engine shall have at least 4,000 Engine Cycles remaining until next scheduled shop visit based upon disk life limits or other hard-time requirements.

O. Each Engine shall pass power assurance performance tests without operational limitations in accordance with the Engine Manufacturer's maintenance manual. The Aircraft and Engines shall be capable of certificated full rated (20,000 lb) (B1 power) performance without limitations throughout the entire operating envelope as defined by the Aviation Authority

approved Aircraft Flight Manual. Neither Engine shall exhibit accelerated deterioration in takeoff EGT margin.

P.    Each Engine shall pass a complete video borescope inspection, conducted by Lessor, of all accessible Engine sections (accessible whether by borescope port or other means) in accordance with Engine Manufacturer specifications. If any Engine fails to pass a borescope inspection, Lessee must correct each found defect at its sole expense. In the event Lessee shall cause any Engine to be removed from any Aircraft to accomplish repairs by the above, Lessee shall bear all costs associated with the installation and lease of a loaner engine and reinstallation of the respective Engine.

Q.    No Engine shall be on engineering watch or on a reduced interval inspection of any nature that could lead to premature removal of the Engine.

R.    All Landing Gear shall have not less than 24 months remaining before next scheduled Overhaul or replacement in accordance with Lessee's Maintenance Program and with LLP full back-to-birth traceability.

S.    The APU shall be returned in serviceable condition with no more than 2,000 APU hours and cycles (whichever is more limiting) since the last hot section inspection or overhaul.

T.    Complete and current maintenance records, as specified in Attachment 1 to this Schedule 2, which comply with all Aviation Authority requirements, shall be returned with the Aircraft. Maintenance records required to be maintained by the Aviation Authority shall be in the English language and include complete documentation for all Airworthiness Directives, life limited parts (including back-to-birth records for all life limited parts) and major repairs and alterations in accordance with Aviation Authority requirements. For each Airworthiness Directive that is applicable to the Aircraft, the records shall include the current status of the Aircraft, the date of compliance, and the method of compliance with appropriate supporting documentation. Any deficiencies with Aviation Authority requirements are to be corrected prior to return of the Aircraft at Lessee's cost.

U.    Any Airframe Manufacturer no-charge service kits which Lessee has received but not installed for the Aircraft shall be returned to Lessor with the Aircraft.

V.    All windows shall be free of delamination, blemishes, and crazing that is beyond maintenance manual limits.

W.    All doors shall be free moving, correctly rigged and fitted with serviceable seals.

X.    All ceiling, sidewall and bulkhead panels shall be clean and free from significant or unserviceable damage. All seats shall be serviceable and in good overall condition in accordance with international air carrier standards.

Y.    All flight control surfaces and wing leading edges shall be free from damage that is beyond serviceable limits.

CHICAGO/#1626279.11

Z.    All cargo compartment floor, sidewall and ceiling panels shall be in serviceable condition in accordance with Airbus maintenance manual limits.

AA.    The Aircraft shall be repainted white or such other livery identified by Lessor. Such notification shall be made by Lessor to allow Lessee to incorporate any such changes without materially impacting the return of the Aircraft hereunder. Any costs over and above the cost of painting the Aircraft white shall be the responsibility of Lessor.

BB.    The Aircraft shall be returned with a reinforced cockpit door installed.

CC.    A complete catalog of loose equipment and accessories shall be provided.

CHICAGO/#1626279.11

Aircraft Documentation

A.   Certificates
   1.   Certificate of Airworthiness
   2.   Noise Certificate
   3.   Radio License Certificate
   4.   Export Statement of Airworthiness (on delivery only)
   5.   Original Export Certificate of Airworthiness from FAA delivered in connection
        with original delivery of Aircraft from Airbus
   6.   Certificate of Sanitary Construction of Galleys

B.   Aircraft Status Records
   1.   Technical Log Books
   2.   Airframe Maintenance Status Report
   3.   Manufacturer's Service Bulletin Status Report
   4.   Airworthiness Directive Compliance Report (terminated and repetitive)
   5.   Local Modification Status Report List
   6.   Last Weighing Report
   7.   Last Compass Swing

C.   Aircraft Maintenance Records
   1.   Test Flight Reports
   2.   All Airbus "C" Checks and last lower level maintenance check
   3.   Work Cards for each C-Check multiple (or segment)
   4.   Modification records including accomplishing documents
   5.   CPCP compliance report
   6.   Aging Aircraft compliance report

D.   Aircraft History Records
   1.   Aircraft Structural Repair History (if applicable)
   2.   Service Difficulty Report (if applicable)
   3.   Accident or Incident Report (if applicable)
   4.   Damage Chart

E.   Engine Records
   1.   Log Books
   2.   Last overhaul and repair documents for each module
   3.   Airworthiness Directive Compliance Report (terminated and repetitive)
   4.   Manufacturer's Service Bulletin Status Report
   5.   Engine Disk Sheets and full Engine LLP back-to-birth and traceability records
   6.   Engine Data Submittal Sheet
   7.   Condition Monitoring Status Report

F.    APU Records
  1.    Log Book
  2.    Last overhaul and repair documents
  3.    Manufacturer's Service Bulletin Status Report

G.    Component Records (including components installed on Engines and APU)
  1.    Time Monitored Component Status Report with installed part numbers, serial
        numbers, remaining hours and cycles (if applicable)
  2.    Serviceability tags or back-up documentation for components replaced since
        delivery from Airbus
  3.    Serialized latest shop records on the JAR Form 1, as applicable, including all
        serviceable tags, release to service, and repair orders detailing maintenance
        checks, inspections, tests, repairs, replacements, restorations, overhauls,
        modifications and refurbishments

H.    Manuals (with current revision)
  1.    Airplane Flight Manual
  2.    Quick Reference Handbook
  3.    Aircraft Operating Manual
  4.    Weight and Balance Manual Supplement
  5.    Wiring Diagram Manual (microfilm)
  6.    Illustrated Parts Catalog (microfilm)
  7.    Aircraft Maintenance Manual (microfilm)
  8.    CFMI Illustrated Parts Catalog
  9.    Systems Schematic Manual
  10.   Minimum Equipment List

I.    Miscellaneous Technical Documents
  1.    Maintenance Program Specifications/Requirements/Schedule
  2.    Interior Configuration Drawings
  3.    Loose Equipment Inventory List

J.    All records gathered and/or created by Lessee during the Lease Term including all
      records delivered to Lessee as set forth in Schedule 1 to Exhibit D.

CHICAGO/#1626279.11

April __, 2008

BY HAND DELIVERY, CERTIFIED AIRMAIL MAIL (RETURN RECEIPT REQUESTED), E-MAIL & FACSIMILE

Air Comet Sociedad Anonima
Bahia de Pollensa, 21-23
28042 Madrid, Spain
Attn: Mr. Fernando Gil Rubio
Telephone:     011-34 91 203 6300
E-mail:     fgilr@aircomet.com
Facsimile:     011-34 91 329 3511

Re:     Aircraft Lease Agreement (342), dated as of June 15, 2007 – **Notice of Default, Demand for Payment and Notice of Termination of Lease ("Lease Termination Notice")**

TO THE ABOVE REFERENCED PARTY:

Reference is hereby made to that certain Aircraft Lease Agreement (342), dated as of June 15, 2007 (as amended and in effect, the "*Lease*"), between Air Comet Sociedad Anonima, as Lessee ("*Lessee*"), and Wells Fargo Northwest, National Association, not in its individual capacity but solely as owner trustee, as lessor ("*Lessor*"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Lease.

Under the Lease, the Lessee leased from Lessor that certain Airbus A320-200 aircraft bearing manufacturer serial number 342 and Aircraft Registration Mark EC-KJG, together with two CFM56-5A1 jet engines bearing manufacturer serial numbers 731681 and 731682, along with related parts and documentation (collectively, the "*Aircraft*"). Performance by the Lessee of its obligations (including, without limitation, its payment obligations) under the Lease were guaranteed by Viajes Marsans, S.A. ("*Guarantor*"), pursuant to that certain Deed of Guarantee executed and delivered on or about the date of the Lease.

The Lease provides, among other things, that (a) Lessee must pay Basic Rent of $225,000 on the 14th day of each month as provided under Article 5.3 of the Lease; and (b) Lessee must pay, as Supplemental Rent, Maintenance Supplemental Rent on the 15th calendar day of each month as provided under Article 29.1 of the Lease.

If Lessee fails to pay Rent or any other amount when due and payable under the Lease and such Rent or other amount remains unpaid after four (4) days, Lessee

must pay Lessor default interest ("*Default Interest*").   Specifically, Article 5.7 of the Lease provides for the payment of Default Interest as follows: "Lessee will pay Lessor, as additional Supplemental Rent (by way of agreed compensation and not as a penalty), the amount of One Thousand Dollars ($1,000) per day until such Rent or amount is paid in full."

Pursuant to Article 25.2(b) of the Lease, an Event of Default occurs when Lessee "fails to make a payment of Rent or other payment due [under the Lease] in the manner and by the date provided [in the Lease] and fails to make such payment within five (5) Business Days after such payment is due."

As of the date of this Lease Termination Notice, one or more Events of Default under the Lease have occurred and are continuing, including, but not limited to, the following:

(a)     the Lessee has failed to pay Basic Rent under the Lease for the month of March 2008 in the amount of $225,000.00;

(b)     the Lessee has failed to pay Maintenance Supplemental Rent for the month of March 2008 in the amount of approximately $75,160.40;

(c)     the Lessee has failed to pay, as of the date hereof, Default Interest in the amount of approximately $200,000.00, which amount shall increase by $1,000 per day until all of the amounts specified in clauses (a) and (b) above and this clause (c) have been paid in full; and

(d)     the Lessee has failed to pay charges due to European Organisation for the Safety of Air Navigation (a/k/a EUROCONTROL) ("*EUROCONTROL*"), Central Route Charges Office, and such charges have remained outstanding for a period in excess of thirty (30) days from the date EUROCONTROL invoiced Lessee.

In addition, as set forth in a Notice of Default and Demand for Payment, dated as of the date hereof, with respect to the Other Lease, "Events of Default" under the Other Lease have occurred and are continuing, which also constitute an Event of Default under the Lease pursuant to Article 25.2(d) of the Lease.

Moreover, in addition to the foregoing Events of Default that have occurred and are continuing, the Lessee has repeatedly failed to meet other payment obligations under the Lease in a timely or complete manner.   Notices of Default and Demands for Payment have been delivered to Lessee and to the Guarantor on each of September 19, 2007, December 27, 2007 and January 10, 2008.   Guarantor failed to respond to any of the aforementioned demands for payment, including the public notarial deed by the Spanish notary which accompanied the January 10, 2008 correspondence. Numerous other communications regarding overdue payments of Basic Rent, Maintenance Supplemental Rent, and Default Interest have been sent to Lessee by Lessor

over the past several months. Lessee's current Events of Default and continuing pattern of non-payment and/or delay are in direct contravention of the Lessee's obligations under the Lease.

In addition, Lessor has been notified by EUROCONTROL that Lessee owes EUROCONTROL at least € 1,949,462.60 in unpaid charges, with in excess of € 1,000,000 being due for a period in excess of thirty (30) days, which constitutes an Event of Default under Article 25.2(r) of the Lease. EUROCONTROL has specifically informed Lessor that Lessee has consistently been delinquent on payments and Lessee's substantial payment arrearages are causing EUROCONTROL concern regarding nonpayment.

Furthermore, the Lessee has failed to provide notice of such Events of Default in contravention of its obligations under Article 25.1 of the Lease.

Lessor hereby gives Lessee notice that such past dereliction of its contractual obligations, continuation of such conduct and/or additional contractual breaches in the future are not acceptable to Lessor. Please also be advised that this pattern of non-payment and/or delay has caused Lessor to be in breach of its obligations to CIT, thereby requiring Lessor to exercise its rights and remedies against Lessee under and pursuant to the terms of the Lease.

Based on the foregoing, Lessor hereby demands that Lessee *immediately* pay in full such Basic Rent, Maintenance Supplemental Rent and Default Interest as specified herein and as required under the Lease.

**IN ADDITION, LESSEE HEREBY EXERCISES ITS RIGHTS UNDER ARTICLE 25.3.1 OF THE LEASE TO IMMEDIATELY TERMINATE THE LEASE. ACCORDINGLY, ALL OF LESSEE'S RIGHT AND INTEREST TO AIRCRAFT, AND ANY AND ALL OF LESSEE'S RIGHT TO POSSESS AND OPERATE THE AIRCRAFT, HEREBY HAS TERMINATED AND LESSEE HAS NO FURTHER RIGHT TO OPERATE OR POSSESS THE AIRCRAFT. LESSOR HEREBY INSTRUCTS LESSEE (A) TO IMMEDIATELY PROCEED, AS APPLICABLE, TO THE SCHEDULED DESTINATION OF, AS APPLICABLE, PARIS (CHARLES DE GAULLE AIRPORT) OR LONDON (GATWICK AIRPORT), (B) TO REFRAIN FROM ANY FURTHER USE OF THE AIRCRAFT, (C) TO IMMEDIATELY SURRENDER POSSESSION AND CONTROL OF THE AIRCRAFT (AND ALL RELATED ENGINES, EQUIPMENT AND PARTS) TO REPRESENTATIVES OF THE LESSOR AT, AS APPLICABLE, PARIS (CHARLES DE GAULLE AIRPORT) OR LONDON (GATWICK AIRPORT), AND (D) TO IMMEDIATELY COMPLY WITH YOUR OBLIGATIONS UNDER ARTICLE 23 OF THE LEASE REGARDING THE RETURN OF THE AIRCRAFT.**

Please coordinate the aforesaid surrender and return of the Aircraft as follows:

(a) if the Aircraft is located in England, please contact and coordinate with:

International Aviation Services Group
First Floor, 7 Jenner Road
Gatwick Airport
Crawley, W. Sussex RH10GA
United Kingdom
Contact:      Paul Coakley, Technical Director
Tel. No.:     +44 1293 456105
Mobile No.:   +44 7956 580596; and

(b) if the Aircraft is located outside of England, please contact and coordinate with:

AeroCounseil
#3 Rue Dieudonne Costes
Blagnac, France 31703
Contact:      Thierry Tajan
Tel. No.:     +33 567 208712
Mobile No.:   +33 687 696907.

This Lease Termination Notice is without prejudice to any other rights or remedies of the Lessor and/or C.I.T. Leasing Corporation, as lessor under the Head Lease (the "*Head Lessor*"), under the Lease, the Guaranty, any other operative documents relating to the Lease or under applicable law. The Lessor expressly reserves any and all of Lessor's (and Head Lessor's) rights and remedies, including under the Lease, the Guaranty, any other operative documents relating to the Lease or under applicable law, waiving none of their rights by the presentment of this demand. This demand is also without prejudice to the Lessor's and/or Head Lessor's rights and remedies with respect to any other Default or Event of Default which may have occurred and which may be continuing, and the Lessor expressly reserves any and all rights and remedies with respect thereto, including under the Lease, the Guaranty, any other operative documents relating to the Lease or under applicable law. The failure or delay by the Lessor and/or Head Lessor to exercise any other right under the Lease, the Guaranty, any other operative documents relating to the Lease or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

*        *        *

Very truly yours,

**WELLS FARGO NORTHWEST, NATIONAL ASSOCIATION**, not in its individual capacity but solely as owner trustee, as Lessor

By: _____
Name: JOSHUA ELSMORE
Title: VICE PRESIDENT

cc:    To the Following:

C.I.T. Leasing Corporation    (Via Facsimile)
11 West 42nd Street, 12th Floor
New York, New York 10036
Facsimile: (212) 461-5402
Attention: Chief Counsel-Transportation Finance

Viajes Marsans, S.A.    (Via Certified Air Mail, Return Receipt Requested)
C/o Don Vicente Munoz Perez Y Don Fernando Gonzalez Sanchez
Calle Avenida de Burgos, 16-D
Madrid, Spain

AAR Financial Services, L.L.C.    (Via E-Mail)
One AAR Place
1100 North Wood Dale Road
Wood Dale, Illinois 60191
E-mail: tromenesko@aarcorp.com & john.johnson@aarcorp.com

Bufete M. Vega Penichet (Via E-Mail & Facsimile)
Calle Alcalá 115
28009 Madrid, Spain
Facsimile: +34-91-431-5938
E-mail: lvp@mvegapenichet.com